**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MOHAMMAD ABUSADEH | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| DEPARTMENT OF HOMELAND | )   Civil Action No. 06-2014 (CKK) |
| SECURITY, <u>et. al.</u> | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANTS' MOTION TO DISMISS, OR IN THE
ALTERNATIVE, FOR CHANGE OF VENUE**

Defendants, pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(3), move the Court to dismiss this case for lack of subject matter jurisdiction and lack of venue, or in the alternative, to transfer the case to the United States District Court, Southern District of Texas, Houston Division, where venue properly lies.

In support of this Motion, Defendants submit the attached Memorandum of Points and Authorities, Declarations of Sharon A. Hudson, District Director, Houston, Texas Office, United States Citizenship and Immigration Services, Department of Homeland Security, and Michael A. Cannon, Section Chief, National Name Check Program Section, Headquarters, Federal Bureau of Investigation, Washington, D.C. and Exhibits. Two proposed orders are attached.

Respectfully submitted,

__/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
Assistant United States Attorney

_/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

_____
WYNEVA JOHNSON, DC Bar #278515
Assistant United States Attorney
555 4th Street, N.W., E-4106
Washington, D.C. 20530


Of Counsel:
Pauline A.  Appelbaum
Associate Regional Counsel
Department of Homeland Security
United States Citizenship and Immigration Services
Houston, Texas

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MOHAMMAD ABUSADEH | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | Civil Action No. 06-2014 (CKK) |
| SECURITY, et. al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS,
OR IN THE ALTERNATIVE, FOR CHANGE OF VENUE**

Plaintiff Mohammad Abusadeh brings this case " to compel action on an application for naturalization properly filed by the Plaintiff. This application is also brought against the Defendants to compel action on an application to replace an alien registration card. The applications were filed and remains within the jursidiction of the Defendants who have improperly withheld action on said applications to Plaintiff's detriment." Complaint ¶2.

Plaintiff previously filed this lawsuit in the United States District Court, Southern District of Texas, Houston Division.  In that case, the Court issued an  Order of Remand issued on August 23, 2006.  The Complaint and Order of remand are attached as Exhibit A.

Plaintiff's current civil action is identical to the action filed in the United States District Court, Southern District of Texas, Houston Division, except that Plaintiff has now additionally sought to compel action on his application to replace an alien registration card.

Both the adjudication of Plaintiff's naturalization application and adjudication of Plaintiff's Form I-90 application to replace his alien resident card are issues adjudicated at the United States Citizenship and Immigration Services (USCIS) office where the Plaintiff resides. Plaintiff resides in Houston, Texas. Complaint ¶5. Accordingly, Defendants move to dismiss this civil action for lack of proper venue, or transfer venue back to the United States District Court, Southern District of Texas, Houston, Division.

Defendants also move to dismiss this case for lack of subject matter jurisdiction or to remand this matter to defendant USCIS for completion of mandatory background checks.

## I. STATEMENT OF FACTS

Plaintiff is a native of Kuwait and a citizen of Jordan whose nonimmigrant student status was adjusted to a lawful permanent resident of the United States on November 13, 1992.  On August 17, 2004, Defendant USCIS interviewed Plaintiff in connection with a Form N-400 application for naturalization filed on April 13, 2004.  The name check request for Plaintiff Mohammad Abusadeh was received by the Federal Bureau of Investigation (FBI) from USCIS on or about April 28, 2004, and has not been completed. See Declaration of Michael A. Cannon, ¶22, Exhibit D. Defendant USCIS cannot approve Plaintiff's naturalization application unless and until all mandatory background checks have been completed and favorably resolved in Plaintiff's favor.  See Declaration of Sharon A. Hudson, attached hereto as Exhibit B.

Plaintiff's Form I-90 application for a replacement resident alien card has also been approved.  See Declaration of Sharon A. Hudson, attached hereto as Exhibit B.

2

## II. STANDARD OF REVIEW

A court may resolve a motion for lack of subject matter jurisdiction under Rule 12(b)(1) in two ways. First, the court may determine the existence of jurisdiction based solely on the complaint. See <u>Herbert v. National Acad. Of Sci.</u>, 974 F.2d 192, 197 (D.C Cir. 1992). Alternatively, where necessary, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence.

## III. ARGUMENT

**A.     VENUE**

### 1. VENUE IS NOT APPROPRIATE IN THE DISTRICT OF COLUMBIA AS THIS CASE HAS AN INADEQUATE CONNECTION TO WASHINGTON, D.C.

Plaintiff contends that venue is proper in Washington, D.C. solely because Defendants Department of Homeland Security, United States Citizenship and Naturalization Services, and the Federal Bureau of Investigation "reside" in Washington, D.C. Complaint, ¶4.

Venue is proper in the District where: (1) the defendant resides; (2) a substantial part of the events or omissions giving rise to the claim occurred; (3) the plaintiff resides if no real property is involved in the action. 28 U.S.C. § 1391(e). Courts, however, investigate challenges to venue very closely when a Plaintiff files suit in Washington, D.C. and the only connection to the District of Columbia is that named Defendants are high government officials who reside there. "Courts in [the District of Columbia] Circuit must examine challenges to . . . venue very carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia. By naming high government officials as defendants, a plaintiff could bring suit here

3

that properly should be pursued elsewhere." See Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993) (ruling Washington, D.C. was not the proper venue because (1) the acts and omissions occurred elsewhere; (2) the two appellees that had the most direct connection with the case were in Indiana and Kansas; and (3) the sole connection to Washington, D.C. was the inclusion of the Director of the Federal Bureau of Prisons and the Attorney General in their official capacities); Joyner v. District of Columbia, 267 F. Supp.2d 15, 20-21 (D.C. Cir. 2003) (holding that the case's only connection to Washington, D.C. was the situs of named federal government defendants; and since the case had several connections to the Middle District of Pennsylvania, the case should be transferred).

The United States Citizenship and Immigration Services (USCIS) normally conducts all of its adjudication of applications for naturalization and applications to replace an alien registration card locally. As such, the adjudication of Plaintiff's applications would normally be conducted in Houston,Texas; thus having little or no connection to Washington, D.C. Similar to Cameron and Joyner: (1) the acts and omissions occurred elsewhere: the decision whether or not to grant Plaintiff's application for naturalization and application to replace an alien registration card is made by federal officials in Houston, Texas. The FBI (background) name check is conducted in Washington, D.C., but the results are simply sent to the federal officials in Houston, Texas to take into account as part of the overall local adjudication of the application for naturalization; (2) the Defendant with the strongest direct connection to the adjudication of Plaintiff's applications is in the Southern District of Texas (the Houston USCIS office, which is responsible for adjudicating Plaintiff's applications); and (3) relevant records are presumably in Houston, Texas rather than

4

Washington, D.C., which favors venue in the United States District Court, Southern District of Texas, Houston Division.

### 2. THE COURT SHOULD TRANSFER VENUE TO THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

For the "convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  See 28 U.S.C. § 1404(a).  A threshold question is whether the case could have been brought in the district to which transfer is sought.  Stewart Organization v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citing Van Dusen v. Barrack, 376 U.S. 612, 613 (1964)).  The Court must engage in a case-by-case analysis and balance the private interests of the parties with public interests such as efficiency and fairness to decide if transfer is proper.  Id. at 29.  The moving party bears the burden to establish that it is proper to transfer the case.  Trout Unlimited v. United States Dep't of Agriculture, 944 F. Supp. 13, 16 (D.D.C. 1996) (citing Air Line Pilots Ass'n v. Eastern Air Lines, 672 F. Supp. 525, 526 (D.D.C. 1987) (citations omitted). The private interests of the parties include:  plaintiff's choice of forum, defendant's choice of forum, whether the claim arose elsewhere, convenience of the parties, convenience of the witnesses, and ease of access to sources of proof.  Trout Unlimited, 944 F. Supp. at 16 (citation omitted). The public interest considerations include:  transferee's familiarity with governing laws, relative congestion of the calendars of the potential transferee and transferor courts, and local interests in deciding local controversies at home.  Id.

**B.    THE PRIVATE INTEREST AND PUBLIC INTEREST CONSIDERATIONS
FAVOR TRANSFER OF VENUE TO THE UNITED STATES DISTRICT COURT,
SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

Plaintiff should have brought this case in the United States District Court, Southern

District of Texas, Houston Division. Venue is proper in the district where: (1) the defendant

resides; (2) a substantial part of the events or omissions giving rise to the claim occurred; (3) the

plaintiff resides if no real property is involved in the action.  28 U.S.C. § 1391(e).  Here, the

Plaintiff resides in Houston, Texas, in the Southern District of Texas; and the principal defendant,

the Houston USCIS office, is in the Southern District of Texas.  Furthermore, a substantial part of

the events or omissions giving rise to Plaintiff's claim occurred in the Southern District of Texas,

Houston Division.  USCIS adjudicates its applications for naturalization and applications to

replace an alien registration card locally; therefore the delay in the processing of Plaintiff's

applications is a matter related to the Houston USCIS office.  Plaintiff admits this in his

complaint.  See Complaint ¶¶ 26,27.

After determining the case could have been brought in the district to which transfer is

sought, the Court must grant substantial deference to plaintiff's choice of venue; although this

deference can be minimized.  For example, plaintiff's choice of venue is afforded less deference if

the forum is not the plaintiff's home forum.  Shawnee Tribe v. United States, 298 F. Supp.2d 21,

24 (D.D.C. 2002) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)).

Deference is also minimized if the plaintiff's choice has an inadequate nexus to the events in the

case.  Courts have held that there is an inadequate nexus if federal officials in Washington, D.C.

were not involved in the decision-making process  Shawnee Tribe, 298 F. Supp.2d at 24 (citing

Trout Unlimited, 944 F. Supp. at 17.)   See also Sierra Club v. Flowers, 276 F. Supp. 62, 67-68

(D.D.C. 2003) (holding that plaintiff's choice of forum, Washington, D.C., deserved little deference, because (1) federal officials in Washington, D.C. were not involved in the decision-making process that led up to the issuance of mining permits affecting the Lake Belt area of the Everglades; and (2) federal officials in Florida signed the final record of decision. Thus, the Court ruled that Washington, D.C. did not play an "active or significant" role in the decision to issue the permits.); The Wilderness Society v. Babbitt, 104 F. Supp.2d 10, 13-15 (D.D.C. 2000) (ruling that plaintiffs' choice of forum deserves substantial deference because (1) the Secretary of Interior, a federal official in Washington, D.C., was directly involved in the decision-making as evidenced by (a) the Secretary had involvement in the decision that was far from "routine;[1]" (b) the Secretary signed the record of decision in Washington, D.C.; and (c) the Secretary briefed the public on his decision in Washington, D.C., (2) the environmental issue's national scope, and (3) plaintiff's ties to the District of Columbia).

Plaintiff contends that venue is proper in Washington, D.C., because Defendants DHS, USCIS and FBI reside there. See Complaint ¶ 4. Plaintiff appears to have largely chosen Washington, D.C. as a method of forum shopping. Plaintiff had previously filed suit regarding the same application for naturalization in the Southern District of Texas to seek examination of his application pursuant to 8 U.S.C. § 1447(b). See Exhibit A. Section 1447(b) allows a petitioner, who has not received a determination under 8 U.S.C. § 1446 before the end of the 120-day period after examination, to apply to the district court where the applicant resides for a

---

[1] The Secretary made a six day visit to Alaska where he met with and was briefed by local residents, government officials, industry officials and scientists on the decision to begin oil and gas leasing in the National Petroleum Reserve planning area in Alaska. The Wilderness Society, 104 F. Supp.2d at 14.

hearing.  The District Court in the Southern District of Texas remanded Plaintiff's case to USCIS.

See Exhibit A.  The Court held that it lacked jurisdiction under 8 U.S.C. § 1447(b) since the FBI

name check process was not completed; thus plaintiff's 120-day period had not been triggered and

Plaintiff had not exhausted his administrative remedies.  Id.

       This Court should grant less deference to plaintiff's choice of forum for several reasons.

As in Shawnee Tribe, the Government is seeking transfer to Plaintiff's home forum, the United

States District Court, Southern District of Texas, Houston, Texas.  In addition, Washington, D.C.

has an insufficient connection with the events of this case.   USCIS normally conducts all of its

adjudication of applications for naturalization and applications to replace an alien registration card

locally.  As such, federal officials in Houston,Texas would be responsible for the decision-making

process and final decision regarding plaintiff's application for naturalization.  Even though the FBI

conducts the (background) name check in Washington, D.C., the decision-making process and

final decision is conducted by local officials in Houston, Texas.  The FBI has a very "routine" role

in Plaintiff's application - to conduct the (background) name check and simply send the results to

the Houston USCIS office.  Federal officials in Washington, D.C. do not play a direct role in the

decision whether or not to grant plaintiff's application for naturalization.

       The Court in Sierra Club further held that the national significance of the Everglades does

not tilt the balance in favor of keeping the forum in Washington, D.C., because the federal

officials in Washington, D.C. did not have an active role in the decision to issue a permit.

276 F. Supp. at 68.  As such, the "national significance" of this case does not tilt the balance

toward keeping the forum in Washington, D.C.

       The Court next considers Defendant's choice of forum, and the Government has legitimate

reasons for the Court to transfer this case.  The United States District Court, Southern District of Texas, Houston Division is where Plaintiff resides and is the jurisdiction that is home to the Houston office of USCIS.  The Houston office has the strongest connection to the case, since that office will adjudicate Plaintiff's application for naturalization and application to replace an alien registration card.  As Plaintiff has alleged, the Houston USCIS office is responsible for the length of the delay in the processing of his application for naturalization and application to replace his alien registration card.  See Complaint ¶¶ 26-27 (complaining that the delay is "excessive and far beyond normal processing times for the Houston USCIS district.")  Since this case arose in the United States District Court, Southern District of Texas, Houston Division, there is local interest in resolving the case there as well.  Schmidt v. American Institute of Physics, 322 F. Supp.2d 28, 36 (D.D.C. 2004) (holding that cases should be resolved in the locale in which they arise.)

Moreover, it will be more convenient to litigate this case in the United States District Court, Southern District of Texas, Houston Division.  As stated above, Plaintiff resides in Houston, Texas.  It is surely more convenient to litigate this case in Plaintiff's home forum, rather than having to travel to Washington, D.C.  In addition, the Houston USCIS office is responsible for the adjudication of plaintiff's application for naturalization and application to replace his alien registration card.  As such: (1) the people involved in making the determination as to Plaintiff's applications are located in Houston; and (2) documents or records related to the case would be located in Houston, Texas.

Inasmuch as this action concerns federal law; the United States District Court, Southern District of Texas, Houston Division, is also as familiar with the applicable law as the United States District Court, District of Columbia, in Washington, D.C.  As such, this factor does not

9

influence the Court's decision on whether to transfer venue.

In addition, there is no evidence presented by Plaintiff that the United States District Court, Southern District of Texas, Houston Division's Court Calendar is more congested than the United States District Court for the District of Columbia's Court Calendar. Thus, this factor does not influence the Court's decision on whether to transfer venue.

Based on the foregoing, this Court should grant Defendants' motion and transfer venue to the United States District Court, Southern District of Texas, Houston Division.

C.     **THE PENDING NATURALIZATION APPLICATION IS PROPERLY REMANDED TO DEFENDANTS IN ACCORDANCE WITH THE ORDER FOR REMAND ISSUED BY THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION.**

On August 23, 2006, the United States District Court for the Southern District of Texas, Houston Division, issued an Order for Remand in Cause No. H-06-0337 after finding that it lacked jurisdiction under 8 U.S.C. § 1447(b) to hear a petition for hearing on a pending naturalization application where mandatory background checks were incomplete. See Exhibit A. The current lawsuit raises precisely the same issue on the same naturalization application. This matter should therefore be dismissed because the issue has already been decided.

D.     **ALTERNATIVELY, THIS COURT SHOULD EITHER DISMISS THE MATTER FOR LACK OF SUBJECT MATTER JURISDICTION  OR ISSUE AN ORDER REMANDING THE MATTER TO DEFENDANT USCIS FOR COMPLETION OF MANDATORY BACKGROUND CHECKS**

In the United States of America, "[n]o alien has the slightest right to naturalization unless all statutory requirements are complied with." United States v. Ginsberg, 243 U.S. 472, 475 (1917). "Failure to comply with any [congressionally imposed] conditions renders the certificate

10

of citizenship illegally procured, and naturalization that is unlawfully procured can be set aside."

Fedorenko v. United States, 449 U.S. 490, 506 (1981).   The statutory naturalization requirements

are strictly construed and enforced.  Id., 449 U.S. at 506.  An applicant for naturalization has the

burden of proving that he or she satisfies all of the requirements for citizenship.  Berenyi v.

District Director, 385 U.S. 630, 636-37 (1967) ("[W]hen an alien seeks to obtain the privileges

and benefits of citizenship . . . the burden is on the alien applicant to show his eligibility for

citizenship in every respect.").  Any doubts as to whether those requirements have been met are to

be resolved against the applicant. Berenyi, 385 U.S. at 637; see also United States v. Macintosh,

283 U.S. 605, 626 (1931) ("The Naturalization Act is to be construed 'with definite purpose to

favor and support the government,' and the United States is entitled to the benefit of any doubt

which remains in the mind of the court as to any essential matter of fact.").

       An applicant who seeks to become a naturalized United States citizen must fully comply

with each statutory prerequisite before taking the oath of allegiance.  Fedorenko, 449 U.S. at 506.

Among other prerequisites, these requirements demand that applicants for naturalization reside

continuously in the United States for at least five years after being lawfully admitted for

permanent residence; maintain physical presence in the United States for the five years

immediately preceding the application date: reside in the United States "from the date of the

application up to the time of admission to citizenship"; and during all such periods establish and

maintain "good moral character, attached to the principles of the Constitution of the United States,

and well disposed to the good order and happiness of the United States."  8 USC § 1427(a).

Unless and until the mandated criminal and national security background checks are completed

and resolved in favor of an applicant for naturalization, the applicant cannot demonstrate

11

compliance with the statutory prerequisites to eligibility for citizenship in the United States.  8 U.S.C. § 1446.

The naturalization process also contemplates an initial examination and a final examination just before the oath ceremony at which United States citizenship is conferred.  A number of courts have looked at the term "examination" and reached differing conclusions as to its meaning within the context of Section 1447(b)'s 120 day provision.    In Sweilem v. USCIS, 2005 WL 1123582 (N.D. Ohio 2005)(unpublished), the District Court assumed subject matter jurisdiction under 1447(b) but remanded to USCIS to await the final FBI security clearance).  In Castracani v. Chertoff, 377 F.Supp.2d 71, (D.C.C. 2005), the District Court found that it had exclusive jurisdiction under §1447(b) once 120 days had run without a USCIS decision and where the FBI name check cleared favorably after the lawsuit was filed.  In Danilov v. Aguirre, 370 F.Supp.2d 441 (E.D. Va. 2005), on the other hand, the Court found that the process of naturalization is a continuing process of investigation and interview right up to the oath of ceremony, all constituting part of the required "examination" of all naturalization applicants.  The Danilov court ruled that the 120 day period is tolled during completion of security checks and concluded that no subject matter jurisdiction exists in cases with pending FBI name checks because the examination has not been completed.  Recently, the District Court in Damra v. Chertoff, 2006 WL 1786246 (N.D. Ohio June 23, 2006) agreed with the Danilov analysis, noting that "[i]t is essential for USCIS to make a fully-informed decision regarding any application for naturalization, and as a matter of law, USCIS cannot move forward on a naturalization application without first receiving confirmation from the FBI that a complete criminal background investigation has been completed… and the examination cannot be deemed complete…."  Accord

12

Martinez v. Gonzales, 2006 WL 3477985 (E.D. Va.)(the language of the statutes makes it clear that Congress intended for the examination of an applicant to entail not just a single interview, but a host of investigatory mechanisms, including an FBI criminal background check); El Kassemi v. DHS, 2006 WL 2938819 (D. N.J. 2006)(Congress now requires completion and review of an FBI background investigation as part of the examination process). Based on the reasoning of the Danilov, Damra, Martinez, and El Kassemi courts, as well as the Order of Remand specific to this case (Ex. A), Defendants ask this Court to find that it lacks subject matter jurisdiction because 8 USC § 1447(b)'s 120 day requirement has not yet been met and dismiss the lawsuit pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

    Alternatively, numerous other courts have determined that remand is appropriate when an applicant seeks district court intervention pursuant to § 1447(b) but the applicant's background check process is incomplete[2].  See e.g., Shalabi v. Gonzales, 2006 WL 3032413 (E.D. Mo. 2006) (A background check that is rushed and incomplete due to an artificial, court imposed deadline would not meet the statutory and regulatory requirements of a 'full criminal background check'"); Said v. Gonzales, 2006 WL 2711765 (W.D. Wash. 2006) (remand with instruction that if derogatory information is obtained and such information is classified, the information should be provided to the Court for en camera review); Khelifa v. Chertoff, 433 F.Supp.2d 836,  (E.D. Mich.

---

[2]Additionally, Congress added the FBI full criminal background check in 1997.  See Act of Nov. 26, 1997, Pub.L. No. 105-119, 111 Stat. 2440, 2448-49.  Stat. 2448, provides in part that "[d]uring fiscal year 1998 and each fiscal year thereafter, none of the funds appropriated or otherwise made available to the Immigration and Naturalization Service shall be used to **complete adjudication of an application for naturalization** unless the Immigration and Naturalization Service has received confirmation from the Federal Bureau of Investigation that a full criminal background check has been completed, except for those exempted by regulation as January 1, 1997."  (Emphasis added.)  See Historical and Statutory Notes to 8 U.S.C. § 1446.

2006)(remand appropriate to USCIS agency with experience and expertise in making background

investigation assessment as to whether derogatory information truly reflects legitimate national

security concern or instead is merely a "false positive"); El-Daour v. Chertoff, 417 F. Supp.2d 679

(W.D.Pa. 2005); Essa v. USCIS,  2005 WL 3440827 (D. Minn. Dec. 14, 2005);  Al-Kudsi v.

Gonzales, 2006 WL 752556 (D. Or. Mar. 22, 2006) (remand appropriate); Affaneh v. Hansen,

2007 WL 295474 (S.D. Ohio Jan. 29, 2007)(remand appropriate where Congress intends that an

FBI background check is to be completed prior to the adjudication of every naturalization

application).

More generally, a remand is consistent with the rule that, "[g]enerally speaking, a court...

shall remand a case to an agency for decision of a matter that statutes place primarily in agency

hands." Immigration & Naturalization Service v. Ventura, 537 U.S. 12, 16, (2002).  The Supreme

Court has cited a number of considerations in support of this "ordinary remand" rule:

The agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can

make an initial determination; and, in doing so, it can, through informed discussion and analysis,

help a court later determine whether its decision exceeds the leeway that the law provides.

Ventura, 537 U.S. at 17.

The Court in Ventura further observed that this preference for remand "has obvious

importance in the immigration context."  537 U.S. at 16-17; see also Gonzales v. Thomas, 126

S.Ct. 1613, 1615, (2006) (finding, in another immigration case, that there was "no special

circumstance here" that warranted a deviation from the "ordinary remand" rule).

Further, "[n]o alien has the slightest right to naturalization unless all statutory

requirements are complied with."  United States v. Ginsberg, 243 U.S. 472, 475 (1917).  "This

14

judicial insistence on strict compliance with statutory conditions precedent to naturalization is simply an acknowledgment of the fact that Congress alone has the Constitutional authority to prescribe rules for naturalization, and the courts' task is to assure compliance with the particular prerequisites to the acquisition of United States citizenship . . . [a] priceless treasure." <u>Fedorenko v. United States</u>, 449 U.S. 490, 506-7 (1981).

Assuming this Court has subject matter jurisdiction pursuant to 8 U.S.C. § 1447(b), the Court should remand the case to Defendant USCIS for the reasons set out in <u>El-Daour</u>, 417 F.Supp.2d at 683-684:

> ... Section 1447 (b) permits a court to 'remand the matter, with appropriate instructions, to the Service to determine the matter.' Certainly, I sympathize with El-Daour's plight. He 'is understandably anxious to complete the naturalization process so he can fully enjoy the benefits of United States citizenship.' [citation omitted] Yet the very reason that the CIS did not process El-Daour's application within 120 days of his examination prevents me from deciding his application. The FBI has not yet completed the criminal background check. This is a vital piece of information. A court is not equipped to conduct such an investigation. I do not have the resources at my disposal to determine whether El-Daour presents a risk to national security or to public safety.

In another case, <u>Khelifa v. Chertoff</u>, 433 F. Supp. 2d 836 (E.D. Mich. 2006) plaintiff filed suit because of the delay in processing his application for naturalization. As here, the suit was filed under 8 U.S.C. § 1447(b). Although the court ruled that it had jurisdiction, it remanded to CIS even though the criminal background check had been completed. As the court recognized, CIS should be allowed to make the assessment as to whether any information disclosed in an investigation, has any bearing upon a Plaintiff's eligibility for citizenship. As the court stated:

> First and foremost, CIS has the experience and expertise in making this assessment and, more generally, in determining whether an applicant meets all of the various criteria for naturalization--while

15

the Court has neither. Next, any subsequent judicial review ... would
be considerably aided by an agency analysis and explanation as to
why it acted as it did on Plaintiff's application. 433 F. Supp. 2d at
843.

A further case on the issue of remand is also instructive.  In Shalabi v. Gonzales, 2006 WL

3032413 (E.D. Mo. Oct. 23, 2006), the Plaintiff filed an application for naturalization with USCIS

which had remained pending for some time.  Plaintiff filed suit under 8 U.S.C. § 1447(b) asking

the court to assume jurisdiction and naturalize him or order USCIS to make a final determination

of Plaintiff's application within a specified time period.  The FBI "name check" had not been

completed and as a result the background investigation required by federal regulations was

pending for over two years.  The court noted that Congress has expressly limited the jurisdiction

of district courts in the naturalization processes.  8 U.S.C. § 1421(a) provides that "the sole

authority to naturalize persons as citizens of the United States is conferred upon the Attorney

General."  Furthermore, "[j]udicial deference to the Executive Branch is especially appropriate in

the immigration context where officials 'exercise especially sensitive political functions that

implicate questions of foreign relations'."  INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999)

(quoting INS v. Abudo, 485 U.S. 94, 110 (1988)).The court in Shalabi held that 8 U.S.C.

§1447(b) conferred limited jurisdiction in the naturalization process and also rejected the

reasoning of Danilov as to the term "examination" as found in that statute, stating that

"examination" is a discrete event and not part of an on-going process.

The Court, however, opted to remand the case to USCIS for determination of Plaintiff's

application as "[a] district court is not equipped to conduct such an investigation to determine if

an applicant presents any risk to national security or public safety."  2006 WL 3032413 at *4.

16

Further, the court rejected Plaintiff's request that if the case was remanded that USCIS be given

instructions to make a determination of his application by a specified deadline.  The court stated:

> '[T]he agency is in a superior position to view its projects
> as a whole and to optimally allocate its resources.'  This
> fact, combined with the deference given the executive
> branch in immigration matters, leads me to conclude that
> the decision whether to expedite Shalabi's background
> check is an issue more appropriately left to the USCIS.
> 2006 WL 3032413 at *5.

The court in Shalabi recognized that not only is USCIS in the best position to determine

the effect of derogatory information on a naturalization applicant, but that the agency must also be

permitted to allocate its resources and personnel effectively and efficiently in order to fulfill the

responsibilities imposed by Congress in the post-911 world.  The court in Shalabi remanded to

USCIS with instructions that it make a determination "as expeditiously as possible" after the

completion of Plaintiff's criminal and national security background investigation.  As one court

succinctly stated: "[u]nfortunately, delays of this nature are inevitable and becoming more

frequent in light of heightened security concerns in the post 911 world."  Alkenani v. Barrows,

356 F. Supp. 2d 652, 657 (N.D. Tex. 2005).

Based on all the foregoing, this Court should dismiss the case for lack of subject matter

jurisdiction, or alternatively, remand this matter to Defendant United States Citizenship for

Immigration Services for completion of mandatory background checks.

**E.    THERE EXISTS NO CASE OR CONTROVERSY CONCERNING PLAINTIFF'S ALIEN RESIDENT CARD, AS DEFENDANT USCIS HAS APPROVED THE APPLICATION.**

Plaintiff also contends that his Form I90, "Application to Replace Alien Registration Card" remains unadjudicated. On February 6, 2007, Defendant USCIS approved the Form I90 and processed the application for card production. <u>See</u> Exhibit C. The Constitution limits this Court's jurisdiction to the adjudication of actual cases and controversies. U.S. Const. Art. III, § 2; <u>DeFunis v. Odegaard</u>, 416 U.S. 312, 31516 (1974). A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. <u>Powell v. McCormack</u>, 395 U.S. 486, 496 (1969). If developments occur during the course of adjudication that prevent a court from being able to grant the requested relief, the case must be dismissed as moot. <u>Blanciak v. Allegheny Ludlum Corp.</u>, 77 F.3d 690, 698-99 (3rd. Cir. 1996). Because Defendant USCIS has completed the adjudication of the Form I-90, this issue is now moot.

Respectfully submitted,

\_\_/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
Assistant United States Attorney

\_/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

\_\_/s/_____
WYNEVA JOHNSON, DC Bar #278515
Assistant United States Attorney
555 4th Street, N.W., E-4106
Washington, D.C. 20530

Of Counsel:
Pauline A.  Appelbaum
Associate Regional Counsel
Department of Homeland Security
United States Citizenship and Immigration Services
Houston, Texas

18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MOHAMMAD ABUSADEH,                        §
                                          §
            Plaintiff,                    §
VS.                                       §    MISCELLANEOUS  NO. H-06-0337
                                          §
MICHAEL CHERTOFF, *et al*,                §
                                          §
            Defendant.                    §

## ORDER FOR REMAND

Before the Court is the petitioner, Mohammad Abusadeh's, petition for a hearing on his naturalization application pursuant to 8 U.S.C. § 1447(b).  After review of the application, and before issues are joined, the Court determines that the case should *sua sponte* be remanded to the Director, U. S. Citizenship and Immigration Service.

The petitioner's application was filed, according to pleadings, on or about April 12, 2004. Since that time, the petitioner has completed an interview.  At the conclusion of the interview, the plaintiff was informed that the sole impediment to approval was an FBI or G-325 name check.  The plaintiff was told that the name Mohammad Abusadeh had not cleared.

Title 8 U.S.C. § 1447(b) permits a petitioner under § 1446 to seek examination of his application by a district court on the end of an 120-day period after an examination where the application has not been approved or denied.  Thus, the petitioner's application is properly before the Court in respect to § 1446.  However, a district court lacks jurisdiction under 1447(b) to accept such a petition where the 120-day period has not been triggered.  *See United States v. Ginsberg*, 243 U.S. 472, 475 (1917).

Ex. A

In the case at bar, the mandatory national security FBI name check process has not been completed. Hence, exhaustion of the administrative process has not been completed and the 120-day period has not been triggered. It is, therefore,

Ordered that the case is REMANDED to the United States Citizenship and Immigration Service, pursuant to FRCP, Rule 12(b)(1) and § 1447(b).

SIGNED and ENTERED this 23rd day of August, 2006.


Kenneth M. Hoyt
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Bankruptcy Court
Southern District of Texas
FILED

AUG 1 7 2006

Michael N. Milby, Clerk

| | |
|---|---|
| MOHAMMAD ABUSADEH, | § |
| | § |
| *Plaintiff* | § |
| | § |
| v. | § |
| | § |
| DEPARTMENT OF HOMELAND | § |
| SECURITY, THROUGH ITS | § |
| SECRETARY, MICHAEL CHERTOFF, | § |
| EMILIO GONZALEZ, DIRECTOR, | § |
| UNITED STATES CITIZENSHIP AND | § |
| IMMIGRATION SERVICES (USCIS), | § |
| SHARON HUDSON, DISTRICT | § |
| DIRECTOR, HOUSTON, USCIS, AND | § |
| ROBERT MUELLER, DIRECTOR, | § |
| FEDERAL BUREAU OF | § |
| INVESTIGATION, | § |
| | § |
| *Defendants* | § |

CIVIL ACTION NO. _____

misc. H-06-337

## PLAINTIFF'S ORIGINAL COMPLAINT AND
## PETITION FOR HEARING ON NATURALIZATION APPLICATION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Mohammed Abusadeh, to file Plaintiff's Original Complaint and Petition

for Hearing on Naturalization Application, showing the Court the following:

### I. INTRODUCTION

1.    Plaintiff is suing Michael Chertoff, Secretary of the Department of Homeland Security

("DHS"), Emilio Gonzalez, Director, United States Citizenship and Immigration Services

("USCIS"), Sharon Hudson, District Director, Houston, USCIS, and Robert Mueller,

Director, Federal Bureau of Investigation, Defendants, under Immigration and

Nationality Act § 336(b), 8 U.S.C. § 1447(b) and the Administrative Procedure Act

(APA), 5 U.S.C. § 702 *et seq.*

## II.  JURISDICTION AND VENUE

2.    Under Immigration and Nationality Act § 336(b), 8 U.S.C. § 1447(b), 28 U.S.C. § 1331,

and the APA, 5 U.S.C. § 702 *et seq.*, the Court has jurisdiction over this case.

3.    Pursuant to Immigration and Nationality Act § 336(b), 8 U.S.C. § 1447(b), and 28 U.S.C.

§ 1391(e), venue is proper in this district because Plaintiff resides in this district.

## III.  PARTIES

4.    Plaintiff resides in Houston, Texas.

5.    Michael Chertoff, Secretary of the Department of Homeland Security, Emilio Gonzalez,

Director of USCIS, Sharon Hudson, District Director, Houston, of USCIS, and Robert

Mueller, Director, Federal Bureau of Investigation, Defendants, may be served by

sending a copy of the summons and this Complaint by certified mail to: (1) Office of the

General Counsel, United States Department of Homeland Security, Washington, D.C.

20258; (2) Sharon Hudson, District Director, Citizenship and Immigration Services, 126

Northpoint, Houston, Texas  77060; (3) Alberto Gonzales, United States Attorney

General, U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, D.C.

20530-0001; (4) Civil Process Clerk, United States Attorney's Office, P.O. Box 61129,

Houston, Texas  77208; (5) Michael Chertoff, Secretary, Deparment of Homeland

Security, Washington, D.C. 20528; (6) Emilio Gonzalez, Director, U.S. Department of

Homeland Security, Citizenship and Immigration Services, 425 I Street NW,

Washington, D.C.  20536; and (7) Robert Mueller, Director, Federal Bureau of

2

Investigation, J. Edgar Hoover Building, 935 Pennsylvania Avenue, N.W., Washington, D.C. 20535-0001.

## IV. FACTS

6.  Plaintiff Mohammad Abusadeh is a 35 year old native of Kuwait and citizen of Jordan. Plaintiff's alien number is A 72 421 518. Plaintiff is a lawful permanent resident of the United States.

7.  On April 12, 2004, Plaintiff filed an application for naturalization with Defendants. (Exhibit 1).

8.  On August 17, 2004, Plaintiff was interviewed by Defendants regarding his application for naturalization. Plaintiff passed the tests of English and U.S. history and government. (Exhibit 2).

9.  It has been more than 120 days since the date of the interview and there has been a failure to make a determination under section 335 of the Immigration and Nationality Act, 8 U.S.C. § 1446. There has been no decision on the naturalization application.

10.  Pursuant to Immigration and Nationality Act § 336(b), 8 U.S.C. § 1447(b), Plaintiff applies to this Court for a hearing on this matter.

11.  Plaintiff requests that this Court either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

12.  Plaintiff, through counsel, has made inquiries to find out the status of the naturalization application and has been told that security checks are pending. (Exhibit 3).

13.  Plaintiff has advised the Houston District Office of USCIS of his intention to bring suit since Defendant has not been able to reach a decision.

3

14.    Plaintiff's situation is an actual controversy.  Plaintiff requests that the Court declare

Plaintiff's rights and other legal relations.

15.    All conditions precedent have been performed or have occurred.

16.    Plaintiff is suing Defendants in their official capacities.

## V.  CLAIMS FOR RELIEF

17.    Plaintiff re-alleges sections I-IV as if fully set forth herein.

18.    Pursuant to Immigration and Nationality Act § 336(b), 8 U.S.C. § 1447(b),   INA §

310(c), 8 U.S.C. § 1421(c), Plaintiff requests that the Court either determine the matter or

remand the matter, with appropriate instructions, to the Service to determine the matter.

19.    Pursuant to the APA, 5 U.S.C. § 706(2), Plaintiff requests that the Court hold unlawful

Defendants' failure to make a decision on Plaintiff's naturalization application.

20.    Plaintiff is entitled to recover reasonable attorney's fees, expenses, and costs

pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## VI. PRAYER FOR RELIEF

21.    For the foregoing reasons, Plaintiff requests that the Court:

a.    Determine Plaintiff's naturalization application, or, in the alternative,

b.    Remand the the Plaintiff's naturalization application to the Service with

appropriate instructions to the Service to immediately adjudicate Plaintiff's naturalization

application,

c.    Award Plaintiff reasonable attorney's fees, expenses, and costs.

d.    Grant Plaintiff such other relief as the Court may deem proper.

Respectfully submitted,

COANE & ASSOCIATES

4

Bruce A. Coane
SBOT No. 04423600
Fed. ID. # 7205 (S.D. Tex)
Ajay Choudhary
SBOT No. 90001623
Fed. ID. # 21837 (S.D. Tex)
James P. McCollom, Jr.
SBOT No. 13431960
Fed. ID. # 12592 (S.D. Tex)
3D/International Tower
1900 West Loop South
Suite 820
Houston, TX 77027-3206
713-850-0066
713-850-8528  FAX

5

IN THE UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MOHAMMAD ABUSADEH, | § |
| | § |
| *Plaintiff,* | § |
| | § |
| v. | § |
| | § |
| | § |
| DEPARTMENT OF HOMELAND | § |
| SECURITY, THROUGH ITS | § |
| SECRETARY, MICHAEL CHERTOFF, | § |
| EMILIO GONZALEZ, DIRECTOR, | § |
| UNITED STATES CITIZENSHIP AND | § |
| IMMIGRATION SERVICES (USCIS), | § |
| SHARON HUDSON, DISTRICT | § |
| DIRECTOR, HOUSTON USCIS, AND | § |
| ROBERT MUELLER, DIRECTOR, | § |
| FEDERAL BUREAU OF INVESTIGATION, | § |
| | § |
| *Defendants.* | § |
| | § |

CIVIL ACTION NO. 1:06-CV-02014

**DECLARATION OF SHARON A. HUDSON**

I, Sharon A. Hudson, declare as follows:

(1)      I am the District Director of the Houston, Texas, office of the United States

Citizenship and Immigration Services (USCIS) in the Department of Homeland Security

(DHS).  I oversee the adjudication of all applications for benefits including applications

for naturalization and ensure that, as a matter of my discretion, all applications for

benefits are processed and adjudicated in my office in a fair and impartial manner.  I have

held the position of District Director since March 31, 2005.  As part of my duties, I

oversee the naturalization oath ceremonies and ensure that each applicant approved for

naturalization continues to meet the statutory prerequisites for citizenship up to the

moment of the oath of allegiance and admission as a citizen of the United States.  Prior to

EX.  B

my appointment as District Director, I held various supervisory positions within the former Immigration and Naturalization Service over the last 33 years beginning in 1973. Among other appointments, I served as a Supervisory District Adjudications Officer, a Regional Adjudications Officer and a Senior Adjudications Officer at the District level, the Regional Office, and in Headquarters. I make this Declaration based upon personal knowledge and information made known to me in the course of my professional duties.

(2)     When a lawful permanent resident applies to USCIS for naturalization, in addition to ensuring that each applicant meets all other statutory requirements for naturalization, USCIS conducts several forms of security and criminal background checks to ensure that the alien is eligible for naturalization based on establishing the requisite good moral character, is attached to the principles of the Constitution of the United States, is well disposed to the good order and happiness of the United States, and that he or she is not a risk to national security or public safety.

(3)     Specifically, these background checks currently include: (a) record checks against DHS' own immigration systems; (b) a Federal Bureau of Investigation (FBI) fingerprint check for relevant criminal history records on the alien (*e.g.* arrests and convictions); (c) a check against the DHS-managed Interagency Border Inspection System (IBIS), which contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies, including the Central Intelligence Agency (CIA), FBI, other divisions of the United States Department of Justice, the Department of State, DHS/U.S. Customs and Border Protection (USCBP), and other DHS agencies; IBIS includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity; and (d) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS.

(4)        The FBI name check has historically always been a requirement for both naturalization and adjustment to lawful permanent resident status, and was historically generated from a Form G-325 biographical data document (naturalization applications) or a Form G-325A biographical data document (adjustment of status applications). Historically, USCIS[1] was permitted to proceed with approval of cases with those pending Form G-325 name checks if no derogatory information was received within a certain period of time.  See April 1, 1972 Naturalization Examiner's Guide, "Notations relating to Forms G-325"; see also May 1, 1989 Interpreter Releases article, "INS, FBI Reach Agreement on Automated Name Checks for Naturalization;" and, see also July 13, 1998 Interpreter Releases article, "INS Eliminates Form G-325 for Naturalization Purposes," replacing Form G-325 with an automated system (all attached hereto as Exhibit A-1).

(5)        USCIS is now mandated to await completion of the national security FBI name check and is mandated to have all background checks current and favorably resolved prior to approval of any naturalization application.  See Public Law 105-119, Title I, 111 Stat. 2448, Nov. 26, 1997, which in part amended 8 U.S.C. § 1446, by mandating that no government funds may be used to complete adjudication of a naturalization application until full FBI background checks have been completed.

(6)        The FBI name check process is detailed and set forth both on the USCIS and FBI public websites.  See USCIS 4/25/06 Fact Sheet, at http://www.uscis.gov/graphics/publicaffairs/factsheets/security_checks_42506.pdf, copy attached hereto as Exhibit A-2; see also, FBI National Name Check Program and Frequently Asked Questions, at http://www.fbi.gov/page2/nationalnamecheck.htm, attached hereto as Exhibit A-3.  The USCIS fact sheet clearly sets forth the security checks that USCIS must complete prior to naturalization of an applicant.  The FBI Frequently Asked Questions fact sheet demonstrates that the FBI processes name checks

---

[1] On March 1, 2003, former Immigration and Naturalization Service was abolished and its functions were transferred to successor agencies within the Department of Homeland Security, including USCIS.

on a first-in/first-out basis, and that the majority are checked and returned to the submitting agency as having "No Record" within 48-72 hours. Many other cases are completed within 60-90 days. Some cases remain pending for longer periods of time due to manual check requirements. Less than one percent of the FBI name check requests are ultimately identified with a file containing possible derogatory information.

(7)     The mandatory criminal and national security background checks have in some cases revealed significant derogatory information on some applicants. In some instances, the disqualifying information on the alien has been discovered as a result of the IBIS or FBI name checks, rather than through a fingerprint check alone.

(8)     In some instances, USCIS will receive a "positive" response from the FBI name check. Any "positive" name check response must be resolved before a naturalization application can be approved or before an applicant can take an oath of allegiance or be admitted as a citizen of the United States.

(9)     Mr. Mohammad Abusadeh's naturalization application reveals the following (see attached Exhibit A-4):

> (a)     he is a native of Kuwait and a citizen of Jordan, born on October 10, 1970; on November 13, 1992, he was admitted to the United States as a lawful permanent resident of the United States;
>
> (b)     Mr. Abusadeh applied for naturalization on or about April 13, 2004;
>
> (c)     Mr. Abusadeh was fingerprinted in connection with his application for naturalization on May 21, 2004, the fingerprints were processed by the FBI on the same date, and USCIS received the FBI notification that the fingerprint criminal history check was an IDENT on May 25, 2004; the FBI criminal history report indicates that the IDENT references two separate October 9, 1992 deferred adjudication third degree felony convictions, one for Theft and one for Injury to a Child, with placement on five years concurrent probation for the offenses;

(d)     the fingerprint check cannot be any older than fifteen months at the time

of the approval and at the time of the oath of allegiance and naturalization

ceremony;

(e)     IBIS checks, which must be current within 180 days both at the time of

initial interview and at the time of naturalization and the oath of

allegiance, were most recently conducted by USCIS on July 24, 2006;

(f)     The mandatory national security background check, commonly referred to

as the "FBI name check", was instituted automatically when the Texas

Service Center inputted the application for naturalization into the Claims 4

computer system on April 20, 2004, immediately after the April 13, 2004

filing of the application; on April 28, 2004, the FBI received and

processed the name check, and on April 30, 2004, USCIS received FBI

notification that the FBI name check was "PENDING;" the FBI name

check remains pending as of the date of this Declaration;

(10)     Since the terrorist attacks of September 11, 2001, the need to conduct more

rigorous and thorough background checks on aliens who are seeking naturalization has

required procedures that sometimes result in individuals not receiving a response to their

application as quickly as in the past.  However, the law and public safety requires USCIS

to make certain that the checks have been done before it adjudicates and approves an

application for naturalization, and to ensure the continuing good moral character of each

applicant up to the oath of allegiance and admission as a citizen of the United States.

Pursuant to 28 USC § 1746, I declare under the penalty of perjury of the

laws of the United States of America that the foregoing is true and correct.

Executed in Houston, Texas, on this 22nd day of February, 2007.

Sharon A. Hudson
District Director
USCIS, Houston, Texas

NATURALIZATION EXAMINER'S GUIDE

of voice, accompanied by a slow and easy manner,
will do much to calm the nervous and excited appli-
cant and help to get the latter over the hurdle of these
two very important tests. Accordingly, while these
tests may seem more a part of another phase of the
preliminary investigation, an examiner may use them
as one of the best ways to help an applicant pass
satisfactorily. Never, where it is apparent that the
applicant is going to have difficulty with these tests
should they be left until the very last part of the
interrogation and then the applicant be advised in so
many words that he is going to be examined as to his
ability to speak, read and write English, as well as to
determine the extent of his knowledge of our form of
government. Where necessary, the applicant is en-
titled to the consideration of having questions on
Government phrased in more than one way, and in the
simplest possible language, in order that he may be
afforded every opportunity of understanding what is
being asked. Further, while he may be called upon to
write sentences, he need only be able to write short
sentences comprised of very simple words. A com-
prehensive guide to interrogation designed to deter-
mine whether a petitioner is qualified, educationally,
is offered on pages 12-75 to 12-90, inclusive.

Notations relating to Forms G-325 (See OI 105.10 and
OI 335c.5 and .6).

At the time of filing the petition, or as necessary
thereafter, the notation "Neg" (for negative) shall
be entered in the spaces following "G-325 ID." and
"G-325 Rec Br." on the reverse of the duplicate
petition, if the Form G-325 was endorsed "SPECIAL"
to require a return of the form, and the form as
returned by the FBI is completely negative. Where
the ID. fingerprint chart has been determined by the
Bureau to be unclassifiable after a second attempt,
and has been returned with a notation indicating that
the fingerprints are illegible and that a search (by
name only) has disclosed no criminal record, the
notation "Neg by name only" shall be inserted in the
G-325 ID. space.

Ex B-1

NATURALIZATION EXAMINER'S GUIDE

When form G-325 was endorsed "SPECIAL" to re-
quire a return of the form, and the form has not been
returned by the time the petition is filed, the G-325
spaces should be left blank, and a notation "G-325
returns ID. and Rec Br." should be inserted under
"Action or documents still required". Upon the re-
turn of form G-325, the examiner should line out the
related notation, initial and date his action, and, as
appropriate, should note the reverse of the duplicate
petition as described in the above paragraph or the
paragraph immediately below.

When any issue concerning the applicant's eligibility
for naturalization is raised by a return on form G-325
bearing the endorsement "SPECIAL" and is resolved
in the applicant's favor, the notation "Seen-OK"
should be inserted in the appropriate G-325 space on
the reverse of the duplicate petition, and, if needed
for clarification, a supplemental memorandum should
be prepared. However, if information on a G-325 re-
turn discloses a need for further interrogation or in-
vestigation to clarify any relevant issue raised, then
the related G-325 space shall be left blank, and an
endorsement "G-325 ID. Seen - interrogate (investi-
gate) further" shall be entered under "Action or
documents still required". At a later date, if and
when this matter has been satisfactorily resolved in
favor of the applicant, a line should be drawn·through
the reason for the continuance, followed by the nota-
tion "OK", the date, and initials of the reviewing
officer.

Where the case is one in which form G-325 will not
be returned unless there is a positive response,
and the form has not been returned by the time the
petition is filed, the notation "Neg" (for negative)
shall be entered in the spaces following "G-325 ID."
and "G-325 Rec. Br." on the reverse of the dupli-
cate petition, even though the 40 days within which
the form may be returned have not elapsed. Every
precaution should be taken to assure that such peti-
tions are not presented for final hearing until the
requisite 40 days have passed. Should a G-325 form

(4-1-72)                    1-32

NATURALIZATION EXAMINER'S GUIDE

be returned because of a positive response, the
notation "Neg" appearing in the related space
shall be stricken, and appropriate notations
along the lines described in the paragraph just
above shall be entered upon the reverse of the
duplicate petition.

The results of a request for information from
the CIA made on Form G-325A should be set forth
in any available unassigned space under "RESULT
OF EXAMINATION," adapting and using where feasi-
ble the same notational system described in the
above paragraphs relating to Form G-325.  Simi-
larly, such system of notation also should be
followed in recording the results of a request
for information from military records on Form
G-325B (required in the case of any petitioner
who has had service in the Armed Forces of the
United States), utilizing of course the G-325B
space on the reverse of the duplicate petition.

## Section 101(f) notation

When the examiner has completely satisfied him-
self that the applicant is nowise precluded from
showing good character under section 101(f) he
shall place on the back of the duplicate petition
after the phrase "Eligibility 101(f)" the letters
OK.  If he is of the opinion that for some reason
the applicant does come within section 101(f),
the examiner's endorsement shall be "Eligibility
101(f) OK, except ..." and thereafter briefly
set forth the exception which he believes brings
the applicant within that section.  The sort of
endorsement which is here meant to be described
might be "Eligibility 101(f) OK, except 101(f)(6).
Details concerning any such exception should be
set forth on a separate memorandum and included
in the file.



66 No. 17 INTERREL 483                                                                                          Page 1

66 NO. 17 Interpreter Releases 483

**(Cite as: 66 NO. 17 Interpreter Releases 483)**

Interpreter Releases
May 1, 1989

**\*483** INS, FBI REACH AGREEMENT ON AUTOMATED NAME CHECKS FOR **NATURALIZATION**

Copyright © 1989 Federal Publications Inc.

The INS recently announced that it has concluded an agreement with the Federal Bureau of Investigation (FBI) to automate INS requests for records checks from the FBI in **naturalization** cases. The agreement only affects the 18 INS offices that currently have the **Naturalization** Automated Casework System (NACS). The agreement expands on a February 11, 1987 agreement between the INS and FBI to automate requests regarding §245 adjustment of status cases.

The 1987 agreement, outlined in a memorandum of understanding signed by Allen H. McCreight, Assistant Director of the FBI's Records Management Division, and Richard E. Norton, INS Associate Commissioner for Examinations, provided that the INS Central Office would submit to the FBI each week a magnetic tape containing the name requests to be checked in adjustment of status cases. The FBI would perform a search of the automated data base of its Records Management Division. The FBI would then return the tape to the INS containing those names on which the FBI has no record and those where there is a possible match. The Service would process the information and send it out to INS field offices.

Pursuant to the 1987 agreement, INS district offices stopped using Form **G-325** for FBI name requests in adjustment of status cases. The agreement provided, however, that the INS would continue to use the **G-325** forms in asylum and **naturalization** cases.

The INS and the FBI have now agreed to add **naturalization** cases to the types of cases covered under the earlier agreement. The procedures for **naturalization** cases are the same as those provided for in the 1987 agreement, except that they apply only to the 18 INS offices that have NACS. The INS anticipates that the volume of automated **naturalization** records checks under the new agreement will exceed 250,000 a year. When the Service expands NACS to 10 more offices, as it plans to do, the volume may rise to 300,000 annually.

In a February 2, 1989 memo to all regional commissioners, INS Assistant Commissioner for Adjudications James A. Puleo stated that effective March 1, 1989, the 18 NACS offices should no longer use Form **G-325** for FBI name requests in **naturalization** cases. The INS expects to save considerable clerical time now expended in processing the G-325s.

Mr. Puleo's memo is reproduced in Appendix IV of this Release.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



75 No. 26 INTERREL 959

Page 1

75 NO. 26 Interpreter Releases 959

**(Cite as: 75 NO. 26 Interpreter Releases 959)**

Interpreter Releases
July 13, 1998

**\*959 INS ELIMINATES FORM G-325 FOR NATURALIZATION PURPOSES**

Copyright © 1998 Federal Publications Inc.

The INS' Office of **Naturalization** Operations has issued a brief memorandum to the field that simply confirms the **elimination** of the **Form G-325** for **naturalization purposes**. The June 15, 1998 memo is reproduced in Appendix IV of this Release.

The memo notes that on April 15, 1998, the final group of INS district offices and suboffices was transitioned to direct mail for receipt of **naturalization** applications. [FN58] Prior to this transition, the Form N-400 **naturalization** application required the submission of Form **G-325** by applicants in all non-automated Service offices. The INS used this form to complete name checks through the Criminal Justice Index System (CJIS) at the Federal Bureau of Investigation (FBI).

The memo notes that direct mail removed the initial data entry requirements from the district offices and suboffices and moved it to the INS Service Centers. It also provided the INS with an automated process that allows the agency to electronically send data tapes to the FBI, thereby **eliminating** the need for submission of Form **G-325** by the applicant.

Accordingly, the memo concludes, effective immediately, the **G-325** should not be provided to applicants when they request Form N-400 through a district office or suboffice or through the agency's form centers.

[FN58]. See 75 Interpreter Releases 514 (Apr. 13, 1998).

Appendix IV
<Image in PDF format not available via Offline Print. View on westlaw.com.>

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



U.S. Department of Justice
Immigration and Naturalization Service

HQ 70/35

JUN 15 1998

MEMORANDUM FOR:    All Form Center Directors
All Regional Directors
All District Directors
All Officers-In-Charge
All Service Center Directors

FROM:    James S. Angus
Acting Executive Director
Office of Naturalization Operations

SUBJECT:    Elimination of Form G-325 for Naturalization Purposes

On April 15, 1998, the final group of district and suboffices were transitioned to direct mail for Applications of Naturalization, Form N-400. Prior to this transition, Form N-400 required the submission of Form G-325 by applicants in all non-automated (NACS/RNACS) offices. This form was used by the Service to complete name checks through the Criminal Justice Index System (CJIS) at the Federal Bureau of Investigation (FBI).

Direct Mail removed the initial data entry requirements from the district and suboffices and moved it to the service centers. It also provided the Service with an automated process that allows INS to electronically send data tapes to the FBI eliminating the need for the submission of Form G-325 by the applicant.

Effective immediately this form should not be provided to the public when they request Form N-400 through a district or suboffice or through the form centers.

*Press Office*
**U.S. Department of Homeland Security**



**U.S. Citizenship
and Immigration
Services**

# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

### Background

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

### Why USCIS Conducts Security Checks

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

Ex B-2

Immigration Security Checks—How and Why the Process Works

---

**How Immigration Security Checks Work**

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check**— IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check**—FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks**—FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

---

several years to resolve. Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided. USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.



Home | Site Map | FAQs

FEDERAL BUREAU OF INVESTIGATION

SEARCH

## Contact Us
- Your Local FBI Office
- Overseas Offices
- Submit a Crime Tip
- Report Internet Crime
- More Contacts

## Learn About Us
- Quick Facts
- What We Investigate
- Natl. Security Branch
- Information Technology
- Fingerprints & Training
- Laboratory Services
- Reports & Publications
- History
- More About Us

## Get Our News
- Press Room
- News Feeds

## Be Crime Smart
- Wanted by the FBI
- More Protections

## Use Our Resources
- For Law Enforcement
- For Communities
- For Researchers
- More Services

## Visit Our Kids' Page

## Apply for a Job

## National Name Check Program—Frequently Asked Questions

**How long will it take for my name check to be completed?**

The length of time it takes for a name check to be completed varies from name to name. Normally, a name is submitted by an agency, such as the United States Citizenship and Immigration Services (USCIS), on a data tape. The National Name Check Program (NNCP) receives over 62,000 name checks every week, with over 27,000 coming from USCIS on a weekly basis. When a data tape comes in, the names on the tape are electronically checked against the Federal Bureau of Investigation's Universal Index (UNI). The searches seek all instances of the individual's name appearing in both main files and reference files. A main file name is that of an individual who is, himself/herself, the subject of an FBI investigation, whereas a reference is someone whose name appears in an FBI investigation. References may be associates, conspirators, or witnesses.

The majority of name checks submitted on a data tape are electronically checked and returned to the submitting agency as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's UNI database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth submitted within the last 120 days) are not checked, and the duplicate findings are returned immediately to the submitting agency.

A secondary manual name search conducted within 30-60 days usually identifies additional requests as having a "No Record." The remaining name checks (usually about 10% of the name checks originally submitted) are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record is available in the FBI's electronic record keeping system, it can be reviewed quickly. If not, the relevant information must be retrieved from an existing paper record. Review of this information determines whether the information is positively identified with the name check request. If the information is not identified with the request, the request is closed as a "No Record," and the requesting agency is notified as such.

The average time required to retrieve and review an FBI record for possible information related to a name check request is case specific—it depends on the number of files an analyst must obtain (which is dictated by the number of "hits" on a name), the location and availability of those files, and the amount of information contained in a file. If a file is stored locally, an analyst will be able to obtain the file within a matter of days. If a file is located in a field office or other FBI location, the applicable information must be requested from that location. There are over 265 different FBI locations that could house information pertinent to a name check request. If a file is electronically available, an analyst will have immediate access to that file. Additionally, once an analyst receives the file, or the pertinent information contained in a file, the analyst must review it for possible information related to the name check request.

Many times, the delay associated with the processing of the remaining name checks is not the actual time it takes to process a name check, but the time it takes for an analyst to get to the name check request in order to process it. This is due to the constant volume of name checks, several million each year, combined with the FBI's current work on processing residual name checks from a batch of 2.7 million requests submitted by USCIS in December 2002, as compared to the NNCP's limited resources. Less than one percent of the requests are identified with a file containing possible derogatory information. If applicable, the FBI then forwards a summary of the derogatory information to the requesting agency. It is important to note that the FBI **does not** adjudicate the name check requests, but only provides available information to a requesting agency for its adjudication process.

Ex. B-3

Federal Bureau of Investigation - National Name Check Program-Frequently Asked Questions    Page 2 of 2

**How can I have my name check expedited?**

The FBI tries to process its oldest name checks first. Customer agencies will occasionally request expedited handling of specific name checks. Criteria used to determine which name checks receive expedited handling are internal matters of each customer agency. The FBI does request that the number of expedited cases be kept to a minimum in fairness to the other pending name check requests. Because each customer agency determines which name checks are expedited, contacting Congressional representatives, the FBI's Office of Congressional Affairs, or the NNCP will only further tie up vital resources and **will not** contribute to the expediting of a name check.

**Does contacting my Congressional representative expedite my name check?**

No, the customer agency determines expedited handling. The FBI's policy is to be responsive to our customer's needs given the limits of our resources. Re-prioritization from multiple sources would convolute the customer agency's ability to manage their priority cases.

**Is there a fee I can pay to expedite the process?**

No. Processing times are a function of the volume of work versus the resources that can be applied to the task. Paying an additional fee would not speed up the name check process.

**I am aware that some name checks have been completed that were submitted to the FBI *after* cases that remain pending. Why are the name checks not handled in the order in which they are received?**

The vast majority of name check requests are completed in less than 60 days. Of those remaining, the FBI tries to complete the oldest name checks first. The time to complete any given name check varies. There are many factors that impact processing times such as the number of files to retrieve and review, a file's location and accessibility, case status, and workload all impact processing times. Another factor that might delay the processing of a name check request on a first in/first out basis is the number of requests for expedited handling received from a customer agency.

**My Freedom of Information/Privacy Act request to the FBI resulted in a "no record" response. Given that, why is my name check request still pending?**

Freedom of Information and Privacy Acts (FOIPA) requests are sometimes confused with name check requests. FOIPA provides copies of FBI files relevant to a specific FOIPA request. For FOIPA, the FBI search uses the name or information as provided in the FOIPA request. A FOIPA search determines whether there is an investigative file associated with an individual—a "main file" search. For a name check, "main files" and "reference files" are both checked, in an effort to protect our national security, in addition to searching a name in a multitude of combinations.

**Who can I call to check on the status of my name check?**

The FBI will only respond to status inquiries from its customer agencies. Please contact the organization receiving your original application. In Citizenship and Immigration cases, contact USCIS for the status.

---

Accessibility | eRulemaking | FirstGov | Freedom of Information Act | Links | Privacy Policy | White House

FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice.



Home | Site Map | FAQs

# FEDERAL BUREAU OF INVESTIGATION

SEARCH

## Contact Us
- Your Local FBI Office
- Overseas Offices
- Submit a Crime Tip
- Report Internet Crime
- More Contacts

## Learn About Us
- Quick Facts
- What We Investigate
- Natl. Security Branch
- Information Technology
- Fingerprints & Training
- Laboratory Services
- Reports & Publications
- History
- More About Us

## Get Our News
- Press Room
- News Feeds

## Be Crime Smart
- Wanted by the FBI
- More Protections

## Use Our Resources
- For Law Enforcement
- For Communities
- For Researchers
- More Services

## Visit Our Kids' Page

## Apply for a Job

## National Name Check Program

**Mission:** The National Name Check Program's (NNCP's) mission is to disseminate information from FBI files in response to name check requests received from federal agencies including internal offices within the FBI; components within the legislative, judicial, and executive branches of the federal government; foreign police and intelligence agencies; and state and local law enforcement agencies within the criminal justice system.

**Purpose:** The NNCP has its genesis in Executive Order 10450, issued during the Eisenhower Administration. This executive order addresses personnel security issues, and mandated National Agency Checks (NACs) as part of the pre-employment vetting and background investigation process. The FBI is a primary NAC conducted on all U.S. government employees. Since September 11th, name check requests have grown, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege—whether that privilege is government employment or an appointment, a security clearance, attendance at a White House function, a Green card or naturalization, admission to the bar, or a visa for the privilege of visiting our homeland. More than 70 federal and state agencies regularly request FBI name checks. In addition to serving federal, state, and local government customers, the NNCP conducts numerous name searches in direct support of the counterintelligence, counterterrorism, and homeland security efforts of the FBI.

**Function:** The employees of the NNCP review and analyze potential identifiable documents to determine whether a specific individual has been the subject of or mentioned in any FBI investigation(s), and if so, what (if any) relevant information may be disseminated to the requesting agency. It is important to note that the FBI does not adjudicate the final outcome, it just reports the results to the requesting agency.

**Source of Data:** The NNCP conducts manual and electronic searches of the FBI's Central Records System (CRS) Universal Index (UNI). The CRS encompasses the centralized records of FBI Headquarters, field offices, and Legal Attache offices. The CRS contains all FBI investigative, administrative, personnel, and general files.

### More Information
- Frequently Asked Questions
- Executive Order 10450

**Congressional Testimony:**
- David Hardy 10-23-03
- Robert Garrity 07-10-03

**NNCP Process Step-by-Step:**

- Agency/entity submission to the FBI's NNCP. Submissions are accepted via magnetic tape, hard copy, telephone, or fax.
- Electronic "batch" submissions are searched against the UNI. The majority of the batch names are electronically returned as "no record" with 48-72 hours. A "no record" indicates that the UNI database contains no identifiable information regarding a particular individual. The UNI is searched for "main files", files where the name of an individual is the subject of an FBI investigation, and for "reference files", files where the name being searched is just mentioned in an investigation.
- A secondary "manual" search of residuals from the batch run identifies an additional number of names as a "no record" response.
- The remaining paper files and/or electronic files are reviewed to ensure they are germane to the name check request.
- Identifiable files are then analyzed for relevant or derogatory information that may be disseminated to the requesting agency/entity. Approximately 1 percent of the requests are

determined to contain possible derogatory information. If applicable, the NNCP forwards a summary of the information to the submitting agency/entity.

**Growth of the Name Check Program:** Post September 11, 2001, the number of incoming name checks has increased to above pre-9/11 levels:

|  | FY 01 | FY 02 | FY 03 | FY 04 | FY 05 |
|---|---|---|---|---|---|
| Incoming Name Checks: | 2,771,241 | 3,288,018 | 6,309,346 | 3,884,467 | 3,346,435 |

**Freedom of Information and Privacy Act (FOIPA) vs. Name Check:** Freedom of Information and Privacy Acts (FOIPA) requests are sometimes confused with name check requests. FOIPA provides copies of FBI files relevant to a specific FOIPA request. For FOIPA, the FBI search uses the name or information as provided in the FOIPA request. A FOIPA search determines whether there is an investigative file associated with an individual—a "main file" search. For a name check, "main files" and "reference files" are both checked, in addition to searching a name in a multitude of combinations.

**Major Contributing Agencies:** The FBI's NNCP Section provides services to more than 70 federal, state, and local governments and entities. Although most name checks are conducted for each agency on a first-in, first-out basis, the contributing agency determines the order of resolution for priority, project, or expedite cases. The following are the major contributing agencies to the NNCP:

- U.S. Citizenship and Immigration Services – Submits name check requests on individuals applying for the following benefits: asylum, adjustment of status to legal permanent resident, naturalization, and waivers.
- Office of Personnel Management – Submits name checks requests in order to determine an individual's suitability and eligibility in seeking employment with the federal government.
- Department of State – Submits FBI name check requests on individuals applying for visas. Not all visa matters require FBI name checks.

---

Accessibility | eRulemaking | FirstGov | Freedom of Information Act | Links | Privacy Policy | White House
FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice.

U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0009

## Application for Naturalization

Print clearly or type your answers using CAPITAL letters.  Failure to print clearly may delay your application.  Use black or blue ink.

| Part 1.  Your Name *(The Person Applying for Naturalization)* |
|---|

Write your INS "A"- number here:

A  0  7  2  4  2  1  5  1  8

A. Your current legal name.

Family Name *(Last Name)*

ABUSADEH

Given Name *(First Name)*

MOHAMMAD

Full Middle Name *(If applicable)*

HAFIZ

**FOR INS USE ONLY**

Bar Code          Date Stamp

B. Your name **exactly** as it appears on your Permanent Resident Card.

Family Name *(Last Name)*

ABUSADEH

Given Name *(First Name)*

MOHAMMAD

Full Middle Name *(If applicable)*

HAFIZ

C. If you have ever used other names, provide them below.

| Family Name *(Last Name)* | Given Name *(First Name)* | Middle Name |
|---|---|---|
|  |  |  |
|  |  |  |

D. Name change *(optional)*

Please read the Instructions before you decide whether to change your name.

1. Would you like to legally change your name?    ☐ Yes   ☑ No

2. If "Yes," print the new name you would like to use. Do not use initials or abbreviations when writing your new name.

Family Name *(Last Name)*

Given Name *(First Name)*          Full Middle Name

Action

| Part 2.  Information About Your Eligibility  *(Check Only One)* |
|---|

I am at least 18 years old **AND**

A. ☑ I have been a Lawful Permanent Resident of the United States for at least 5 years.

B. ☐ I have been a Lawful Permanent Resident of the United States for at least 3 years, AND I have been married to and living with the same U.S. citizen for the last 3 years, AND my spouse has been a U.S. citizen for the last 3 years.

C. ☐ I am applying on the basis of qualifying military service.

D. ☐ Other *(Please explain)* _____

Form N-400 (Rev. 07/23/02)N

APR 1 2 2004

Ex B-4

## Part 3. Information About You

Write your INS "A"- number here:

A 0 7 2 4 2 1 5 1 8

A. Social Security Number

▓▓▓▓▓▓▓▓▓

B. Date of Birth *(Month/Day/Year)*

1 0 / 1 0 / 1 9 7 0

C. Date You Became a Permanent Resident *(Month/Day/Year)*

1 1 / 1 3 / 1 9 9 2

D. Country of Birth

KUWAIT

E. Country of Nationality

JORDAN

F. Are either of your parents U.S. citizens? *(if yes, see Instructions)*   ☐ Yes   ☑ No

G. What is your current marital status?   ☐ Single, Never Married   ☐ Married   ☑ Divorced   ☐ Widowed

☐ Marriage Annulled or Other *(Explain)* _____

H. Are you requesting a waiver of the English and/or U.S. History and Government requirements based on a disability or impairment and attaching a Form N-648 with your application?   ☐ Yes   ☑ No

I. Are you requesting an accommodation to the naturalization process because of a disability or impairment? *(See Instructions for some examples of accommodations.)*   ☐ Yes   ☑ No

If you answered "Yes", check the box below that applies:

☐ I am deaf or hearing impaired and need a sign language interpreter who uses the following language: _____

☐ I use a wheelchair.

☐ I am blind or sight impaired.

☐ I will need another type of accommodation. Please explain: _____

_____

_____

## Part 4. Addresses and Telephone Numbers

A. Home Address - Street Number and Name *(Do NOT write a P.O. Box in this space)*

10919 GULF FWY

Apartment Number

4211

| City | County | State | ZIP Code | Country |
|------|--------|-------|----------|---------|
| HOUSTON | HARRIS | TEXAS | 77034 | USA |

B. Care of

COANE & ASSOCIATES

Mailing Address - Street Number and Name *(If different from home address)*

1900 WEST LOOP SOUTH, SUITE 820

Apartment Number

| City | State | ZIP Code | Country |
|------|-------|----------|---------|
| HOUSTON | TEXAS | 77027 | USA |

C. Daytime Phone Number *(If any)*

(713 ) 946-7700

Evening Phone Number *(If any)*

( )

E-mail Address *(If any)*

| Part 5. Information for Criminal Records Search | Write your INS "A"- number here: |
|---|---|
| | A 0 7 2 4 2 1 5 1 8 |

**Note:** The categories below are those required by the FBI. See Instructions for more information.

A. Gender
[✔] Male   [ ] Female

B. Height
5 Feet 7.0 Inches

C. Weight
188.0 Pounds

D. Are you Hispanic or Latino?   [ ] Yes   [✔] No

E. Race *(Select one or more.)*
[ ] White   [✔] Asian   [ ] Black or African American   [ ] American Indian or Alaskan Native   [ ] Native Hawaiian or Other Pacific Islander

F. Hair color
[✔] Black   [ ] Brown   [ ] Blonde   [ ] Gray   [ ] White   [ ] Red   [ ] Sandy   [ ] Bald (No Hair)

G. Eye color
[✔] Brown   [ ] Blue   [ ] Green   [ ] Hazel   [ ] Gray   [ ] Black   [ ] Pink   [ ] Maroon   [ ] Other

| Part 6. Information About Your Residence and Employment |
|---|

A. Where have you lived during the last 5 years? Begin with where you live now and then list every place you lived for the last 5 years. If you need more space, use a separate sheet of paper.

| Street Number and Name, Apartment Number, City, State, Zip Code and Country | Dates *(Month/Year)* | |
|---|---|---|
| | From | To |
| Current Home Address - Same as Part 4.A | 0 1 / 2 0 0 3 | Present |
| 12601 S. GREEN DR., #803, HOUSTON, TX 77034, USA | 0 5 / 2 0 0 1 | 1 2 / 2 0 0 2 |
| 12601 S. GREEN DR., #504, HOUSTON, TX 77034, USA | 1 1 / 1 9 9 8 | 0 5 / 2 0 0 1 |
| | _ _ / _ _ _ _ | _ _ / _ _ _ _ |
| | _ _ / _ _ _ _ | _ _ / _ _ _ _ |

B. Where have you worked (or, if you were a student, what schools did you attend) during the last 5 years? Include military service. Begin with your current or latest employer and then list every place you have worked or studied for the last 5 years. If you need more space, use a separate sheet of paper.

| Employer or School Name | Employer or School Address *(Street, City and State)* | Dates *(Month/Year)* | | Your Occupation |
|---|---|---|---|---|
| | | From | To | |
| EDGEBROOK EXXON | 10521 GULF FWY, HOUSTON, TX | 0 6 / 2 0 0 3 | PRESENT _ _ / _ _ _ _ | CAR INSPECTOR |
| HOUSTON VALET SERVICE | 2513 GESSNER, #303, HOUSTON, TX | 0 1 / 2 0 0 3 | PRESENT _ _ / _ _ _ _ | VALET |
| RANTON'S DRIVE INN | 1202 COLLEGE AVE, HOUSTON, TX | _ _ / 2 0 0 0 | 0 6 / 2 0 0 2 | CASHIER |
| TEXACO | 7450 OLD GALVESTON RD, HOUSTON, TX | _ _ / 1 9 9 9 | _ _ / 2 0 0 0 | CAR INSPECTOR |
| | | _ _ / _ _ _ _ | _ _ / _ _ _ _ | |

**Part 7. Time Outside the United States**
*(Including Trips to Canada, Mexico, and the Caribbean Islands)*

Write your INS "A"- number here:
A 0 7 2 4 2 1 5 1 8

A. How many total days did you spend outside of the United States during the past 5 years? [ 0 ] days

B. How many trips of 24 hours or more have you taken outside of the United States during the past 5 years? [ 0 ] trips

C. List below all the trips of 24 hours or more that you have taken outside of the United States since becoming a Lawful Permanent Resident. Begin with your most recent trip. If you need more space, use a separate sheet of paper.

| Date You Left the United States *(Month/Day/Year)* | Date You Returned to the United States *(Month/Day/Year)* | Did Trip Last 6 Months or More? | Countries to Which You Traveled | Total Days Out of the United States |
|---|---|---|---|---|
| __ / __ / __ __ __ __ | __ / __ / __ __ __ __ | ☐ Yes  ☐ No | | |
| __ / __ / __ __ __ __ | __ / __ / __ __ __ __ | ☐ Yes  ☐ No | | |
| __ / __ / __ __ __ __ | __ / __ / __ __ __ __ | ☐ Yes  ☐ No | | |
| __ / __ / __ __ __ __ | __ / __ / __ __ __ __ | ☐ Yes  ☐ No | | |
| __ / __ / __ __ __ __ | __ / __ / __ __ __ __ | ☐ Yes  ☐ No | | |
| __ / __ / __ __ __ __ | __ / __ / __ __ __ __ | ☐ Yes  ☐ No | | |
| __ / __ / __ __ __ __ | __ / __ / __ __ __ __ | ☐ Yes  ☐ No | | |
| __ / __ / __ __ __ __ | __ / __ / __ __ __ __ | ☐ Yes  ☐ No | | |
| __ / __ / __ __ __ __ | __ / __ / __ __ __ __ | ☐ Yes  ☐ No | | |
| __ / __ / __ __ __ __ | __ / __ / __ __ __ __ | ☐ Yes  ☐ No | | |

**Part 8. Information About Your Marital History**

A. How many times have you been married (including annulled marriages)? [ 1 ] If you have NEVER been married, go to Part 9.

B. If you are now married, give the following information about your spouse:

1. Spouse's Family Name *(Last Name)*
N/A

Given Name *(First Name)*

Full Middle Name *(If applicable)*

2. Date of Birth *(Month/Day/Year)*
__ / __ / __ __ __ __

3. Date of Marriage *(Month/Day/Year)*
__ __ / __ / __ __ __ __

4. Spouse's Social Security Number
__ __ __ - __ - __ __ __ __

5. Home Address - Street Number and Name

Apartment Number

City

State

ZIP Code

**Part 8. Information About Your Marital History** *(Continued)*

Write your INS "A"- number here:
A 0 7 2 4 2 1 5 1 8

C. Is your spouse a U.S. citizen?  ☐ Yes  ☐ No

D. If your spouse is a U.S. citizen, give the following information:

1. When did your spouse become a U.S. citizen?  ☐ At Birth  ☐ Other

If "Other," give the following information:

2. Date your spouse became a U.S. citizen
__ __/__ __/__ __ __ __

3. Place your spouse became a U.S. citizen *(Please see Instructions)*

City and State

E. If your spouse is NOT a U.S. citizen, give the following information :

1. Spouse's Country of Citizenship

2. Spouse's INS "A"- Number *(If applicable)*
A __ __ __ __ __ __ __ __ __

3. Spouse's Immigration Status

☐ Lawful Permanent Resident   ☐ Other _____

F. If you were married before, provide the following information about your prior spouse. If you have more than one previous marriage, use a separate sheet of paper to provide the information requested in questions 1-5 below.

1. Prior Spouse's Family Name *(Last Name)*
PATTERSON

Given Name *(First Name)*
TINA

Full Middle Name *(If applicable)*
DIANE

2. Prior Spouse's Immigration Status

☑ U.S. Citizen

☐ Lawful Permanent Resident

☐ Other _____

3. Date of Marriage *(Month/Day/Year)*
1 2/3 0/1 9 9 1

4. Date Marriage Ended *(Month/Day/Year)*
0 9/0 2/1 9 9 8

5. How Marriage Ended

☑ Divorce  ☐ Spouse Died  ☐ Other

G. How many times has your current spouse been married (including annulled marriages)? ☐

If your spouse has EVER been married before, give the following information about **your spouse's** prior marriage.
If your spouse has more than one previous marriage, use a separate sheet of paper to provide the information requested in questions 1 - 5 below.

1. Prior Spouse's Family Name *(Last Name)*

Given Name *(First Name)*

Full Middle Name *(If applicable)*

2. Prior Spouse's Immigration Status

☐ U.S. Citizen

☐ Lawful Permanent Resident

☐ Other _____

3. Date of Marriage *(Month/Day/Year)*
__ __/__ __/__ __ __ __

4. Date Marriage Ended *(Month/Day/Year)*
__ __/__ __/__ __ __ __

5. How Marriage Ended

☐ Divorce  ☐ Spouse Died  ☐ Other _____

| Part 9. Information About Your Children | Write your INS "A"- number here: |
|---|---|
| | A 0 7 2 4 2 1 5 1 8 |

A.  How many sons and daughters have you had? For more information on which sons and
    daughters you should include and how to complete  this section, see the Instructions.

0

B.  Provide the following information about all of your sons and daughters. If you need more space, use a separate sheet of paper.

| Full Name of Son or Daughter | Date of Birth (Month/Day/Year) | INS "A"- number (if child has one) | Country of Birth | Current Address (Street, City, State & Country) |
|---|---|---|---|---|
| | _ _ / _ / _ _ _ _ | A_ _ _ _ _ _ _ _ _ | | |
| | _ _ / _ / _ _ _ _ | A_ _ _ _ _ _ _ _ _ | | |
| | _ _ / _ / _ _ _ _ | A_ _ _ _ _ _ _ _ _ | | |
| | _ _ / _ / _ _ _ _ | A_ _ _ _ _ _ _ _ _ | | |
| | _ _ / _ / _ _ _ _ | A_ _ _ _ _ _ _ _ _ | | |
| | _ _ / _ / _ _ _ _ | A_ _ _ _ _ _ _ _ _ | | |
| | _ _ / _ / _ _ _ _ | A_ _ _ _ _ _ _ _ _ | | |
| | _ _ / _ / _ _ _ _ | A_ _ _ _ _ _ _ _ _ | | |

## Part 10.  Additional Questions

Please answer questions 1 through 14. If you answer "Yes" to any of these questions, include a written explanation with this form. Your
written explanation should (1) explain why your answer was "Yes," and (2) provide any additional information that helps to explain your
answer.

### A. General Questions

1. Have you **EVER** claimed to be a U.S. citizen *(in writing or any other way)*?  ☐ Yes  ☑ No

2. Have you **EVER** registered to vote in any Federal, state, or local election in the United States?  ☐ Yes  ☑ No

3. Have you **EVER** voted in any Federal, state, or local election in the United States?  ☐ Yes  ☑ No

4. Since becoming a Lawful Permanent Resident, have you **EVER** failed to file a required Federal,
   state, or local tax return?  ☐ Yes  ☑ No

5. Do you owe any Federal, state, or local taxes that are overdue?  ☐ Yes  ☑ No

6. Do you have any title of nobility in any foreign country?  ☐ Yes  ☑ No

7. Have you ever been declared legally incompetent or been confined to a mental institution
   within the last 5 years?  ☐ Yes  ☑ No

Form N-400 (Rev. 07/23/02)N Page 6

| Part 10. Additional Questions *(Continued)* | Write your INS "A"- number here: |
|---|---|
| | A 0 7 2 4 2 1 5 1 8 |

**B. Affiliations**

8. a. Have you **EVER** been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place?  ☐ Yes  ☑ No

  b. If you answered "Yes," list the name of each group below. If you need more space, attach the names of the other group(s) on a separate sheet of paper.

| Name of Group | Name of Group |
|---|---|
| 1. | 6. |
| 2. | 7. |
| 3. | 8. |
| 4. | 9. |
| 5. | 10. |

9. Have you **EVER** been a member of or in any way associated *(either directly or indirectly)* with:

  a. The Communist Party?  ☐ Yes  ☑ No

  b. Any other totalitarian party?  ☐ Yes  ☑ No

  c. A terrorist organization?  ☐ Yes  ☑ No

10. Have you **EVER** advocated *(either directly or indirectly)* the overthrow of any government by force or violence?  ☐ Yes  ☑ No

11. Have you **EVER** persecuted *(either directly or indirectly)* any person because of race, religion, national origin, membership in a particular social group, or political opinion?  ☐ Yes  ☑ No

12. Between March 23, 1933, and May 8, 1945, did you work for or associate in any way *(either directly or indirectly)* with:

  a. The Nazi government of Germany?  ☐ Yes  ☑ No

  b. Any government in any area (1) occupied by, (2) allied with, or (3) established with the help of the Nazi government of Germany?  ☐ Yes  ☑ No

  c. Any German, Nazi, or S.S. military unit, paramilitary unit, self-defense unit, vigilante unit, citizen unit, police unit, government agency or office, extermination camp, concentration camp, prisoner of war camp, prison, labor camp, or transit camp?  ☐ Yes  ☑ No

**C. Continuous Residence**

Since becoming a Lawful Permanent Resident of the United States:

13. Have you **EVER** called yourself a "nonresident" on a Federal, state, or local tax return?  ☐ Yes  ☑ No

14. Have you **EVER** failed to file a Federal, state, or local tax return because you considered yourself to be a "nonresident"?  ☐ Yes  ☑ No

**Part 10.  Additional Questions** *(Continued)*

Write your INS "A"- number here:
A  0  7  2  4  2  1  5  1  8

### D. Good Moral Character

For the purposes of this application, you must answer "Yes" to the following questions, if applicable, even if your records were sealed or otherwise cleared or if anyone, including a judge, law enforcement officer, or attorney, told you that you no longer have a record.

15. Have you **EVER** committed a crime or offense for which you were NOT arrested?  ☐ Yes  ☑ No

16. Have you **EVER** been arrested, cited, or detained by any law enforcement officer (including INS and military officers) for any reason?  ☑ Yes  ☐ No

17. Have you **EVER** been charged with committing any crime or offense?  ☑ Yes  ☐ No

18. Have you **EVER** been convicted of a crime or offense?  ☑ Yes  ☐ No

19. Have you **EVER** been placed in an alternative sentencing or a rehabilitative program (for example: diversion, deferred prosecution, withheld adjudication, deferred adjudication)?  ☑ Yes  ☐ No

20. Have you **EVER** received a suspended sentence, been placed on probation, or been paroled?  ☑ Yes  ☐ No

21. Have you **EVER** been in jail or prison?  ☑ Yes  ☐ No

If you answered "Yes" to any of questions 15 through 21, complete the following table.  If you need more space, use a separate sheet of paper to give the same information.

| Why were you arrested, cited, detained, or charged? | Date arrested, cited, detained, or charged *(Month/Day/Year)* | Where were you arrested, cited, detained or charged? *(City, State, Country)* | Outcome or disposition of the arrest, citation, detention or charge *(No charges filed, charges dismissed, jail, probation, etc.)* |
|---|---|---|---|
| SUBJECT TO REMOVAL | 09/21/2001 | HOUSTON, TX, USA | TERMINATED W/O PREJUDICE |
| INJURY TO A CHILD | 09/04/1992 | HOUSTON, TX, USA | DEFERRED ADJ/PROBATION |
| THEFT | 08/05/1992 | HOUSTON, TX, USA | DEFERRED ADJ/PROBATION |

Answer questions 22 through 33.  If you answer "Yes" to any of these questions, attach (1) your written explanation why your answer was "Yes," and (2) any additional information or documentation that helps explain your answer.

22. Have you **EVER**:

    a. been a habitual drunkard?  ☐ Yes  ☑ No

    b. been a prostitute, or procured anyone for prostitution?  ☐ Yes  ☑ No

    c. sold or smuggled controlled substances, illegal drugs or narcotics?  ☐ Yes  ☑ No

    d. been married to more than one person at the same time?  ☐ Yes  ☑ No

    e. helped anyone enter or try to enter the United States illegally?  ☐ Yes  ☑ No

    f. gambled illegally or received income from illegal gambling?  ☐ Yes  ☑ No

    g. failed to support your dependents or to pay alimony?  ☐ Yes  ☑ No

23. Have you **EVER** given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?  ☐ Yes  ☑ No

24. Have you **EVER** lied to any U.S. government official to gain entry or admission into the United States?  ☐ Yes  ☑ No

Form N-400 (Rev. 07/23/02)N Page 8

**Part 10. Additional Questions** *(Continued)*

Write your INS "A"- number here:
A 0 7 2 4 2 1 5 1 8

**E. Removal, Exclusion, and Deportation Proceedings**

25. Are removal, exclusion, rescission or deportation proceedings pending against you? ☐ Yes ☑ No

26. Have you **EVER** been removed, excluded, or deported from the United States? ☐ Yes ☑ No

27. Have you **EVER** been ordered to be removed, excluded, or deported from the United States? ☐ Yes ☑ No

28. Have you **EVER** applied for any kind of relief from removal, exclusion, or deportation? ☐ Yes ☑ No

**F. Military Service**

29. Have you **EVER** served in the U.S. Armed Forces? ☐ Yes ☑ No

30. Have you **EVER** left the United States to avoid being drafted into the U.S. Armed Forces? ☐ Yes ☑ No

31. Have you **EVER** applied for any kind of exemption from military service in the U.S. Armed Forces? ☐ Yes ☑ No

32. Have you **EVER** deserted from the U.S. Armed Forces? ☐ Yes ☑ No

**G. Selective Service Registration**

33. Are you a male who lived in the United States at any time between your 18th and 26th birthdays in any status except as a lawful nonimmigrant? ☑ Yes ☐ No

If you answered "NO", go on to question 34.

If you answered "YES", provide the information below.

If you answered "YES", but you did NOT register with the Selective Service System and are still under 26 years of age, you must register before you apply for naturalization, so that you can complete the information below:

Date Registered (Month/Day/Year) 12/14/1995    Selective Service Number 7 0 /2 0 / 5 3 9 5 /5

If you answered "YES", but you did NOT register with the Selective Service and you are now 26 years old or older, attach a statement explaining why you did not register.

**H. Oath Requirements** *(See Part 14 for the text of the oath)*

Answer questions 34 through 39. If you answer "No" to any of these questions, attach (1) your written explanation why the answer was "No" and (2) any additional information or documentation that helps to explain your answer.

34. Do you support the Constitution and form of government of the United States? ☑ Yes ☐ No

35. Do you understand the full Oath of Allegiance to the United States? ☑ Yes ☐ No

36. Are you willing to take the full Oath of Allegiance to the United States? ☑ Yes ☐ No

37. If the law requires it, are you willing to bear arms on behalf of the United States? ☑ Yes ☐ No

38. If the law requires it, are you willing to perform noncombatant services in the U.S. Armed Forces? ☑ Yes ☐ No

39. If the law requires it, are you willing to perform work of national importance under civilian direction? ☑ Yes ☐ No

Form N-400 (Rev. 07/23/02)N Page 9

| Part 11.  Your Signature | Write your INS "A"- number here:<br>A 0 7 2 4 2 1 5 1 8 |
|---|---|

I certify, under penalty of perjury under the laws of the United States of America, that this application, and the evidence submitted with it, are all true and correct. I authorize the release of any information which INS needs to determine my eligibility for naturalization.

Your Signature _____

Date (Month/Day/Year) 0 4 0 7 2 0 0 4

### Part 12.  Signature of Person Who Prepared This Application for You *(if applicable)*

I declare under penalty of perjury that I prepared this application at the request of the above person. The answers provided are based on information of which I have personal knowledge and/or were provided to me by the above named person in response to the *exact questions* contained on this form.

| Preparer's Printed Name | Preparer's Signature |
|---|---|
| CATHY NGUYEN, LAW CLERK | |

| Date (Month/Day/Year) | Preparer's Firm or Organization Name (If applicable) | Preparer's Daytime Phone Number |
|---|---|---|
| 0 4 / 0 2 / 2 0 0 4 | COANE & ASSOCIATES | (713 ) 850-0066 |

| Preparer's Address - Street Number and Name | City | State | ZIP Code |
|---|---|---|---|
| 1900 WEST LOOP SOUTH, SUITE 820 | HOUSTON | TEXAS | 77027 |

### Do Not Complete Parts 13 and 14 Until an INS Officer Instructs You To Do So

### Part 13.  Signature at Interview

I swear (affirm) and certify under penalty of perjury under the laws of the United States of America that I know that the contents of this application for naturalization subscribed by me, including corrections numbered 1 through ___ and the evidence submitted by me numbered pages 1 through ___ , are true and correct to the best of my knowledge and belief.

Subscribed and sworn to (affirmed) before me    *RALPH RYAS*    8/17/04

Complete Signature of Applicant *Mohammad Hafiz Abusadeh*     Officer's Printed Name or Stamp    Date (Month/Day/Year)

Officer's Signature

### Part 14.  Oath of Allegiance

If your application is approved, you will be scheduled for a public oath ceremony at which time you will be required to take the following oath of allegiance immediately prior to becoming a naturalized citizen.  By signing , you acknowledge your willingness and ability to take this oath:

I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, of whom or which which I have heretofore been a subject or citizen;

that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic;

that I will bear true faith and allegiance to the same;

that I will bear arms on behalf of the United States when required by the law;

that I will perform noncombatant service in the Armed Forces of the United States when required by the law;

that I will perform work of national importance under civilian direction when required by the law; and

that I take this obligation freely, without any mental reservation or purpose of evasion; so help me God.

| Printed Name of Applicant | Complete Signature of Applicant |
|---|---|
| Mohammad Hafiz Abusadeh | |

*Mohammad Hafiz Abusadeh*

Form N-400 (Rev. 07/23/02)N Page 10

  Interim Case Management Solution (ICMS) 

## Case Query Results

Home
Training
Change
Password
Logout

> Please note the following:
> - Notice(s) have been added to the batch queue.
> - APPROVED/NOTICE ORDERED : Receipt Number MSC0540073879

| Receipt Number | Form | Applicant/Beneficiary | Petitioner |
|---|---|---|---|
| MSC0540073879 | I90 | ABUSADEH, MOHAMMAD H | |

Case Query
Query Results

Create

Ex. C

## Case History

### Document Production Status

| Date | Action | User |
|------|--------|------|

There is no document production information for this case.

### History

| Date | Action | User |
|------|--------|------|
| 06 Feb 2007 09:14 | APPROVED/NOTICE ORDERED | MSCHOUDD (RICHARD PENA) |
| 06 Feb 2007 09:14 | DATA CHANGED IN RECORD | MSCHOUDD (RICHARD PENA) |
| 06 Feb 2007 09:14 | DATA CHANGED IN RECORD | MSCHOUDD (RICHARD PENA) |
| 06 Feb 2007 09:14 | CARD REQUEST SENT TO ICPS PRINT SERVER | MSCHOUDD (RICHARD PENA) |
| 17 Jul 2006 14:24 | DATA CHANGED IN RECORD | MSCXHHAC (NANCY KUGLER) |
| 17 Jul 2006 14:24 | REQUEST FOR ADDITIONAL EVIDENCE SENT | MSCXHHAC (NANCY KUGLER) |
| 03 Oct 2005 07:05 | DATA CHANGED IN RECORD | MSCBRU01 (MSCBRU01 MSCBRU01) |
| 01 Aug 2005 18:05 | NO SYSTEM IDENTIFIED DEROGATORY INFORMATION | MSCIBIS (MSC IBIS) |
| 27 Jul 2005 18:05 | RECEIVED | MSCUSBNK (USBANK LOSLOCKBOX) |
| 27 Jul 2005 18:05 | RECEIPT NOTICE SENT | MSCUSBNK (USBANK LOSLOCKBOX) |

Close Window

  ICMS *Online*    Interim Case Management Solution (ICMS)   

Home
Training
Change
Password
Logout

**Form: I-90 / I-89**
**Application to Replace Permanent Resident Card and**
**I-551 or I-586 Card Data Collection Form**

| Receipt Number: | MSC0540073879 |
|---|---|
| Date Received: | 07/27/2005 |

**In Production (Address Changes Only)**
This ARC card is currently in production. Printing of duplicate cards is not allowed. In an emergency situation, call the ICMS support line at the National Benefits Center to request an override of this restriction.

Case History
CIS Check
Decision Data
City/State/Zip
Calculator

This Case
▽
Adjudicate
▽
Clerical Options
▽

Case Query
Query Results

Case Review
▽
Additional Actions

Create ▽

I-90 / I-89    G-28

UNITED STATES DISTRICT COURT
DISTRICT OF THE DISTRICT OF COLUMBIA

MOHAMMAD ABUSADEH,

        Plaintiff,

        v.

MICHAEL CHERTOFF, et al.,

        Defendants.

Case No.:  1:06-cv-2014
A No.:  072 421 518

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units.  The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for Mohammad Abusadeh, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)    The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies.  The Central

1   Records System ("CRS") contains the FBI's administrative, personnel, and investigative files.

2   The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower

3   Administration. That executive order addresses personnel security issues and mandates National

4   Agency Checks as part of the pre-employment vetting and background investigation process for

5   prospective Government employees. The FBI performs the primary National Agency Check

6   conducted on all United States Government employees. From this modest beginning, the

7   Program has grown exponentially, with more and more customers seeking background

8   information from FBI files on individuals before bestowing a privilege, such as Government

9   employment or an appointment, a security clearance, attendance at a White House function, a

10   "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and

11   local agencies regularly request FBI name searches. In addition to serving our regular

12   Government customers, the FBI conducts numerous name searches in direct support of the FBI's

13   counterintelligence, counterterrorism, and homeland security efforts.

14                   **EXPLANATION OF THE CENTRAL RECORDS SYSTEM**

15          (5)    The FBI's CRS enables the FBI to maintain all information which it has

16   acquired in the course of fulfilling mandated law enforcement responsibilities. The records

17   maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

18   compiled for law enforcement purposes. This system consists of a numerical sequence of files

19   broken down according to subject matter. The subject matter of a file may relate to an

20   individual, organization, company, publication, activity, or foreign intelligence matter. Certain

21   records in the system are maintained at FBI Headquarters. Records which are pertinent to

22   specific FBI Field Offices are mostly maintained at those Field Offices.

23          (6)    FBI Headquarters and each Field Division can access the CRS through the

24   FBI's General Indices. The General Indices are arranged in alphabetical order and consist of

25   indices on various subjects, including the names of individuals and organizations. Only the

26   information considered pertinent, relevant, or essential for future retrieval is indexed.

27

28

                                          2

(7)    Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)    The entries in the General Indices fall into two categories:

(a)    "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

(b)    "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)    In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system consists of the following three automated applications that support case management functions for all investigative and administrative cases:

(a)    Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b)    Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the

3

computerized system. All serials originated by the Office
of Origin are maintained in the Office of Origin's case file.

(C)  Universal Index: This application, sometimes referred to as
"UNI", continues the universal concepts of the ACS system
by providing a complete subject/case index to all
investigative and administrative cases. Only the Office of
Origin is required to index. However, the Lead Offices
may index additional information as needed. The Universal
Index, which consists of an index of approximately 96.4
million records, functions to index names to cases, and to
search names and cases for use in the FBI investigative and
administrative cases. Names of individuals or entities are
recorded with identifying information such as the date or
place of birth, race, sex, locality, social security number,
address, or date of event.

(10)  The decision to index names other than subjects, suspects, and victims is a

discretionary decision made by the investigative FBI Special Agent, the supervisor in the field

division conducting the investigation, and the supervising FBI Special Agent at FBI

Headquarters. The FBI does not index every name in its files, but indexes only that information

considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this

mass information, information essential to ongoing investigations could not be readily retrieved.

The FBI files would thus be merely archival in nature and could not be effectively used to serve

the mandated mission of the FBI, which is to investigate violations of federal criminal statutes.

Therefore, the General Indices to the CRS files are the means by which the FBI can determine

what retrievable information, if any, the FBI may have in its CRS files on a particular subject

matter.

(11)  When the FBI searches a person's name, the name is electronically

checked against the FBI's Universal Index. The searches seek all instances of the individual's

name, social security number, and dates close to his or her date of birth, whether a main file or

reference. As previously stated, any "main" file name would be that of an individual who is,

himself or herself, the subject of an FBI investigation, whereas any "reference" would be an

individual whose name appears as part of an FBI investigation. For example, "references"

include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

4

1   reasons to explain why an FBI Special Agent conducting an investigation believed it important to

2   include a particular name in the FBI's index for later recovery. The names are searched in a

3   multitude of combinations, switching the order of first, last, and middle names, as well as

4   combinations with only the first and last names, first and middle names, and so on. The Program

5   application searches names phonetically against the Universal Index records and retrieves similar

6   spelling variations (which is especially important considering that many names in our indices

7   have been transliterated from a language other than English).

8         (12)   If there is a match with a name in a FBI record, it is designated as a "Hit,"

9   meaning that the system has stopped on a possible match with the name being checked. If a

10   search comes up with a match to a name and either a birth date or social security number, it is

11   designated an "Ident."

12                              **RESOLUTION RATE**

13         (13)   Historically, approximately 68 percent of the name checks submitted by

14   USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72

15   hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable

16   information regarding a particular individual. Duplicate submissions (i.e., identically spelled

17   names with identical dates of birth and other identical information submitted while the original

18   submission is still pending) are not checked, and the duplicate findings are returned to USCIS

19   within 48-72 hours.

20         (14)   For the name check requests that are still pending after the initial

21   electronic check, additional review is required. A secondary manual name search completed

22   within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having

23   "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent

24   also are returned to USCIS. The remaining 10 percent are identified as possibly being the subject

25   of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was

26   electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed

27   quickly. If not, however, the relevant information must be retrieved from an existing paper

28

1  record. Review of this information will determine whether the information is identified with the

2  request. If the information is not identified with the request, the request is closed as a "No

3  Record" and USCIS is so notified.

4        (15)    Once a record is retrieved, the FBI reviews the file for possible derogatory

5  information. Less than one percent of USCIS's requests are identified with a file containing

6  possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory

7  information to USCIS.

8  **GROWTH OF THE NAME CHECK PROGRAM**

9        (16)    Prior to September 11, 2001, the FBI processed approximately 2.5 million

10  name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the

11  number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4

12  million name checks.

13  **USCIS NAME CHECK REQUESTS**

14        (17)    In November 2002, heightened national security concerns prompted a

15  review of the former Immigration and Naturalization Service's ("INS's") procedures for

16  investigating the backgrounds of individuals seeking immigration benefits. It was determined

17  that deeper, more detailed clearance procedures were required to protect the people and the

18  interests of the United States effectively. One of the procedures identified was the FBI's name

19  check clearance. Before November 2002, only those "main" files that could be positively

20  identified with an individual were considered responsive to the immigration authorities name

21  check requests. However, because that approach ran a risk of missing a match to a possible

22  derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a

23  processing standpoint, this meant the FBI was required to review many more files in response to

24  each individual background check request.

25        (18)    In December of 2002 and January of 2003, the former INS resubmitted 2.7

26  million name check requests to the FBI for background investigations of all individuals with

27  then-pending applications for immigrations benefits for which the Immigration and Nationality

28

6

Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests.

(19)    The FBI's processing of those 440,000 resubmissions has delayed the processing of regular submissions from USCIS. As directed by USCIS, the FBI processes name check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check be expedited.

(20)    The FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of priority checks the analyst must process for, among others, military call-ups, medical emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When results of a name check are available, the FBI provides them to USCIS as quickly as possible.

(21)    It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

### PLAINTIFF'S NAME CHECK REQUEST

(22)    The name check request for plaintiff Mohammad Abusadeh was received by the FBI from USCIS on or about April 28, 2004, and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(23)    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _15_ day of February 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MOHAMMAD ABUSADEH | ) | |
| | ) | |
|     Plaintiff | ) | |
|     v. | ) | |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | Civil Action No. 06-2014 (CKK) |
| SECURITY, et. al. | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |

**ORDER**

Upon consideration of Defendants' Motion to Dismiss, or in the Alternative for Change of

Venue, any Opposition thereto, and the entire record herein, it is on this _____ day of March,

2007.

ORDERED, that the said Motion should be and hereby is granted; and it is

FURTHER ORDERED that the Plaintiff's complaint be and hereby is dismissed.


Date:_____                                        _____

                                                         United States District Judge

Copies to:

Attorney for Defendants

Wyneva Johnson
Assistant United States Attorney
555 4th Street, E-4106
Washington, D.C. 20530

Attorneys for Plaintiff

Jonathon S. Rochkind
Smith, Hudson & Carluzzo, P.C.
9300 West Courthouse Road
Judiciary Sqaure - Suite 203
Manassas, Virginia 20110

Bruce A.  Coane
Ajay Choudhary
James P. McCollum, Jr
3D/International Tower
1900 West Loop South
Suite 820
Houston, Texas 77027-3206

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MOHAMMAD ABUSADEH )
)
    Plaintiff )
v. )
)
DEPARTMENT OF HOMELAND )   Civil Action No. 06-2014 (CKK)
SECURITY, <u>et. al.</u> )
)
    Defendants. )
_____ )

**ORDER**

    Upon consideration of Defendants' Motion to Dismiss, or in the Alternative for Change of

Venue, any Opposition thereto, and the entire record herein, it is on this _____ day of March,

2007.

    ORDERED, that the said Motion should be and hereby is granted; and it is

    FURTHER ORDERED that this civil action is transferred to the United States District

Court, Southern District of Texas, Houston Division.

Date:_____　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　United States District Judge

Copies to:

Attorney for Defendants

Wyneva Johnson
Assistant United States Attorney
555 4th Street, E-4106
Washington, D.C. 20530

Attorneys for Plaintiff

Jonathon S. Rochkind
Smith, Hudson & Carluzzo, P.C.
9300 West Courthouse Road
Judiciary Sqaure - Suite 203
Manassas, Virginia 20110

Bruce A.  Coane
Ajay Choudhary
James P. McCollum, Jr
3D/International Tower
1900 West Loop South
Suite 820
Houston, Texas 77027-3206