IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MOHAMMAD ABUSADEH, | § | |
| | § | |
| *Plaintiff* | § | Civil Action No. 06-2014 (CKK) |
| | § | |
| v. | § | |
| | § | |
| DEPARTMENT OF HOMELAND | § | |
| SECURITY, THROUGH ITS | § | |
| SECRETARY, MICHAEL CHERTOFF, | § | |
| EMILIO GONZALEZ, DIRECTOR, | § | |
| UNITED STATES CITIZENSHIP AND | § | |
| IMMIGRATION SERVICES (USCIS), | § | |
| SHARON HUDSON, DISTRICT | § | |
| DIRECTOR, HOUSTON, USCIS, AND | § | |
| ROBERT MUELLER, DIRECTOR, | § | |
| FEDERAL BUREAU OF | § | |
| INVESTIGATION, | § | |
| | § | |
| *Defendants* | § | |

**PLAINTIFF'S RESPONSE OPPOSING DEFENDANTS' MOTION TO DISMISS,
OR IN THE ALTERNATIVE, FOR CHANGE OF VENUE**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Mohammad Abusadeh ("Abusadeh") and files this response

opposing Defendants' Motion to Dismiss, or in the alternative, for Change of Venue.

Plaintiff prays that the Court deny Defendants' Motion.  In support of his response to

Defendants' Motion, Plaintiff refers the Court to the accompanying memorandum of

points and authorities.  A proposed Order is attached.

Respectfully submitted,

/s/ Jonathan S. Rochkind
Jonathan S. Rochkind
Smith, Hudson & Carluzzo, P.C.

9300 West Courthouse Road
Judiciary Square – Suite 203
Manassas, Virginia 20110
(703) 361-0776 ext 107
DC Bar ID number 425185


COANE & ASSOCIATES


/s/ James P. McCollom, Jr.
Bruce A. Coane
SBOT No. 04423600
Ajay Choudhary
SBOT No. 90001623
James P. McCollom, Jr.
SBOT No. 13431960
3D/International Tower
1900 West Loop South
Suite 820
Houston, TX 77027-3206
713-850-0066
713-850-8528  FAX

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent by

electronic means through the Electronic Case Filing system on May 1, 2007 to:


Ms. Wyneva Johnson
Assistant U.S. Attorney
Judiciary Center Building
555 4th Street, NW
Civil Division
Washington, DC 20530
Wyneva.Johnson@usdoj.gov


/s/ James P. McCollom, Jr.
James P. McCollom, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMAD ABUSADEH, §
§
*Plaintiff* §        Civil Action No. 06-2014 (CKK)
§
v. §
§
DEPARTMENT OF HOMELAND §
SECURITY, THROUGH ITS §
SECRETARY, MICHAEL CHERTOFF, §
EMILIO GONZALEZ, DIRECTOR, §
UNITED STATES CITIZENSHIP AND §
IMMIGRATION SERVICES (USCIS), §
SHARON HUDSON, DISTRICT §
DIRECTOR, HOUSTON, USCIS, AND §
ROBERT MUELLER, DIRECTOR, §
FEDERAL BUREAU OF §
INVESTIGATION, §
§
*Defendants* §

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' RESPONSE OPPOSING DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR CHANGE OF VENUE**

Plaintiff Mohammad Abusadeh ("Abusadeh") respectfully requests that the Court

deny Defendants' Motion to Dismiss or, in the alternative, for Change of Venue, and

would show as follows:

I.  Statement of Facts

Plaintiff brings this lawsuit seeking to compel action on an application for

naturalization that he filed with the Defendants on April 12, 2004.  (Plaintiff's Original

Complaint, ¶ 8).  Plaintiff also seeks to compel action on an application to replace a

lawful permanent residence card that he filed with the Defendants on July 27, 2005.

(Plaintiff's Original Complaint, ¶ 14).  The Defendants state that they have approved

Abusadeh's application to replace his lawful permanent residence card.  (Defendants'
Memorandum in Support of Motion to Dismiss, page 2)("D Memo").

## II.  Introduction

The Defendants have moved pursuant to Rule 12(b)(1) and (3) of the Federal
Rules of Civil Procedure to dismiss this action for lack of subject matter jurisdiction and
lack of venue.  The Defendants also move in the alternative to transfer venue pursuant to
28 U.S.C. § 1404(a).  Defendants' motions are the only issue before the Court.

Federal Rule of Civil Procedure 12(b)(1) requires that the plaintiff bear the burden
of establishing that the court has subject matter jurisdiction.  *Brady Campaign to Prevent
Gun Violence v. Ashcroft,* 339 F.Supp.2d 68, 72 (D.D.C.2004). While the Court must
accept as true all the factual allegations contained in the complaint when reviewing a
motion to dismiss pursuant to Rule 12(b)(1), *Leatherman v. Tarrant County Narcotics
Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517
(1993), because the plaintiff has the burden of proof to establish jurisdiction, the
"'plaintiff's factual allegations in the complaint ... will bear closer scrutiny in resolving a
12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand
Lodge of Fraternal Order of Police v. Ashcroft,* 185 F.Supp.2d 9, 13-14 (D.D.C.2001).

"In considering a motion to dismiss for lack of proper venue under Rule 12(b)(3),
'the Court accepts the plaintiff['s] well-pled factual allegations regarding venue as true,
draws all reasonable inferences from those allegations in the plaintiff['s] favor, and
resolves any factual conflicts in the plaintiff ['s] favor.'" *Varma v. Gutierrez,* 421
F.Supp.2d 110, 112-13 (D.D.C.2006) *citing Quarles v. Gen. Inv. & Dev. Co.,* 260
F.Supp.2d 1, 8 (D.D.C.2003) (internal quotation marks and citation omitted).  In order for

the Defendants to prevail on a 12(b)(3) motion, the Defendants must present facts that will defeat the plaintiff's assertion of venue. *Freeman v. Fallin,* 254 F.Supp.2d 52, 56 (D.D.C.2003) *citing 2115 Fifth St. Assocs. v. U-Haul Int'l, Inc.,* 148 F.Supp.2d 50, 54 (D.D.C.2001). The plaintiff has the obligation to institute the action in a permissible forum, and consequently the plaintiff usually bears the burden of establishing that venue is proper. *Freeman v. Fallin,* 254 F.Supp.2d 52, 56 (D.D.C.2003) *citing Bartholomew v. Va. Chiropractors Ass'n, Inc.,* 612 F.2d 812, 816 (4th Cir.1979).

### III. This Lawsuit is not Barred by Res Judicata

The Defendants state that this lawsuit is "identical" to an action Abusadeh previously filed in the United States District Court, Southern District of Texas. (D Memo, 1). In fact, Abusadeh brought the previous action under 8 U.S.C. § 1447(b) requesting that the Court either determine the naturalization matter or remand the matter, with appropriate instructions to the Service. (Exhibit A, Plaintiff's Original Complaint, ¶¶ 9-11, 18, 21). In the previous action, the Court *sua sponte* remanded the naturalization case back to the Defendants stating that it lacked jurisdiction under 1447(b). (Exhibit A, Order for Remand, pages 1-2). The Defendants admit that the previous Court dismissed the case for lack of jurisdiction under 1447(b). (D memo, 10).

In the current lawsuit, Abusadeh does not plead 1447(b). Rather, Abusadeh seeks relief under 28 U.S.C. § 1331, the Mandamus Act, 28 U.S.C. § 1361 and the Administrative Procedures Act, 5 U.S.C. § 706 *et. seq.* to "compel agency action unlawfully withheld or unreasonably delayed." (Complaint ¶¶ 2, 3, 26, 34, and 35).

The Defendants argue that the current lawsuit should be dismissed because it "raises precisely the same issue on the same naturalization application." (D Memo, 10). Thus, the Defendants make a res judicata argument.

A lawsuit may be barred by res judicata as a matter of "claim preclusion" or "issue preclusion." *I.A.M. Nat'l Pension Fund,* 723 F.2d 944, 946 (D.C.Cir.1983). "Under the claim preclusion aspect of res judicata, a final judgment on the merits in a prior suit involving the same parties or their privies bars subsequent suits based on the same cause of action." *NextWave Personal Commc'ns, Inc. v. Fed. Commc'ns Comm'n,* 254 F.3d 130, 143 (D.C.Cir.2001) *citing I.A.M. Nat'l Pension Fund,* 723 F.2d at 946-7. However, dismissals for lack of jurisdiction are not decisions on the merits and therefore have no claim preclusive effect on subsequent attempts to bring suit in a court of competent jurisdiction. *NextWave Personal Commc'ns, Inc.,* 254 F.3d at 143 *citing Kasap v. Folger Nolan Fleming & Douglas, Inc.,* 166 F.3d 1243, 1248 (D.C.Cir.1999). *See also Fed R. Civ. P. 41(b).* Because it has already been established that the previous lawsuit was dismissed for lack of jurisdiction under 1447(b), and not on the merits, the instant lawsuit is not barred by claim preclusion.

Because of the same principles, this lawsuit is also not barred by issue preclusion. "Under the issue preclusion aspect of res judicata, a final judgment on the merits in a prior suit precludes subsequent relitigation of issues actually litigated and determined in the prior suit, regardless of whether the subsequent suit is based on the same cause of action." *NextWave Personal Commc'ns, Inc.,* 254 F.3d at 147 *citing I.A.M. Nat'l Pension Fund,* 723 F.2d at 947. "For issue preclusion to apply, however, 'the issue must have been actually litigated and necessarily determined by a court of competent jurisdiction in

the first trial." *NextWave Personal Commc'ns, Inc.,* 254 F.3d at 147 *citing Connors v. Tanoma Mining Co.,* 953 F.2d 682, 684 (D.C.Cir.1992).  The prior judgment was not a final judgment on the merits and therefore issue preclusion does not apply.

Also, because the current lawsuit raises different issues than the previous lawsuit, it is not barred by issue preclusion.  In the previous lawsuit, the Court *sua sponte* remanded the case based upon its finding of lack of subject matter jurisdiction under 1447(b).  There is no ambiguity as to the issue that the previous Court decided.   Issue preclusion "prevents the relitigation of any issue that was raised and decided in a previous action."  *I.A.M. Nat'l Pension Fund,* 723 F.2d at 949.  It is true that a dismissal for lack of jurisdiction has preclusive effect on the jurisdictional issue litigated.  *Dozier v. Ford Motor Co.,* 702 F.2d 1189, 1194 (D.C.Cir.1983).  In order to give res judicata effect to the prior judgment on a jurisdictional question, the Court must determine precisely what the prior judgment decided.  *Id.* at 1190.  In this case, because the jurisdictional questions are not the same, the Court can not give res judicata effect to the prior judgment.  As stated above, in the prior judgment, the Court ruled that there is no subject matter jurisdiction under 1447(b).  In the previous lawsuit, there was no determination as to jurisdiction under 1331; there was no determination under the Mandamus Act; and there was no determination as to unreasonable agency delay under the APA.

## IV.  Venue Is Appropriate in Washington, D.C.

The Defendants move the Court to dismiss this case pursuant to Fed.R.Civ.Pro. 12(b)(3) for improper venue.  Yet, venue properly lies in Washington, D.C. according to 28 U.S.C. § 1391(e) as the Defendants Department of Homeland Security, United States

Citizenship and Immigration Services, and the Federal Bureau of Investigation all reside in Washington, D.C.  28 U.S.C. § 1391(e) states:

> A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides …

Furthermore, as authority for their argument, the Defendants cite a case in which a prisoner filed a *Bivens* action against defendants in their individual capacities for damages and an injunctive action against officials in their official capacities.  (D Memo, 4).  *Cameron v. Thornburgh,* 983 F.2d 253, 255 (D.C.Cir.1993).  1391(e) does not apply to *Bivens* actions.  *Cameron v. Thornburgh,* 983 F.2d at 256 *citing Stafford v. Briggs,* 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980).  However, 1391(e) certainly applies to an action for an injunction against defendants in their official capacities and venue properly lies in any district in which one defendant resides.  *Cameron v. Thornburgh,* 983 F.2d at 257, n.2.  In *Cameron,* venue became improper in the District of Columbia only when the injunctive claim became moot.  *Id.*

1391(e) permits an action which is essentially against the United States to be brought locally rather than requiring that it be brought in the District of Columbia.  *Stafford v. Briggs,* 444 U.S. at 542.  Prior to the Mandamus and Venue Act of 1962, plaintiffs seeking mandamus relief in a suit essentially against the federal government were required to file in the District of Columbia.  *Stafford v. Briggs,* 444 U.S. at 534.  Yet 1391(e) is a permissive statute and thus the Plaintiffs may properly file a mandamus-type suit that is essentially against the United States government in the District of Columbia.

1391(e) is a statute which broadens venue but venue in the District of Columbia is still permitted.  *Stafford v. Briggs,* 444 U.S. at 543 *citing Schlanger v. Seamans,* 401 U.S. 487, 490, n. 4, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971).

The Defendants also inappositely cite another prisoner case for damages.  (D Memo, 4).  *Joyner v. District of Columbia,* 267 F.Supp.2d 15 (D.C.Cir.2003).  Neither *Cameron* nor *Joyner* is a mandamus-type lawsuit filed essentially against the United States government as is the instant case.  Neither the *Cameron* nor *Joyner* plaintiffs could avail themselves of the venue statute 1391(e).  Both *Cameron* and *Joyner* alleged ill treatment in places far away from Washington, D.C. and named federal government officials as defendants.  Both of these cases involved disputed facts requiring witnesses in their locales.  In both of these cases, the Courts dismissed the federal government defendants or ruled that there was at best a tenuous connection between the prisoner and Washington, D.C.  As a result, the Courts transferred venue.

The Defendants further inaccurately compare the instant case on its facts to *Cameron* and *Joyner.*  (D memo, 4-5).  First, a prisoner suit is a suit for damages that does not fall under the general venue statute as does a mandamus-type lawsuit under federal immigration laws.  The defendants in the instant suit are properly named defendants because they are the federal government officials who are the decision-makers in immigration matters.  *See 8 C.F.R. § 2.1.*

In addition, the Plaintiffs have sued the FBI, the Defendant that is conducting the name check that is pending as of the time of this lawsuit.  (D Memo, Declaration of Sharon A. Hudson, Ex. B ¶ 9(f)) (Exhibit B).  It is the federal government officials in Washington, D.C. who are directing the policy that has ultimately resulted in no decision

having been made on this case.  For example, the USCIS Defendant Headquarters in Washington, D.C. has recently issued a memorandum stating that USCIS policy will be to no longer routinely request that an FBI name check be expedited when a mandamus lawsuit is filed.  (Exhibit C).  As will be argued more extensively later, although the Houston District Director Defendant may ultimately make a decision on the naturalization application itself, the policy makers in Washington, D.C., in both the Department of Homeland Security and the FBI, have failed to respond to the increased demand for name checks.  (*see* D Memo, Ex. B-2 and B-3) (Exhibits D and E).  As will be seen later, this problem has not been redressed for at least ten years.  It is inaccurate to say that there is little or no connection to Washington, D.C. regarding the adjudication of this case.

It should also be noted that there are no contested facts on the application for naturalization to be decided in this lawsuit.  Rather, Plaintiff simply wants the agency to make a decision on his application.  Ms. Hudson, the USCIS Houston Defendant, states that an FBI criminal history report from 2004 identifies two criminal convictions for Abusadeh from 1992.  (D Memo, Ex. B ¶ 9(c), (Ex. B ¶ 9(c)).  In fact, this criminal history has been in the Defendants' file since 1992 when Abusadeh revealed these convictions at the time he applied and was granted lawful permanent residence.  (Exhibit BB).  On March 20, 2000, the Defendants denied Abusadeh's first naturalization application because of lack of good moral character because these two criminal convictions occurred during the statutory period.  (Exhibit BC).  At this juncture, they are not a bar to naturalization.  It is apparent that before adjudicating this petition, the Defendants are simply awaiting the results of the FBI name check.

### III.  This Court Should Not Transfer Venue

The Defendants move to transfer this case to the U.S. District Court for the Southern District of Texas under 28 U.S.C. § 1404(a) but fail to carry their burden.  The statute states, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  *Id.*

"In order to succeed on their motion, defendants have the heavy burden of establishing the plaintiff's choice of forum is inappropriate."  *Shapiro, Lifschitz, & Schram, P.C. v. Hazard,* 24 F.Supp.2d 66, 71 (D.D.C.1998) *citing Pain v. United Technologies Corp.,* 637 F.2d 775, 783 (D.C.Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981).  However, less weight is given to a foreign plaintiff's choice of forum.  *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255-56, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

The Court has broad discretion to adjudicate motions to transfer under 1404(a).  *Norwood v. Kirkpatrick,* 349 U.S. 29, 32, 75 S.Ct. 544, 99 L.Ed. 789 (1955).  However, the Court may not transfer a case "from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff."  *Shapiro, Lifschitz, & Schram, P.C.,* 24 F.Supp.2d 66, 71 *citing Pain v. United Technologies, Corp.,* 637 F.2d 775, 783.

A threshold question under 1404(a) is whether the case could have been brought in the district to which transfer is sought.  *Van Dusen v. Barrack,* 376 U.S. 612, 622, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).  There is no issue that the case could have been brought in the Southern District of Texas.

11

A motion to transfer under 1404(a) requires a factually intensive analysis to determine which forum is more appropriate. *Thayer/Patricof Educ. Funding LLC v. Pryor Res.,* 196 F.Supp.2d 21, 32 (D.D.C.2002).

"Courts consider several factors in determining whether a case should be transferred under section 1404(a), including private and public interests. The private interest considerations include: (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses …, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof. The public interest considerations include: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home." *Id.* at 31-32.

It is true that the interests of justice militate a transfer when it is a local dispute. For example, if the outcome would affect the land, water, and wildlife of Colorado, then the Court properly transferred the case to Colorado from Washington, D.C. *Thayer/Patricof Educ. Funding LLC v. Pryor Res.,* 196 F.Supp.2d at 37, n. 10 (D.D.C.2002) *citing Trout Unlimited v. Dep't of Agric.,* 944 F.Supp. 13, 19 (D.D.C. 1996). Likewise, the Court transferred a case from to Kansas from Washington, D.C. primarily because of the "local interest" relating to the "development of a massive area in Kansas." *Shawnee Tribe v. United States,* 298 F.Supp.2d 21, (D.D.C.2002). Similarly, the Court transferred a case to California from Washington, D.C. because "at core" the dispute involved the proposed construction of a hotel/casino on a certain parcel of land in

San Diego County.  *Rosales v. U.S.,* --- F.Supp.2d ---, 2007 WL 809663 (D.D.C. Mar. 19, 2007).  Again, the Court transferred a case to Florida from Washington, D.C. largely because there was a strong local interest in deciding a dispute regarding issuing mining permits for certain Everglades wetlands in southern Florida. *Sierra Club v. Flowers,* 276 F.Supp. 62, 70-71 (D.D.C.2003).

In their argument on venue, the Defendants make a fundamental error.  Plaintiff complains of agency delay in making the decision on the naturalization case.  In all of the cases on venue cited by the Defendants, the issue is the actual determination of a factual controversy.  Such a determination requires witnesses and a finder of fact.  In the instant lawsuit, there are no facts for the Court to determine on the application for naturalization.  Rather, Plaintiffs seek to have the Court compel the Defendants to issue a decision.  As such, the actual result of the decision on the naturalization is not relevant to this action.

The gravamen of Plaintiffs' complaint is that the Defendants have failed to act to clear a backlog of FBI name checks that has existed for over 10 years.  *Sze v. INS,* 1997 WL 446236 (N.D.Cal. Jul 24, 1997).  As such, the federal government Defendants have caused an unreasonable delay for the respective local USCIS offices in processing otherwise simple naturalization applications.  In order to further develop this issue, it is necessary to preview an essential part of Plaintiffs' argument as to jurisdiction.

The leading case on the issue of whether relief under the APA is warranted for "agency action unlawfully withheld or unreasonably delayed" is *Telecomm. Research and Action Ctr. (TRAC) v. FCC,* 750 F.2d 70 (D.C.Cir.1984).  The *TRAC* case sets forth six relevant factors.  For example, the first factor is that the Court must consider the agency's justification for the pace of its decision.  *Muwekma Tribe v. Babbitt,* 133

F.Supp.2d  30, 36 (D.D.C.2000).  An examination of the TRAC factors necessarily involves an examination of the action of the agency as a whole.  The Defendants argue that the Court should transfer venue because the federal government officials in Washington, D.C. are not involved in the decision-making process.  (D Memo, 6).  While it is true that the federal government official in Washington, D.C. is not ordinarily involved in the adjudication of a particular naturalization application, this Court is not deciding the merits of the naturalization application itself.  Rather, this Court is reviewing whether the agencies have unreasonably delayed the processing of the application.  The conduct of the federal officials and the agencies in Washington, D.C. is certainly at issue.

In considering the TRAC analysis, Courts have frequently considered the fourth factor significant: the effect of expediting delayed action on agency activities of a higher or competing priority.  *See eg. Sze v. INS,* 1997 WL at *8.  In 1997, the *Sze* Court held that agency delay was reasonable, in large part, because the delay in the processing of FBI name checks was largely attributable to "short-term factors such as increased applicants, recent changes to INS' processing rules, and the fallout from the FBI's recent relocation of its facilities" and because the Plaintiffs had shown no bad faith on the part of the INS or the FBI.  *Id.*  The *Sze* Court reasoned that in view of the limited resources of the agency, the agency was in the best position to allocate its resources and a court order would at best reorder the queue, leading to little benefit.  *Id.*

Abusadeh brings suit alleging agency delay because in the ten years since the *Sze* decision, for example, the federal agencies have not corrected the "short-term factors" that account for the delay in the processing of FBI name checks and there is no end in sight.  The Defendants, in their Motion to Dismiss, have not offered any timetable as to

when the FBI name check might be cleared nor have they made any assurances that they are diligently processing the application. Defendants also appear to admit that the problem of the delay in processing name checks is largely one of methodology. (D Memo, Ex. B-2 and B-3) (Ex. D and E). The Defendants state that the files might be located locally or in a field office or in another FBI location. (D Memo, Ex. B-3, Page 1) (Ex. E, Page 1). The Defendants state that the delay is frequently caused by the time it takes an analyst to get to the name check request in order to process it. (D Memo, Ex. B-3, Page 1) (Ex. E, Page 1). The Defendants offer obstacles and no solutions. In other contexts, when the agency has refused to act over a protracted period of time, as will be demonstrated in further detail in this response, the Court has ordered the agency to take action, or has maintained jurisdiction over the case, to monitor the agency.

The Department of Labor was plagued by extensive delays in the processing of alien labor certifications for many years. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d 105, 109 (D.D.C.2005). In 1999 and 2000, the Department of Labor took several steps to assist its regional offices in processing permanent labor certification cases. *Id.* at 110. In July 2004, the Department of Labor created two "backlog" centers dedicated to processing and eliminating the backlog of applications for permanent labor certifications. *Id.* In December 2004, the Department amended agency regulations resulting in great improvements in the way cases were processed. *Id.* at 111.

The *Liberty Fund* Court, when faced with a claim of unreasonable delay in the processing of certain alien labor certifications, again found most significant the fourth *TRAC* factor. *Id.* at 116. The Court placed great weight on a projected timeline that the Department had provided to process the cases. *Id.* at 116. As in *Sze,* the *Liberty Fund*

Court declined to reorder agency priorities in the face of the good faith of the Department and the reasonableness of its actions. *Id.* at 120.

In other contexts, an "ambiguous, indefinite timeframe for review of the plaintiff's petition" has been held to be unreasonable agency delay under APA § 706(1). *Muwekma Tribe v. Babbitt,* 133 F.Supp.2d 30, 37 (D.D.C.2000). The *Muwekma* Court also cited the "specific history of interaction" between the parties. *Id.*

In other instances, Courts have not found "unreasonable delay" but have retained jurisdiction over a case to monitor agency assurances that it is proceeding as diligently as possible with the resources available to it. *See eg. St. Lawrence Seaway Pilots' Ass'n v. Collins,* 362 F.Supp.2d 59, 75 (D.D.C.2005).

Even though the Defendants claim that there is an inadequate nexus to the events in the case with Washington, D.C., this argument cannot stand. The Defendants have proffered the Declaration of Michael A. Cannon, the Section Chief, National Name Check Program Section, Records Management Division, Federal Bureau of Investigation, Washington, D.C. (D Memo, unmarked exhibit) (Ex. F). In Paragraph 9 of his declaration, Mr. Cannon describes that the FBI implemented the Automated Case Support system in 1995. Mr. Cannon does not describe any further attempts by the FBI to respond to the increased volume of name checks. In Paragraph 20, Mr. Cannon recites a laundry list of possible reasons affecting the time frame for processing name checks. The Defendants state that "the delay in the processing of Plaintiff's applications is a matter related to the Houston CIS office." (D Memo, 6). In Paragraph 22, Mr. Cannon states that the name check has not been completed. He further states that the "FBI is performing its check in response to USCIS's request in accordance with the procedures

16

outlined above.  The results of the name check will be forwarded to USCIS in

Washington, D.C. in due course, in accordance with the FBI's normal protocol."

Therefore, it is a fair conclusion to draw that it is actually the FBI that is the cause of the

delay because it is the agency processing the name check.  Further, it should be noted that

Mr. Cannon stated that he will forward the name check result to USCIS in Washington,

D.C.

In Paragraph 20, Mr. Cannon also states that "the FBI's mission on homeland

security requires that its name check process be primarily focused on providing accurate

and thorough results."   The Defendants frame the issue as one of national security.  The

real question is whether in the face of a question of national security, the delay by the

Defendants is reasonable.  Mr. Cannon describes the increased volume of name check

requests per year since 9-11.  (D Memo, unmarked exhibit, ¶ 16) (Ex. F ¶ 16).  Since

1995, the Defendants do not appear to have taken any concerted action to address the

issue of the increased volume of name checks and to alleviate the corresponding delay in

processing immigration applications.  These policy decisions are made in Washington,

D.C. and, correspondingly, Defendants' argument that there is an inadequate nexus to

Washington, D.C. is incorrect.

It should be further noted that 8 U.S.C. § 1571 states that "it is the sense of

Congress that the processing of an immigration benefit application should be completed

not later than 180 days after the initial filing of the application."  8 U.S.C. § 1572 and

1573 require the Attorney General to reduce the backlog in the processing of immigration

applications.

Venue is proper in Washington, D.C. because the delay in processing the naturalization application of Abusadeh is not being immediately created by the local USCIS office in Houston, Texas. Rather, the delay is being created in particular by the FBI Defendant in Washington, D.C.. As such, there is a sufficient nexus to Washington, D.C.

IV. This Court has subject matter jurisdiction

Federal question jurisdiction, 28 U.S.C. § 1331 and § 706(1) of the Administrative Procedures Act combine to provide subject matter jurisdiction over challenges to unreasonably delayed agency action unless there is a statute which restricts judicial review. *Yu v. Brown,* 36 F.Supp.2d 922, 929 (D.N.M.1999) *citing Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). *See also Mashpee Wampanoag Tribal Council, Inc. v. Norton,* 336 F.3d 1094, 1098 (D.C.Cir.2003).

A. 8 U.S.C. § 1252(a)(2)(B)(ii) does not divest this Court of jurisdiction

8 U.S.C. §1252(a)(2)(B)(ii) does not strip the Court of jurisdiction. Under this statute, Courts are barred from reviewing any "decision or action of the Attorney General … the authority for which is specified under this title to be in the discretion of the Attorney General."

The USCIS shall determine whether a naturalization application should be granted or denied and must give the reasons for any denial. 8 U.S.C. § 1446(d). If the USCIS were to deny the application, the applicant may request a hearing before an immigration officer. 8 U.S.C. § 1447(a). If the USCIS were to deny such hearing, then the applicant may seek review of such denial in federal court. 8 U.S.C. § 1421(c).

However, although the USCIS Defendants have discretion in the ultimate decision whether to grant naturalization, they have a ministerial, nondiscretionary duty to adjudicate naturalization applications within a reasonable time. *Yu v. Brown,* 36 F.Supp.2d at 931; *eg. Anjum v. Hansen,* 2007 WL 983215 at *5 (S.D.Ohio March 28, 2007). It has been specifically held that 8 U.S.C. §1252(a)(2)(B)(ii) does not strip jurisdiction over a claim of agency delay in processing an adjustment of status application. *Duan v. Zamberry,* 2007 WL 626116 (W.D.Pa. Feb.23, 2007) *criticizing Safadi v. Howard,* 466 F.Supp.2d 696 (E.D.Va.2006); *Elmalky v. Upchurch,* 2007 WL 944330 (N.D.Tex. Mar.28, 2007) *criticizing Safadi v. Howard.* The *Safadi* court held that 8 U.S.C. §1252(a)(2)(B)(ii) does strip jurisdiction over the pace at which the USCIS processed an application for adjustment of status.

In another instance, the Defendants cited federal regulations at 8 C.F.R. § 103.2(b)(7) and (18) to support the proposition that USCIS has a discretionary decision to withhold adjudication. *Mustafa v. Pasquarell,* 2006 WL 488399 (W.D.Tex. Jan 10, 2006). The problem is that in this case the Defendants have not claimed that they are acting under these regulations. Further, it should be noted that if the Defendants were claiming that a **regulation** provides discretion for the USCIS to withhold adjudication, under 8 U.S.C. §1252(a)(2)(B)(ii) jurisdiction is only stripped when a **statute** specifies that the action lies within the discretion of the Attorney General. *Zhao v. Gonzales,* 404 F.3d 295, 303 (5th Cir. 2005). If a regulation specifies the quantum of discretion, then jurisdiction is not stripped under 8 U.S.C. §1252(a)(2)(B)(ii).

B. 8 U.S.C. § 1252(g) does not divest this Court of jurisdiction

19

8 U.S.C. § 1252(g) does not divest this Court of jurisdiction.  The Fifth Circuit has stated that the Supreme Court in *Reno v. Am.-Arab Anti-Discrimination Comm.,* 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) narrowly construed the reach of 1252(g).  *Cardoso v. Reno,* 216 F.3d 512, 516 (5th Cir. 2000).   The Congressional aim of § 1252(g) is to protect from judicial intervention the Attorney General's long-established discretion to decide whether and when to prosecute or adjudicate **removal proceedings** or to execute removal orders.  *Alvidres-Reyes v. Reno,* 180 F.3d 199 (5th Cir. 1999). (emphasis added).  Other courts have arrived at the same conclusion.  *See eg. Yu v. Brown,* 36 F.3d 922, 934 (D.N.M.1999).  The Supreme Court stated that 1252(g) was directed at the particular evil of imposing judicial constraints on prosecutorial discretion. *Reno v. Am.-Arab Anti Discrimination Comm.* at 944, fn.9.   The Supreme Court stated that at each stage (commencing proceedings, adjudicating cases, and executing removal orders) the Executive has discretion to abandon the endeavor, and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as "deferred action") of exercising that discretion for humanitarian reasons or simply for its own convenience.  *Reno v. Am.-Arab Anti Discrimination Comm.* at 943.  1252(g) does not apply to a claim of unreasonable agency delay in processing an adjustment of status application.  *See eg. Elmalky v. Upchurch,* 2007 WL 944330 (N.D.Tex. Mar.28, 2007)

C.  The Defendants have not processed the Plaintiff's naturalization
application within a reasonable time

The Administrative Procedures Act provides that "[w]ith due regard for the convenience and necessity of the parties or their representatives and **within a reasonable time**, each agency shall proceed to conclude a matter presented to it …." 5 U.S.C. § 555(b) (emphasis added).

The Administrative Procedures Act further provides that the federal courts "shall … compel agency action unlawfully withheld or unreasonably delayed …." 5 U.S.C. § 706(1).

There is no statute stripping this Court of jurisdiction to review a claim of unreasonable agency delay by the USCIS in processing immigration applications. The question thus becomes whether the USCIS is in violation of 5 U.S.C. § 555(b). *Mashpee Wampanoag Tribal Council, Inc. v. Norton,* 336 F.3d at 1100.

D. Defendants have unreasonably delayed adjudication of Plaintiffs' applications

In the leading case on the issue of unreasonable delay, *Telecommunications Res. and Action Ctr. V. FCC,* 750 F.2d 70 (D.C.Cir.1984) ("TRAC"), the Court identified six relevant considerations.

First, the TRAC Court said that a "rule of reason" governs the time agencies take to make decisions. *Id.* At 80.

On the one hand, the rule of reason cautions against ordering action in this case because there are pending FBI security name checks. It has become evident that "[d]elays of this nature are inevitable and becoming more frequent in light of heightened security concerns in the post-911 world." *Alkenani v. Barrows,* 356 F.Supp.2d 652, 657 (N.D.Tex2005).

On the other hand, the USCIS has an affirmative duty to adjudicate the naturalization application. 8 U.S.C. § 1446(d). Therefore, when the USCIS fails to do so after more than three years, the applicant may reasonably seek Court intervention. Under the rule of reason, the USCIS cannot delay indefinitely. The question then becomes at what point should the Court act.

Second, the TRAC court said that a statutory scheme may supply content for the rule of reason. *Id.* at 80. It should be further noted that 8 U.S.C. § 1571 states that "it is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application." 8 U.S.C. § 1572 and 1573 require the Attorney General to reduce the backlog in the processing of immigration applications. Further, there are published guidelines by the USCIS Houston District office that show that this case is well outside of processing guidelines. (Exhibit G).

Third, the TRAC court said that reasonable delays in the sphere of economic regulation are less tolerable when human health and welfare are at stake. *Id.* at 80. This consideration does not at first blush apply in this case because economic regulations are not at stake. At the same time, the concern is that by refusing to act, and by further arguing that there should be no review of that refusal, the Defendants "relegate aliens to a state of 'limbo,' leaving them to languish indefinitely." *Kim v. Ashcroft,* 340 F.Supp.2d 384, 393 (S.D.N.Y.2004).

Fourth, the TRAC court said that the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority. *Id.* at 80. Plaintiff complains that the named Defendant, the Federal Bureau of Investigation, has not completed the requisite name checks.

In two recent cases, when faced with a claim of unreasonable delay, the Court has refused to order an agency to adjudicate a petition in large part because of this fourth consideration. *Mashpee Wampanoag Tribal Council, Inc. v. Norton,* 336 F.3d 1094 (D.C.Cir.2003); *Liberty Fund, Inc. v. Chao,* 394 F.Supp2d 105 (D.D.C.2005). The Court

reasoned that because the Department of Labor adhered to a principle of "first-in, first-out" in processing its applications, moving the petitioner to the front of the line would be at the expense of similarly situated applicants. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d at 115. The Court said that the Department's decision on how to handle competing applications is deserving of deference. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d at 117. The Court also said that although the Department of Labor was initially slow to react to a substantial increase in applications, it has, in more recent years taken comprehensive steps to process the applications more quickly. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d at 120. The Court placed great weight on the representations by the Department of Labor that projected guidelines showed that there would be relief in the foreseeable future as applications would be completed. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d at 116. The Court further believed that the Department of Labor's efforts demonstrated their good faith. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d at 120.

In contrast, in the instant case, the Defendants are offering no timetable to resolve this impossible situation. The Defendants state that name check requests have grown since 9-11. (Exhibit F, ¶ 16). Yet, unlike the Department of Labor, as detailed above, the Defendant FBI has apparently instituted no comprehensive steps to solve the situation. Rather, the Defendant FBI is apparently relying on antiquated methods of manually checking files that are located at offices throughout the country. (Exhibits D, E, and F).

In 1997, the *Sze* Court held that agency delay was reasonable, in large part, because the delay in the processing of FBI name checks was largely attributable to "short-term factors such as increased applicants, recent changes to INS' processing rules, and the fallout from the FBI's recent relocation of its facilities" and because the Plaintiffs

had shown no bad faith on the part of the INS or the FBI. *Sze v. INS,* 1997 WL 446236 (N.D.Cal. Jul 24, 1997). The *Sze* Court reasoned that in view of the limited resources of the agency, the agency was in the best position to allocate its resources and a court order would at best reorder the queue, leading to little benefit. *Id.*

Ten years later, in the instant case, good faith cannot be presumed because the Defendant FBI has not demonstrated that it has taken any action to respond to the development of a vast increase of name check applications. Consequently, immigrants all over the country similarly situated to Plaintiffs are in limbo. Abusadeh has been forced to resort to filing a lawsuit only because of this impossible situation.

It is undisputed that Abusadeh is one of many immigrants who are filing lawsuits of this sort because they are in limbo for years waiting for a logjam to clear. Abusadeh does not seek preferential treatment. Rather, he seeks that the FBI Defendant take appropriate steps to address the backlog so that his case in turn might be resolved expeditiously. Abusadeh complains about a systemic failure at the agency level to address its backlog.

8 U.S.C. § 1573 mandates that the Attorney General "shall take such measures as may be necessary to … reduce the backlog in the processing of immigration benefit applications." Because this backlog is being created in large part by the FBI Defendant, this Court should find that the FBI Defendant, and correspondingly, the DHS Defendants have unreasonably delayed the processing of these applications. For that reason, Abusadeh seeks an order compelling the FBI Defendant to take action. Under the cases cited above, it may ultimately be necessary for the Court to maintain jurisdiction over this

matter to monitor any future assurances from the FBI Defendant that it is addressing this backlog.

Fifth, the TRAC Court said that the court should also take into account the nature and extent of the interests prejudiced by the delay. *Id.* at 80.

As of this date, Abusadeh has been denied the privilege of being a United States citizen along with its accompanying benefits. Abusadeh cannot travel abroad at this point. As a result, he was not able to visit his mother before she died. (Exhibit H). Now, his father is ill and Abusadeh cannot travel to see his father. (Exhibit I). Abusadeh cannot participate in the democratic process. Because he is in limbo, he does not have the constitutional rights that U.S. citizens take for granted. In short, Abusadeh's life is at a complete standstill.

In contrast, the Defendants might cite the competing priorities of applications of other immigrants. This argument has already been refuted earlier.

Sixth, the TRAC Court said that the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" *Id.* at 80.

The Court cannot presume that the Defendants have shown good faith in addressing the delay because the FBI has not demonstrated any improvement in managing the processing of name checks despite the fact that this problem has existed for ten years. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d at 120. The Defendants do not offer any projected timeline that might provide relief in the foreseeable future.

It is possible for the Court to question the good faith or draw an inference of bad faith because of the agency's inaction in dealing with a problem that has existed for at

least ten years and because the agency offers no solution.  In the absence of a proposed

plan, the Court should be persuaded that the Defendants will not take any action on their

own initiative and that mandamus and court oversight is warranted.  In any case, the

Court should find jurisdiction under the APA for the claim against the FBI Defendant.

*Kaplan v. Chertoff,* 2007 WL 966510 at *23-24 (E.D.Pa.Mar. 29, 2007).

E.  Review under the APA is not precluded because of 5 U.S.C. § 701(a)(2)

5 U.S.C. § 701(a)(2) precludes review under the APA when "agency action is

committed to agency discretion by law."  Although the USCIS has the discretion to

whether to grant or deny the naturalization petition, it has a nondiscretionary duty to

process the application.  *See eg. Alkenani v. Barrows,* 356 F.Supp.2d 652, 656

(N.D.Tex.2005).  "A decision to grant or deny the application shall be made … The

applicant shall be notified that the application has been granted or denied …" 8 C.F.R. §

335.3(a).  Abusadeh complains that the application has not been processed after a lapse of

more than three years.  The USCIS does not have the discretion to refuse to process an

application.

The Defendants are not complying with the Congressional intent that immigration

applications be processed within 6 months.  8 U.S.C. § 1571.  The Defendants are not

complying with the Congressional mandate to reduce and eliminate the backlogs in

processing immigration applications.  8 U.S.C. § 1573.

"Although '[t]here 'is no *per se* rule as to how long is too long' to wait for agency

action, … a reasonable time for agency action is typically counted in weeks or months,

not years."  *U.S. Women's Chamber of Commerce v. U.S. Small Business Admin.,* 2005

WL 3244182 (D.D.C. Nov. 30, 2005) *citing Am. Rivers and Idaho Rivers United,* 372

F.3d 413, 419 (D.C.Cir.2004) (*quoting Int'l Chem. Workers Union,* 958 F.2d 1144, 1149

(D.C.Cir.1992) (*citing Midwest Gas Users Ass'n v. FERC,* 833 F.2d 341, 359

(D.C.Cir.1987).

It is true that under 8 C.F.R. § 103.2(b)(7) permits the USCIS to conduct an

investigation on an application.  If the Defendant Houston USCIS District Director

("Hudson") decided to withhold adjudication on an application, then she must follow the

strict procedures in 8 C.F.R. § 103.2(b)(18).  Hudson's declaration (Defendant's Motion,

Exhibit B) (Ex. B) does not cite 8 C.F.R. § 103.2(b)(7) or (18).  Hudson further does not

state that this case has been reviewed every six months as required by these regulations.

Nor does Hudson allege that she has withheld adjudication pursuant to the purpose

intended by 8 C.F.R. § 103.2(b)(18) as explained by legacy INS in 53 Fed. Reg. 26034

(INS) (final rule) (July 11, 1988).  A contemporaneous indication of a rule's meaning

made by an agency at the time of the rule's promulgation will trump any subsequent

interpretation that goes contrary to the original intent.  *Thomas Jefferson University v.*

*Shalala,* 512 U.S. 504, 512 (1994).

Further, although it is logical that the USCIS should have the discretion to

investigate an application, such an investigation does not mean that the application

process is beyond the jurisdiction of this Court.  When the agencies conducting an

investigation are taking an unreasonable amount of time to process the application, then

the alien rightfully complains to the Court.

F.  The Mandamus statute further confers subject matter jurisdiction

The Mandamus statute, 28 U.S.C. § 1361, further confers subject matter

jurisdiction.  *Anjum v. Hansen,* 2007 WL 983215 (S.D.Ohio Mar.28, 2007) *citing Lazli v.*

*U.S. Citizenship and Immigration Servs,* 2007 WL 496351 (D.Or. Feb.12, 2007); *see also eg. Elkhatib v. Butler,* 2005 WL 5226742 (S.D.Fla.2005). Plaintiff must first show that it has a "clear and certain claim." *Anjum v. Hansen,* 2007 WL 983215 (S.D.Ohio Mar.28, 2007). Abusadeh properly filed the naturalization petition. Therefore, he has a clear and certain claim to its adjudication. *Id.; see also Yu v. Brown,* 36 F.Supp.2d 2d 922 (D.N.M.1999). Plaintiff must next show that the respondent has a "clear duty" to do the particular act requested. *Anjum v. Hansen,* 2007 WL 983215 (S.D.Ohio Mar.28, 2007). Numerous District Courts have held that USCIS has a "nondiscretionary duty" to the alien plaintiff to "adjudicate immigration petitions." *Id.* Plaintiff must finally show that there is no other remedy available. *Id.* District courts have also agreed that continuing to wait indefinitely after more than three and a half years have passed, for example, is not an adequate remedy. *Anjum v. Hansen,* 2007 WL 983215 (S.D.Ohio Mar.28, 2007); *Lazli v. U.S. Citizenship and Immigration Servs,* 2007 WL 496351 (D.Or. Feb.12, 2007); *Yu v. Brown,* 36 F.Supp.2d 2d 922 (D.N.M.1999).

### G. Citizenship is a privilege, not a right

Citizenship is a privilege, not a right. "No alien has the slightest right to naturalization unless all statutory requirements are complied with." *United States v. Ginsberg,* 243 U.S. 472, 475 (1917). It is undisputed that there is no natural or inherent right to become a citizen of the United States. *U.S. v. Schwimmer,* 279 U.S. 644, 649, 49 S.Ct. 448, 73 L.Ed. 889 (1929). It is likewise true that an alien who seeks American citizenship can be naturalized only if he meets the requirements fixed by Congress. *Schneiderman v. U.S.,* 320 U.S. 118, 131, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943). In this case, Abusadeh is asking the Court to compel the Defendants, particularly the FBI

Defendant, to take action on his case so that all statutory requirements are met. Abusadeh petitions to the Court because of the unreasonable delay of the Defendants in processing the naturalization application.

VI.  Conclusion

For the foregoing reasons, Plaintiffs request that the Court find that venue is proper and that it has subject matter jurisdiction and deny Defendants' Motion.

Respectfully submitted,

/s/ Jonathan S. Rochkind
Jonathan S. Rochkind
Smith, Hudson & Carluzzo, P.C.
9300 West Courthouse Road
Judiciary Square – Suite 203
Manassas, Virginia 20110
(703) 361-0776 ext 107
DC Bar ID number 425185

COANE & ASSOCIATES

/s/ James P. McCollom, Jr.
Bruce A. Coane
SBOT No. 04423600
Ajay Choudhary
SBOT No. 90001623
James P. McCollom, Jr.
SBOT No. 13431960
3D/International Tower
1900 West Loop South
Suite 820
Houston, TX 77027-3206
713-850-0066
713-850-8528  FAX

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent by

electronic means through the Electronic Case Filing system on May 1, 2007 to:


Ms. Wyneva Johnson
Assistant U.S. Attorney
Judiciary Center Building
555 4th Street, NW
Civil Division
Washington, DC 20530
Wyneva.johnson@usdoj.gov


/s/ James P. McCollom, Jr.
James P. McCollom, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MOHAMMAD FAYYAZ and | § | |
| GIZELA FAYYAZ, | § | |
| | § | |
| *Plaintiffs* | § | Civil Action No. 06-2016 (HHK) |
| | § | |
| v. | § | |
| | § | |
| DEPARTMENT OF HOMELAND | § | |
| SECURITY, THROUGH ITS | § | |
| SECRETARY, MICHAEL CHERTOFF, | § | |
| EMILIO GONZALEZ, DIRECTOR, | § | |
| UNITED STATES CITIZENSHIP AND | § | |
| IMMIGRATION SERVICES (USCIS), | § | |
| SHARON HUDSON, DISTRICT | § | |
| DIRECTOR, HOUSTON, USCIS, AND | § | |
| ROBERT MUELLER, DIRECTOR, | § | |
| FEDERAL BUREAU OF | § | |
| INVESTIGATION, | § | |
| | § | |
| *Defendants* | § | |

**<u>ORDER</u>**

This Court finds that venue is proper in the District of Columbia.  The Court further finds that it has subject matter jurisdiction over this case.

Accordingly, this Court DENIES the Defendants' Motion to Transfer or, in the alternative, to Dismiss.

SIGNED at Washington, D.C. this _____ day of _____, 2007.

_____
UNITED STATES DISTRICT JUDGE



United States Bankruptcy Court
Southern District of Texas
FILED

AUG 1 7 2006

Michael N. Milby, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MOHAMMAD ABUSADEH,                          §
                                            §
        *Plaintiff*                         §
                                            §    CIVIL ACTION NO. _____
v.                                          §
                                            §    misc. H-06-337
DEPARTMENT OF HOMELAND                      §
SECURITY, THROUGH ITS                       §
SECRETARY, MICHAEL CHERTOFF,                §
EMILIO GONZALEZ, DIRECTOR,                  §
UNITED STATES CITIZENSHIP AND               §
IMMIGRATION SERVICES (USCIS),               §
SHARON HUDSON, DISTRICT                     §
DIRECTOR, HOUSTON, USCIS, AND               §
ROBERT MUELLER, DIRECTOR,                   §
FEDERAL BUREAU OF                           §
INVESTIGATION,                              §
                                            §
        *Defendants*                        §

### PLAINTIFF'S ORIGINAL COMPLAINT AND
### PETITION FOR HEARING ON NATURALIZATION APPLICATION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Mohammed Abusadeh, to file Plaintiff's Original Complaint and Petition

for Hearing on Naturalization Application, showing the Court the following:

### I.  INTRODUCTION

1.     Plaintiff is suing Michael Chertoff, Secretary of the Department of Homeland Security

       ("DHS"), Emilio Gonzalez, Director, United States Citizenship and Immigration Services

       ("USCIS"), Sharon Hudson, District Director, Houston, USCIS, and Robert Mueller,

       Director, Federal Bureau of Investigation, Defendants, under Immigration and

P:\Jim's Documents A-B\Abusadeh, Mohammed\Original Complaint.doc

**EXHIBIT**

tabbies'

**A**

Nationality Act § 336(b), 8 U.S.C. § 1447(b) and the Administrative Procedure Act

(APA), 5 U.S.C. § 702 *et seq.*

## II.  JURISDICTION AND VENUE

2.   Under Immigration and Nationality Act § 336(b), 8 U.S.C. § 1447(b), 28 U.S.C. § 1331,

and the APA, 5 U.S.C. § 702 *et seq.*, the Court has jurisdiction over this case.

3.   Pursuant to Immigration and Nationality Act § 336(b), 8 U.S.C. § 1447(b), and 28 U.S.C.

§ 1391(e), venue is proper in this district because Plaintiff resides in this district.

## III.  PARTIES

4.   Plaintiff resides in Houston, Texas.

5.   Michael Chertoff, Secretary of the Department of Homeland Security, Emilio Gonzalez,

Director of USCIS, Sharon Hudson, District Director, Houston, of USCIS, and Robert

Mueller, Director, Federal Bureau of Investigation, Defendants, may be served by

sending a copy of the summons and this Complaint by certified mail to: (1) Office of the

General Counsel, United States Department of Homeland Security, Washington, D.C.

20258; (2) Sharon Hudson, District Director, Citizenship and Immigration Services, 126

Northpoint, Houston, Texas  77060; (3) Alberto Gonzales, United States Attorney

General, U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, D.C.

20530-0001; (4) Civil Process Clerk, United States Attorney's Office, P.O. Box 61129,

Houston, Texas  77208; (5) Michael Chertoff, Secretary, Deparment of Homeland

Security, Washington, D.C. 20528; (6) Emilio Gonzalez, Director, U.S. Department of

Homeland Security, Citizenship and Immigration Services, 425 I Street NW,

Washington, D.C.  20536; and (7) Robert Mueller, Director, Federal Bureau of

Investigation, J. Edgar Hoover Building, 935 Pennsylvania Avenue, N.W., Washington, D.C. 20535-0001.

## IV. FACTS

6.   Plaintiff Mohammad Abusadeh is a 35 year old native of Kuwait and citizen of Jordan. Plaintiff's alien number is A 72 421 518. Plaintiff is a lawful permanent resident of the United States.

7.   On April 12, 2004, Plaintiff filed an application for naturalization with Defendants. (Exhibit 1).

8.   On August 17, 2004, Plaintiff was interviewed by Defendants regarding his application for naturalization. Plaintiff passed the tests of English and U.S. history and government. (Exhibit 2).

9.   It has been more than 120 days since the date of the interview and there has been a failure to make a determination under section 335 of the Immigration and Nationality Act, 8 U.S.C. § 1446. There has been no decision on the naturalization application.

10.   Pursuant to Immigration and Nationality Act § 336(b), 8 U.S.C. § 1447(b), Plaintiff applies to this Court for a hearing on this matter.

11.   Plaintiff requests that this Court either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

12.   Plaintiff, through counsel, has made inquiries to find out the status of the naturalization application and has been told that security checks are pending. (Exhibit 3).

13.   Plaintiff has advised the Houston District Office of USCIS of his intention to bring suit since Defendant has not been able to reach a decision.

14.    Plaintiff's situation is an actual controversy.  Plaintiff requests that the Court declare

Plaintiff's rights and other legal relations.

15.    All conditions precedent have been performed or have occurred.

16.    Plaintiff is suing Defendants in their official capacities.

### V.  CLAIMS FOR RELIEF

17.    Plaintiff re-alleges sections I-IV as if fully set forth herein.

18.    Pursuant to Immigration and Nationality Act § 336(b), 8 U.S.C. § 1447(b),   INA §

310(c), 8 U.S.C. § 1421(c), Plaintiff requests that the Court either determine the matter or

remand the matter, with appropriate instructions, to the Service to determine the matter.

19.    Pursuant to the APA, 5 U.S.C. § 706(2), Plaintiff requests that the Court hold unlawful

Defendants' failure to make a decision on Plaintiff's naturalization application.

20.    Plaintiff is entitled to recover reasonable attorney's fees, expenses, and costs

pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

### VI. PRAYER FOR RELIEF

21.    For the foregoing reasons, Plaintiff requests that the Court:

a.    Determine Plaintiff's naturalization application, or, in the alternative,

b.    Remand the the Plaintiff's naturalization application to the Service with

appropriate instructions to the Service to immediately adjudicate Plaintiff's naturalization

application,

c.    Award Plaintiff reasonable attorney's fees, expenses, and costs.

d.    Grant Plaintiff such other relief as the Court may deem proper.

Respectfully submitted,

COANE & ASSOCIATES

4

Bruce A. Coane
SBOT No. 04423600
Fed. ID. # 7205 (S.D. Tex)
Ajay Choudhary
SBOT No. 90001623
Fed. ID. # 21837 (S.D. Tex)
James P. McCollom, Jr.
SBOT No. 13431960
Fed. ID. # 12592 (S.D. Tex)
3D/International Tower
1900 West Loop South
Suite 820
Houston, TX 77027-3206
713-850-0066
713-850-8528  FAX

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MOHAMMAD ABUSADEH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | MISCELLANEOUS NO. H-06-0337 |
| | § | |
| MICHAEL CHERTOFF, *et al*, | § | |
| | § | |
| Defendant. | § | |

## ORDER FOR REMAND

Before the Court is the petitioner, Mohammad Abusadeh's, petition for a hearing on his naturalization application pursuant to 8 U.S.C. § 1447(b). After review of the application, and before issues are joined, the Court determines that the case should *sua sponte* be remanded to the Director, U. S. Citizenship and Immigration Service.

The petitioner's application was filed, according to pleadings, on or about April 12, 2004. Since that time, the petitioner has completed an interview. At the conclusion of the interview, the plaintiff was informed that the sole impediment to approval was an FBI or G-325 name check. The plaintiff was told that the name Mohammad Abusadeh had not cleared.

Title 8 U.S.C. § 1447(b) permits a petitioner under § 1446 to seek examination of his application by a district court on the end of an 120-day period after an examination where the application has not been approved or denied. Thus, the petitioner's application is properly before the Court in respect to § 1446. However, a district court lacks jurisdiction under 1447(b) to accept such a petition where the 120-day period has not been triggered. *See United States v. Ginsberg*, 243 U.S. 472, 475 (1917).

Ex. A

1 / 2

In the case at bar, the mandatory national security FBI name check process has not been completed. Hence, exhaustion of the administrative process has not been completed and the 120-day period has not been triggered. It is, therefore,

Ordered that the case is REMANDED to the United States Citizenship and Immigration Service, pursuant to FRCP, Rule 12(b)(1) and § 1447(b).

SIGNED and ENTERED this 23rd day of August, 2006.

Kenneth M. Hoyt
United States District Judge

IN THE UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF COLUMBIA**

MOHAMMAD ABUSADEH,                    §
                                      §
    *Plaintiff,*                    §
                                      §
v.                                    §     CIVIL ACTION NO. 1:06-CV-
                                            02014
                                      §
DEPARTMENT OF HOMELAND                §
SECURITY, THROUGH ITS                 §
SECRETARY, MICHAEL CHERTOFF,          §
EMILIO GONZALEZ, DIRECTOR,            §
UNITED STATES CITIZENSHIP AND         §
IMMIGRATION SERVICES (USCIS),         §
SHARON HUDSON, DISTRICT               §
DIRECTOR, HOUSTON USCIS, AND          §
ROBERT MUELLER, DIRECTOR,             §
FEDERAL BUREAU OF INVESTIGATION,      §
                                      §
    *Defendants.*                   §
                                      §

## DECLARATION OF SHARON A. HUDSON

I, Sharon A. Hudson, declare as follows:

(1)      I am the District Director of the Houston, Texas, office of the United States

Citizenship and Immigration Services (USCIS) in the Department of Homeland Security

(DHS). I oversee the adjudication of all applications for benefits including applications

for naturalization and ensure that, as a matter of my discretion, all applications for

benefits are processed and adjudicated in my office in a fair and impartial manner. I have

held the position of District Director since March 31, 2005. As part of my duties, I

oversee the naturalization oath ceremonies and ensure that each applicant approved for

naturalization continues to meet the statutory prerequisites for citizenship up to the

moment of the oath of allegiance and admission as a citizen of the United States. Prior to



EXHIBIT
B

EX. B

my appointment as District Director, I held various supervisory positions within the former Immigration and Naturalization Service over the last 33 years beginning in 1973. Among other appointments, I served as a Supervisory District Adjudications Officer, a Regional Adjudications Officer and a Senior Adjudications Officer at the District level, the Regional Office, and in Headquarters. I make this Declaration based upon personal knowledge and information made known to me in the course of my professional duties.

(2)     When a lawful permanent resident applies to USCIS for naturalization, in addition to ensuring that each applicant meets all other statutory requirements for naturalization, USCIS conducts several forms of security and criminal background checks to ensure that the alien is eligible for naturalization based on establishing the requisite good moral character, is attached to the principles of the Constitution of the United States, is well disposed to the good order and happiness of the United States, and that he or she is not a risk to national security or public safety.

(3)     Specifically, these background checks currently include: (a) record checks against DHS' own immigration systems; (b) a Federal Bureau of Investigation (FBI) fingerprint check for relevant criminal history records on the alien (*e.g.* arrests and convictions); (c) a check against the DHS-managed Interagency Border Inspection System (IBIS), which contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies, including the Central Intelligence Agency (CIA), FBI, other divisions of the United States Department of Justice, the Department of State, DHS/U.S. Customs and Border Protection (USCBP), and other DHS agencies; IBIS includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity; and (d) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS.

(4)      The FBI name check has historically always been a requirement for both

naturalization and adjustment to lawful permanent resident status, and was historically

generated from a Form G-325 biographical data document (naturalization applications) or

a Form G-325A biographical data document (adjustment of status applications).

Historically, USCIS[1] was permitted to proceed with approval of cases with those pending

Form G-325 name checks if no derogatory information was received within a certain

period of time. See April 1, 1972 Naturalization Examiner's Guide, "Notations relating

to Forms G-325"; see also May 1, 1989 Interpreter Releases article, "INS, FBI Reach

Agreement on Automated Name Checks for Naturalization;" and, see also July 13, 1998

Interpreter Releases article, "INS Eliminates Form G-325 for Naturalization Purposes,"

replacing Form G-325 with an automated system (all attached hereto as Exhibit A-1).

(5)      USCIS is now mandated to await completion of the national security FBI

name check and is mandated to have all background checks current and favorably

resolved prior to approval of any naturalization application. See Public Law 105-119,

Title I, 111 Stat. 2448, Nov. 26, 1997, which in part amended 8 U.S.C. § 1446, by

mandating that no government funds may be used to complete adjudication of a

naturalization application until full FBI background checks have been completed.

(6)      The FBI name check process is detailed and set forth both on the USCIS and

FBI public websites. See USCIS 4/25/06 Fact Sheet, at

http://www.uscis.gov/graphics/publicaffairs/factsheets/security_checks_42506.pd

f, copy attached hereto as Exhibit A-2; see also, FBI National Name Check Program and

Frequently Asked Questions, at http://www.fbi.gov/page2/nationalnamecheck.htm,

attached hereto as Exhibit A-3. The USCIS fact sheet clearly sets forth the security

checks that USCIS must complete prior to naturalization of an applicant. The FBI

Frequently Asked Questions fact sheet demonstrates that the FBI processes name checks

---

[1] On March 1, 2003, former Immigration and Naturalization Service was abolished and its functions were transferred to successor agencies within the Department of Homeland Security, including USCIS.

on a first-in/first-out basis, and that the majority are checked and returned to the submitting agency as having "No Record" within 48-72 hours. Many other cases are completed within 60-90 days. Some cases remain pending for longer periods of time due to manual check requirements. Less than one percent of the FBI name check requests are ultimately identified with a file containing possible derogatory information.

(7)      The mandatory criminal and national security background checks have in some cases revealed significant derogatory information on some applicants. In some instances, the disqualifying information on the alien has been discovered as a result of the IBIS or FBI name checks, rather than through a fingerprint check alone.

(8)      In some instances, USCIS will receive a "positive" response from the FBI name check. Any "positive" name check response must be resolved before a naturalization application can be approved or before an applicant can take an oath of allegiance or be admitted as a citizen of the United States.

(9)      Mr. Mohammad Abusadeh's naturalization application reveals the following (see attached Exhibit A-4):

      (a)      he is a native of Kuwait and a citizen of Jordan, born on October 10, 1970; on November 13, 1992, he was admitted to the United States as a lawful permanent resident of the United States;

      (b)      Mr. Abusadeh applied for naturalization on or about April 13, 2004;

      (c)      Mr. Abusadeh was fingerprinted in connection with his application for naturalization on May 21, 2004, the fingerprints were processed by the FBI on the same date, and USCIS received the FBI notification that the fingerprint criminal history check was an IDENT on May 25, 2004; the FBI criminal history report indicates that the IDENT references two separate October 9, 1992 deferred adjudication third degree felony convictions, one for Theft and one for Injury to a Child, with placement on five years concurrent probation for the offenses;

4

(d)     the fingerprint check cannot be any older than fifteen months at the time
of the approval and at the time of the oath of allegiance and naturalization
ceremony;

(e)     IBIS checks, which must be current within 180 days both at the time of
initial interview and at the time of naturalization and the oath of
allegiance, were most recently conducted by USCIS on July 24, 2006;

(f)     The mandatory national security background check, commonly referred to
as the "FBI name check", was instituted automatically when the Texas
Service Center inputted the application for naturalization into the Claims 4
computer system on April 20, 2004, immediately after the April 13, 2004
filing of the application; on April 28, 2004, the FBI received and
processed the name check, and on April 30, 2004, USCIS received FBI
notification that the FBI name check was "PENDING;" the FBI name
check remains pending as of the date of this Declaration;

(10)     Since the terrorist attacks of September 11, 2001, the need to conduct more
rigorous and thorough background checks on aliens who are seeking naturalization has
required procedures that sometimes result in individuals not receiving a response to their
application as quickly as in the past.  However, the law and public safety requires USCIS
to make certain that the checks have been done before it adjudicates and approves an
application for naturalization, and to ensure the continuing good moral character of each
applicant up to the oath of allegiance and admission as a citizen of the United States.

Pursuant to 28 USC § 1746, I declare under the penalty of perjury of the

laws of the United States of America that the foregoing is true and correct.

Executed in Houston, Texas, on this 22nd day of February, 2007.

Sharon A. Hudson
District Director
USCIS, Houston, Texas

*Office of Communications*
**U.S. Department of Homeland Security**



February 20, 2007

# USCIS Update

**USCIS CLARIFIES CRITERIA TO EXPEDITE FBI NAME CHECK**
*Federal Litigation Removed as Sole Basis to Expedite Check*

WASHINGTON – U.S. Citizenship and Immigration Services (USCIS) is no longer routinely requesting the FBI to expedite a name check when the only reason for the request is that a mandamus (or other federal court petition) is filed in the case.

USCIS may continue to request an expedited FBI name check if the case meets one of the other approved criteria, including:

1. Military deployment,
2. Age-out cases not covered under the *Child Status Protection Act*, and applications affected by sunset provisions such as diversity visas,
3. Significant and compelling reasons, such as critical medical conditions, and
4. Loss of social security benefits or other subsistence at the discretion of the USCIS District Director.

The FBI name check is an invaluable part of the security screening process, ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens. USCIS also requests an FBI name check to screen out people who seek immigration benefits improperly or fraudulently and ensure that only eligible applicants receive benefits.

Information about the FBI name check is available on the USCIS website at http://www.uscis.gov or by calling the USCIS National Customer Service Center toll free at 1-800-375-5283.

–USCIS –

On March 1, 2003, U.S Citizenship and Immigration Services became one of three legacy INS components to join the U.S. Department of Homeland Security.   USCIS is charged with fundamentally transforming and improving the delivery of immigration and citizenship services,  while enhancing our nation's security.



*Press Office*
**U.S. Department of Homeland Security**

U.S. Citizenship
and Immigration
Services

# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

### Background

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

### Why USCIS Conducts Security Checks

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.



Immigration Security Checks—How and Why the Process Works

---

### How Immigration Security Checks Work

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

Immigration Security Checks—How and Why the Process Works

---

several years to resolve. Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided. USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

# FEDERAL BUREAU OF INVESTIGATION

SEARCH

Contact Us
- Your Local FBI Office
- Overseas Offices
- Submit a Crime Tip
- Report Internet Crime
- More Contacts

Learn About Us
- Quick Facts
- What We Investigate
- Natl. Security Branch
- Information Technology
- Fingerprints & Training
- Laboratory Services
- Reports & Publications
- History
- More About Us

Get Our News
- Press Room
- News Feeds

Be Crime Smart
- Wanted by the FBI
- More Protections

Use Our Resources
- For Law Enforcement
- For Communities
- For Researchers
- More Services

Visit Our Kids' Page

Apply for a Job

## National Name Check Program—Frequently Asked Questions

**How long will it take for my name check to be completed?**

The length of time it takes for a name check to be completed varies from name to name. Normally, a name is submitted by an agency, such as the United States Citizenship and Immigration Services (USCIS), on a data tape. The National Name Check Program (NNCP) receives over 62,000 name checks every week, with over 27,000 coming from USCIS on a weekly basis. When a data tape comes in, the names on the tape are electronically checked against the Federal Bureau of Investigation's Universal Index (UNI). The searches seek all instances of the individual's name appearing in both main files and reference files. A main file name is that of an individual who is, himself/herself, the subject of an FBI investigation, whereas a reference is someone whose name appears in an FBI investigation. References may be associates, conspirators, or witnesses.

The majority of name checks submitted on a data tape are electronically checked and returned to the submitting agency as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's UNI database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth submitted within the last 120 days) are not checked, and the duplicate findings are returned immediately to the submitting agency.

A secondary manual name search conducted within 30-60 days usually identifies additional requests as having a "No Record." The remaining name checks (usually about 10% of the name checks originally submitted) are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record is available in the FBI's electronic record keeping system, it can be reviewed quickly. If not, the relevant information must be retrieved from an existing paper record. Review of this information determines whether the information is positively identified with the name check request. If the information is not identified with the request, the request is closed as a "No Record," and the requesting agency is notified as such.

The average time required to retrieve and review an FBI record for possible information related to a name check request is case specific—it depends on the number of files an analyst must obtain (which is dictated by the number of "hits" on a name), the location and availability of those files, and the amount of information contained in a file. If a file is stored locally, an analyst will be able to obtain the file within a matter of days. If a file is located in a field office or other FBI location, the applicable information must be requested from that location. There are over 265 different FBI locations that could house information pertinent to a name check request. If a file is electronically available, an analyst will have immediate access to that file. Additionally, once an analyst receives the file, or the pertinent information contained in a file, the analyst must review it for possible information related to the name check request.

Many times, the delay associated with the processing of the remaining name checks is not the actual time it takes to process a name check, but the time it takes for an analyst to get to the name check request in order to process it. This is due to the constant volume of name checks, several million each year, combined with the FBI's current work on processing residual name checks from a batch of 2.7 million requests submitted by USCIS in December 2002, as compared to the NNCP's limited resources. Less than one percent of the requests are identified with a file containing possible derogatory information. If applicable, the FBI then forwards a summary of the derogatory information to the requesting agency. It is important to note that the FBI **does not** adjudicate the name check requests, but only provides available information to a requesting agency for its adjudication process.

EXHIBIT
E

Ex. B-3

### How can I have my name check expedited?

The FBI tries to process its oldest name checks first. Customer agencies will occasionally request expedited handling of specific name checks. Criteria used to determine which name checks receive expedited handling are internal matters of each customer agency. The FBI does request that the number of expedited cases be kept to a minimum in fairness to the other pending name check requests. Because each customer agency determines which name checks are expedited, contacting Congressional representatives, the FBI's Office of Congressional Affairs, or the NNCP will only further tie up vital resources and **will not** contribute to the expediting of a name check.

### Does contacting my Congressional representative expedite my name check?

No, the customer agency determines expedited handling. The FBI's policy is to be responsive to our customer's needs given the limits of our resources. Re-prioritization from multiple sources would convolute the customer agency's ability to manage their priority cases.

### Is there a fee I can pay to expedite the process?

No. Processing times are a function of the volume of work versus the resources that can be applied to the task. Paying an additional fee would not speed up the name check process.

### I am aware that some name checks have been completed that were submitted to the FBI *after* cases that remain pending. Why are the name checks not handled in the order in which they are received?

The vast majority of name check requests are completed in less than 60 days. Of those remaining, the FBI tries to complete the oldest name checks first. The time to complete any given name check varies. There are many factors that impact processing times such as the number of files to retrieve and review, a file's location and accessibility, case status, and workload all impact processing times. Another factor that might delay the processing of a name check request on a first in/first out basis is the number of requests for expedited handling received from a customer agency.

### My Freedom of Information/Privacy Act request to the FBI resulted in a "no record" response. Given that, why is my name check request still pending?

Freedom of Information and Privacy Acts (FOIPA) requests are sometimes confused with name check requests. FOIPA provides copies of FBI files relevant to a specific FOIPA request. For FOIPA, the FBI search uses the name or information as provided in the FOIPA request. A FOIPA search determines whether there is an investigative file associated with an individual—a "main file" search. For a name check, "main files" and "reference files" are both checked, in an effort to protect our national security, in addition to searching a name in a multitude of combinations.

### Who can I call to check on the status of my name check?

The FBI will only respond to status inquiries from its customer agencies. Please contact the organization receiving your original application. In Citizenship and Immigration cases, contact USCIS for the status.



Home | Site Map | FAQs

# FEDERAL BUREAU OF INVESTIGATION

SEARCH

**Contact Us**
- Your Local FBI Office
- Overseas Offices
- Submit a Crime Tip
- Report Internet Crime
- More Contacts

**Learn About Us**
- Quick Facts
- What We Investigate
- Natl. Security Branch
- Information Technology
- Fingerprints & Training
- Laboratory Services
- Reports & Publications
- History
- More About Us

**Get Our News**
- Press Room
- News Feeds

**Be Crime Smart**
- Wanted by the FBI
- More Protections

**Use Our Resources**
- For Law Enforcement
- For Communities
- For Researchers
- More Services

**Visit Our Kids' Page**

**Apply for a Job**

## National Name Check Program

**Mission:** The National Name Check Program's (NNCP's) mission is to disseminate information from FBI files in response to name check requests received from federal agencies including internal offices within the FBI; components within the legislative, judicial, and executive branches of the federal government; foreign police and intelligence agencies; and state and local law enforcement agencies within the criminal justice system.

**Purpose:** The NNCP has its genesis in Executive Order 10450, issued during the Eisenhower Administration. This executive order addresses personnel security issues, and mandated National Agency Checks (NACs) as part of the pre-employment vetting and background investigation process. The FBI is a primary NAC conducted on all U.S. government employees. Since September 11th, name check requests have grown, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege—whether that privilege is government employment or an appointment, a security clearance, attendance at a White House function, a Green card or naturalization, admission to the bar, or a visa for the privilege of visiting our homeland. More than 70 federal and state agencies regularly request FBI name checks. In addition to serving federal, state, and local government customers, the NNCP conducts numerous name searches in direct support of the counterintelligence, counterterrorism, and homeland security efforts of the FBI.

**Function:** The employees of the NNCP review and analyze potential identifiable documents to determine whether a specific individual has been the subject of or mentioned in any FBI investigation(s), and if so, what (if any) relevant information may be disseminated to the requesting agency. It is important to note that the FBI does not adjudicate the final outcome, it just reports the results to the requesting agency.

**More Information**
- Frequently Asked Questions
- Executive Order 10450

**Congressional Testimony:**
- David Hardy 10-23-03
- Robert Garrity 07-10-03

**Source of Data:** The NNCP conducts manual and electronic searches of the FBI's Central Records System (CRS) Universal Index (UNI). The CRS encompasses the centralized records of FBI Headquarters, field offices, and Legal Attache offices. The CRS contains all FBI investigative, administrative, personnel, and general files.

**NNCP Process Step-by-Step:**

- Agency/entity submission to the FBI's NNCP. Submissions are accepted via magnetic tape, hard copy, telephone, or fax.
- Electronic "batch" submissions are searched against the UNI. The majority of the batch names are electronically returned as "no record" with 48-72 hours. A "no record" indicates that the UNI database contains no identifiable information regarding a particular individual. The UNI is searched for "main files", files where the name of an individual is the subject of an FBI investigation, and for "reference files", files where the name being searched is just mentioned in an investigation.
- A secondary "manual" search of residuals from the batch run identifies an additional number of names as a "no record" response.
- The remaining paper files and/or electronic files are reviewed to ensure they are germane to the name check request.
- Identifiable files are then analyzed for relevant or derogatory information that may be disseminated to the requesting agency/entity. Approximately 1 percent of the requests are

determined to contain possible derogatory information. If applicable, the NNCP forwards a summary of the information to the submitting agency/entity.

**Growth of the Name Check Program:** Post September 11, 2001, the number of incoming name checks has increased to above pre-9/11 levels:

|  | FY 01 | FY 02 | FY 03 | FY 04 | FY 05 |
|---|---|---|---|---|---|
| Incoming Name Checks: | 2,771,241 | 3,288,018 | 6,309,346 | 3,884,467 | 3,346,435 |

**Freedom of Information and Privacy Act (FOIPA) vs. Name Check:** Freedom of Information and Privacy Acts (FOIPA) requests are sometimes confused with name check requests. FOIPA provides copies of FBI files relevant to a specific FOIPA request. For FOIPA, the FBI search uses the name or information as provided in the FOIPA request. A FOIPA search determines whether there is an investigative file associated with an individual—a "main file" search. For a name check, "main files" and "reference files" are both checked, in addition to searching a name in a multitude of combinations.

**Major Contributing Agencies:** The FBI's NNCP Section provides services to more than 70 federal, state, and local governments and entities. Although most name checks are conducted for each agency on a first-in, first-out basis, the contributing agency determines the order of resolution for priority, project, or expedite cases. The following are the major contributing agencies to the NNCP:

- U.S. Citizenship and Immigration Services – Submits name check requests on individuals applying for the following benefits: asylum, adjustment of status to legal permanent resident, naturalization, and waivers.
- Office of Personnel Management – Submits name checks requests in order to determine an individual's suitability and eligibility in seeking employment with the federal government.
- Department of State – Submits FBI name check requests on individuals applying for visas. Not all visa matters require FBI name checks.

Accessibility | eRulemaking | FirstGov | Freedom of Information Act | Links | Privacy Policy | White House

FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice.

**U.S. Department of Justice**
Immigration and Naturalization Service (INS)

## Application for Permanent Residence

OMB # 1115-0053

| DO NOT WRITE IN THIS BLOCK | | |
|---|---|---|

| Case ID# | Action Stamp | Fee Stamp: PAID AT HOU___ ~~AY 18 1992~~ |
|---|---|---|
| A# | | PUTER NO ___ |
| G-28 or Volag# | | |

Section of Law
☐ Sec. 209(b), INA
☐ Sec. 214(d), INA
☐ Sec. 13, Act of 9/11/57
☐ Sec. 245, INA
☐ Sec. 249, INA

Country Chargeable ___

Eligibility Under Sec. 245
☒ Approved Visa Petition
☐ Dependent of Principal Alien
☐ Special Immigrant
☐ Other
Preference ___

## A. Reason for this application

I am applying for lawful permanent residence for the following reason: (check the box that applies)

1. ☒ An immigrant visa number is immediately available to me because
   ☐ A visa petition has already been approved for me (approval notice is attached)
   ☒ A visa petition is being filed with this application

2. ☐ I entered as the fiance(e) of a U.S. citizen and married within 90 days (approval notice and marriage certificate are attached)

3. ☐ I am an asylee eligible for adjustment

4. ☐ Other: ___

## B. Information about you

1. Name (Family name in CAPS) (First) (Middle)
   ABU SADEH   MOHAMMAD   HAFIZ

2. Address (Number and Street) (Apartment Number)
   (Town or City) HOUSTON   (State/Country) TX   (ZIP/Postal Code)

3. Place of Birth (Town or City) (State/Country)
   KUWAIT

4. Date of Birth (Mo/Day/Yr)

5. Sex ☒ Male ☐ Female

6. Marital Status ☒ Married ☐ Single ☐ Widowed ☐ Divorced

7. Social Security Number

8. Alien Registration Number (if any) NONE

9. Country of Citizenship JORDAN

10. Have you ever applied for permanent resident status in the U.S.? Yes ☒ No
    (If Yes, give the date and place of filing and final disposition)

11. On what date did you last enter the U.S.? 3-24-90

12. Where did you last enter the U.S.? (City and State) NEW YORK, NY

13. What means of travel did you use? (Plane, car, etc.) PLANE

14. Were you inspected by a U.S. immigration officer? ☒ Yes ☐ No

15. In what status did you last enter the U.S.? (Visitor, student, exchange alien, crewman, temporary worker without inspection, etc.) STUDENT

16. Give your name EXACTLY as it appears on your Arrival/Departure Record (Form I-94). ABU SADEH   MOHAMMAD

17. Arrival/Departure Record (I-94) Number 475 363009

18. Visa Number 005430

19. At what Consulate was your nonimmigrant visa issued? KUWAIT   Date (Mo/Day/Yr) 5/23/89

20. Have you ever been married before? ☐ Yes ☒ No
    (If Yes, (Names of prior husbands/wives) (Country of citizenship) (Date marriage ended))

21. Has your husband/wife ever been married before? ☐ Yes ☒ No
    (If Yes, (Names of prior husbands/wives) (Country of citizenship) (Date marriage ended))

| INITIAL RECEIPT | RESUBMITTED | RELOCATED | | COMPLETED | | |
|---|---|---|---|---|---|---|
| | | Rec'd | Sent | Approved | Denied | Returned |

Form I-485 (Rev. 4-11-91) Y

EXHIBIT
BB

**22. List your present husband/wife, all of your sons and daughters, all of your brothers and sisters** (If you have none write "N/A")

| Name | Relationship | Place of Birth | Date of Birth | Country of Residence | Applying With You? |
|------|-------------|----------------|---------------|---------------------|-------------------|
| ABUSADEH TINA | WIFE | McKINNEY, TX | | USA | ☐ Yes ☒ No |
| ___ WAHEED | BROTHER | NEAR, Israel | ① | USA | ☐ Yes ☒ No |
| M. BELLAN | SISTER | NEAR | | Jordan | ☐ Yes ☒ No |
| MOUTINAM | BROTHER | NEAR | | Kuwait | ☐ Yes ☒ No |
| Mowod | BROTHER | Kuwait | | Jordan | ☐ Yes ☒ No |
| ___ | SISTER | Kuwait | | Jordan | ☐ Yes ☒ No |
| TABOU | SISTER | Kuwait | | Jordan | ☐ Yes ☐ No |
| EMD | BROTHER | Kuwait | | Jordan | ☐ Yes ☒ No |
| SUHAD | SISTER | Kuwait | | Jordan | ☐ Yes ☒ No |

**23. List your present and past membership in or affiliation with every organization, association, fund, foundation, party, club, society or similar group in the United States or in any other country or place, and your foreign military service** (If this does not apply write "N/A")

A. N/A _____ 19___ to 19___
B. _____ 19___ to 19___
C. _____ 19___ to 19___
D. _____ 19___ to 19___
E. _____ 19___ to 19___
F. _____ 19___ to 19___
G. _____ 19___ to 19___

**24. Have you ever, in or outside the United States:**

a) knowingly committed any crime for which you have not been arrested? ☐ Yes ☒ No

b) been arrested, cited, charged, indicted, convicted, fined, or imprisoned for breaking or violating any law or ordinance including traffic regulations? *Purchased stolen merchandise* ☒ Yes ☐ No

c) been the beneficiary of a pardon, amnesty, rehabilitation decree, other act of clemency or similar action? ☐ Yes ☒ No

If you answered Yes to (a), (b), or (c) give the following information about each incident

| | Date | Place (City) | (State/Country) | | Nature of offense | Outcome of case if any |
|--|------|--------------|-----------------|--|-------------------|------------------------|
| 1) | 1989 | JACKSONVILLE TX | USA | | SPEEDING | FINED |
| 2) | 1991 | PASADENA TX | USA | | RED LIGHT | FINED |
| 3) | 1991 | HOUSTON TX | USA | | EXPIRED TAGS NO AUTO INSURANCE | FINED |
| 4) | | | | | | |
| 5) | | | | | | |

**25. Have you ever received public assistance from any source, including the U.S. Government or any state, county, city or municipality?**

☐ Yes ☒ No   (If Yes, explain, including the name(s) and Social Security number(s) you used.)

**26. Do any of the following relate to you? (Answer Yes or No to each)**

A. Have you been treated for a mental disorder, drug addiction or alcoholism? ☐ Yes ☒ No

B. Have you engaged in, or do you intend to engage in, any commercialized sexual activity? ☐ Yes ☒ No

C. Are you or have you at any time been an anarchist, or a member of or affiliated with any Communist or other totalitarian party, including any subdivision or affiliate? ☐ Yes ☒ No

D. Have you advocated or taught, by personal utterance, by written or printed matter, or through affiliation with an organization

1) opposition to organized government? ☐ Yes ☒ No

2) the overthrow of government by force or violence? ☐ Yes ☒ No

3) the assaulting or killing of government officials because of their official character? ☐ Yes ☒ No

4) the unlawful destruction of property? ☐ Yes ☒ No

5) sabotage? ☐ Yes ☒ No

6) the doctrines of world communism, or the establishment of a totalitarian dictatorship in the United States? ☐ Yes ☒ No

E. Have you engaged in, or do you intend to engage in, prejudicial activities or unlawful activities of a subversive nature? ☐ Yes ☒ No

F. During the period beginning March 23, 1933, and ending May 8, 1945, did you order, incite, assist or otherwise participate in persecuting any person because of race, religion, national origin or political opinion, under the direction of, or in association with any of the following:

1) the Nazi government in Germany? ☐ Yes ☒ No

2) any government in any area occupied by the military forces of the Nazi government in Germany? ☐ Yes ☒ No

3) any government established with the assistance or cooperation of the Nazi government of Germany? ☐ Yes ☒ No

4) any government that was an ally of the Nazi government of Germany? ☐ Yes ☒ No

G. Have you been convicted of a violation of any law or regulation relating to narcotic drugs or marijuana, or have you been an illicit trafficker in narcotic drugs or marijuana? ☐ Yes ☒ No

H   Have you been involved in assisting any other aliens to enter the United States in violation of the law?    ☐ Yes  ☒ No

I   Have you applied for exemption or discharge from training or service in the Armed Forces of the United States on the ground of alienage and have you been relieved or discharged from that training or service?    ☐ Yes  ☒ No

J   Are you mentally retarded, insane, or have you suffered one or more attacks of insanity?    ☐ Yes  ☒ No

K   Are you afflicted with psychopathic personality, sexual deviation, mental defect, narcotic drug addiction, chronic alcoholism, or any dangerous contagious disease?    ☐ Yes  ☒ No

L   Do you have a physical defect, disease, or disability affecting your ability to earn a living?    ☐ Yes  ☒ No

M   Are you a pauper, professional beggar, or vagrant?    ☐ Yes  ☒ No

N   Are you likely to become a public charge?    ☐ Yes  ☒ No

O   Are you a polygamist or do you advocate polygamy?    ☐ Yes  ☒ No

③  P   Have you been excluded from the United States within the past year, or have you at any time been deported from the United States, or have you at any time been removed from the United States at government expense?  *Reinstated*    ☒ Yes  ☒ No

Q   Have you procured or have you attempted to procure a visa by fraud or misrepresentation?    ☐ Yes  ☒ No

R   Are you a former exchange visitor who is subject to, but has not complied with, the two-year foreign residence requirement?    ☐ Yes  ☒ No

S   Are you a medical graduate coming principally to work as a member of the medical profession, without passing Parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination)?    ☐ Yes  ☒ No

T   Have you left the United States to avoid military service in time of war or national emergency?    ☐ Yes  ☒ No

U   Have you committed or have you been convicted of a crime involving moral turpitude?    ☐ Yes  ☒ No

If you answered Yes to any question above, explain fully. (Attach a continuation sheet if necessary)

REINSTATE T- F1 TO D/S
TO ATTEND SJCC Hoa # 1449 Nov 04 1991

27. ☐ Completed Form G-325A (Biographic Information) is signed, dated and attached as part of this application. Print or type so that all copies are legible    ☐ Completed form G-325A (Biographic Information) is not attached because applicant is under 14 or over 79 years of age.

**Penalties:** You may, by law, be fined up to $10,000, imprisoned up to five years, or both, for knowingly and willfully falsifying or concealing a material fact or using any false document in submitting this application.

Your Certification

I certify, under penalty of perjury under the laws of the United States of America, that the above information is true and correct. Furthermore, I authorize the release of any information from my records which the Immigration and Naturalization Service needs to determine eligibility for the benefit that I am seeking.

Signature _____ Date 4-2-92 ___ Phone Number (713) 941-7054

Signature of Person Preparing Form if Other than Above

I declare that I prepared this document at the request of the person above and that it is based on all information of which I have any knowledge.

(Print Name) _____  (Address) _____  (Signature) _____  (Date) _____

G-28 ID Number _____

Stop Here                                    Volag Number _____

Applicant is not to sign the application below until he or she appears before an officer of the Immigration and Naturalization Service for examination.

I _____ the attached documents, that they are true to the best of my knowledge, and that corrections numbered ( 1 ) to ( 3 ) were made by me or at my request, and that I signed this application with my full, true name _____
swear (affirm) that I know the contents of this application that I am signing

_____ (Complete and true signature of applicant)

Signed and sworn to before me by the above named applicant at Houston, Tx on _____ (Month) (Day) (Year)

Mary Constantino
(Signature and title of officer)



Direct all responses by mail to the office listed below:
IMMIGRATION AND NATURALIZATION SERVICE
126 Northpoint Drive,
Houston, TX 77060
(281) 774-7421

FILE

U.S. Department of Justice
*Immigration and Naturalization Service*



Mohammad H. Abusadeh

**RNACS**
**Alien Number:** A 072 421 518
**Date:** October 17, 2000

### DECISION

On March 20, 2000, you appeared for an examination of your application for naturalization, which was filed in accordance with Section 316(A) of the Immigration and Nationality Act.

Pursuant to the investigation and examination of your application it is determined that you are ineligible for naturalization for the following reason(s):

#### See Attachment(s)

If you desire to request a review hearing on this decision pursuant to Section 336(a) of the Act, you must file a **request for a hearing** <u>within 30 Days</u> of the date of this notice. If no request for hearing is filed within the time allowed, this decision is final. A request for hearing may be made to the District Director, with the Immigration and Naturalization office, which made the decision, on Form N-336. **Request for Hearing on a Decision in Naturalization Proceedings under Section 336 of the Act, together with a <u>fee of $170</u>**. A brief or other written statement in support of your request may be submitted with the Request for Hearing.

Sincerely,

Richard Cravener
District Director

Form N-335

**EXHIBIT**

BC

Attachment(s) to Form N-335

Applicant: Mohammad H. Abusadeh
Application for Naturalization, Form N-400
Alien Number: A 072 421 518

Your application is hereby denied in accordance with the Title 8 Code of Federal Regulations
Section(s) listed below:

Reason:              Poor Moral Character
8CFR Reference:      Part 316 General Requirements for Naturalization
                     Section 316.10 Good Moral Character

On  August 13, 1997, you applied for naturalization under Section 316(a) of the Immigration and
Nationality Act, as amended, herein the Act.  On March 20, 2000, you were interviewed by an officer of
the Immigration and Naturalization Service, herein the Service, to determine your eligibility for
naturalization. During your interview, you admitted that you had been arrested 2 (two) times. Subsequent
to your interview, you submitted records confirming the following record:

| Arrest Date | Charge | Disposition |
|---|---|---|
| 08/05/1992 | Theft | **5 Years Deferred Adjudication, 5 Yr Probation** |
| 09/04/1992 | Injury to a Child | **5 Years Deferred Adjudication, 5 Yr Probation** |

On October 8, 1996, the 230th District Court of Harris County, Texas granted the Probation Office a
Motion to Adjudicate Guilt because you failed to comply with the conditions of probation and
issued an Alias Capias for your arrest.  On January 15, 1997, the 230th District Court granted a
Motion to Dismiss the Motion to Adjudicate and your probation was terminated.  You were
granted unsatisfactory termination of probation per order of the court.  You failed to successfully
complete your probation of five years and you were on probation from October 9, 1992 to January
15, 1997, a period of over 4 (four) years, during the statutory period.

Title Code of Federal Regulations, Section 316.10(a)(2) says, in part, that the Service is not limited to
reviewing the applicant's conduct during the five years immediately preceding the filing of the
application, but may take into consideration, as a basis for its determination, the applicant's conduct and
acts at any time prior to that period, if the conduct of the applicant during the statutory period does not
reflect that there has been reform of character from an earlier period or if the earlier conduct and acts
appear relevant to a determination of the applicant's present moral character.

The Service finds that your record of 2 (two) arrests, one of which occurred within the statutory period,
fails to support a finding of good moral character as could reasonably be defined by the standards of the
community.

The Service concludes that you failed to establish the requisite good moral character. Therefore, your
application must be and hereby is denied.

UNITED STATES DISTRICT COURT
DISTRICT OF THE DISTRICT OF COLUMBIA

MOHAMMAD ABUSADEH, )
)
Plaintiff, )
)
v. )                 Case No.:  1:06-cv-2014
)                 A No.:  072 421 518
MICHAEL CHERTOFF, et al., )
)
Defendants. )

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)      I am currently the Section Chief of the National Name Check Program

Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C.

I have held that position since March 7, 2005.

(2)      In my current capacity as Section Chief, I supervise the National Name

Check Units.  The statements contained in this declaration are based upon my personal

knowledge, upon information provided to me in my official capacity, and upon conclusions and

determinations reached and made in accordance therewith.

(3)      Due to the nature of my official duties, I am familiar with the procedures

followed by the FBI in responding to requests for information from its files pursuant to the policy

and the procedures of the United States Citizenship and Immigration Services ("USCIS").

Specifically, I am aware of the name check request for Mohammad Abusadeh, the plaintiff in this

civil action.

## NATIONAL NAME CHECK PROGRAM

(4)      The National Name Check Program ("Program") has the mission of

disseminating information from the FBI's Central Records System in response to requests

submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign

police and intelligence agencies, and state and local criminal justice agencies.  The Central



EXHIBIT

1   Records System ("CRS") contains the FBI's administrative, personnel, and investigative files.

2   The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower

3   Administration. That executive order addresses personnel security issues and mandates National

4   Agency Checks as part of the pre-employment vetting and background investigation process for

5   prospective Government employees. The FBI performs the primary National Agency Check

6   conducted on all United States Government employees. From this modest beginning, the

7   Program has grown exponentially, with more and more customers seeking background

8   information from FBI files on individuals before bestowing a privilege, such as Government

9   employment or an appointment, a security clearance, attendance at a White House function, a

10  "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and

11  local agencies regularly request FBI name searches. In addition to serving our regular

12  Government customers, the FBI conducts numerous name searches in direct support of the FBI's

13  counterintelligence, counterterrorism, and homeland security efforts.

14                    **EXPLANATION OF THE CENTRAL RECORDS SYSTEM**

15          (5)    The FBI's CRS enables the FBI to maintain all information which it has

16  acquired in the course of fulfilling mandated law enforcement responsibilities. The records

17  maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

18  compiled for law enforcement purposes. This system consists of a numerical sequence of files

19  broken down according to subject matter. The subject matter of a file may relate to an

20  individual, organization, company, publication, activity, or foreign intelligence matter. Certain

21  records in the system are maintained at FBI Headquarters. Records which are pertinent to

22  specific FBI Field Offices are mostly maintained at those Field Offices.

23          (6)    FBI Headquarters and each Field Division can access the CRS through the

24  FBI's General Indices. The General Indices are arranged in alphabetical order and consist of

25  indices on various subjects, including the names of individuals and organizations. Only the

26  information considered pertinent, relevant, or essential for future retrieval is indexed.

27

28

1

(7)     Communications directed to FBI Headquarters from various Field Offices

2 and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals,

3 groups, or organizations which are listed in the case captions or titles as subjects, suspects, or

4 victims. Searches made in the index to locate records concerning particular subjects are made by

5 searching the name of the subject requested in the index.

6

(8)     The entries in the General Indices fall into two categories:

7

(a)     "main" entries – entries that carry the name corresponding
with the subject of a file contained in the CRS.

8

9

(b)     "reference" entries – entries (sometimes called "cross-
references") that generally only mention or reference an
individual, organization, etc., that is contained in a
document located in another "main" file.

10

11

(9)     In 1995, the FBI implemented the Automated Case Support ("ACS")

12 system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records

13 were converted from automated systems previously utilized by the FBI. The ACS system

14 consists of the following three automated applications that support case management functions

15 for all investigative and administrative cases:

16

(a)     Investigative Case Management:  This application provides
the ability to open, assign, and close investigative and

17 administrative cases as well as to set, assign, and track
leads.  A case is opened by the Office of Origin, which sets

18 leads for itself and other field offices, as needed.  The
offices that receive the leads are referred to as Lead Offices.

19 When a case is opened, it is assigned a Universal Case File
Number, which is utilized by FBI Headquarters and all

20 offices conducting or assisting in the investigation.  Using
fictitious file number "111-HQ-12345" as an example, an

21 explanation of the Universal Case File Number is as
follows: "111" indicates the classification for that specific

22 type of investigation; "HQ" is the abbreviated form used for
the Office of Origin of the investigation (in this case, FBI

23 Headquarters); and "12345" indicates the individual case
file number for that particular investigation.

24

(b)     Electronic Case File:  This application serves as the central

25 electronic repository for the FBI's official text-based
documents.  It supports the universal serial concept, where

26 only the creator of a document serializes it into a file,
providing single source entry of serials into the

27

28

3

computerized system.  All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

©)    Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases.  Only the Office of Origin is required to index.  However, the Lead Offices may index additional information as needed.  The Universal Index, which consists of an index of approximately 96.4 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases.  Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters.  The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval.  Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved.  The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes.  Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index.  The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference.  As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation.  For example, "references" include associates, witnesses, or conspirators.  Additionally, there may be a myriad of other

4

reasons to explain why an F.. Special Agent conducting an investigat.. believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)    If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a birth date or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)    Historically, approximately 68 percent of the name checks submitted by USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)    For the name check requests that are still pending after the initial electronic check, additional review is required. A secondary manual name search completed within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper

5

record. Review of this infor...ion will determine whether the inform...n is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(15)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

## GROWTH OF THE NAME CHECK PROGRAM

(16)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

## USCIS NAME CHECK REQUESTS

(17)    In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(18)    In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality

Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests.

(19)    The FBI's processing of those 440,000 resubmissions has delayed the processing of regular submissions from USCIS. As directed by USCIS, the FBI processes name check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check be expedited.

(20)    The FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of priority checks the analyst must process for, among others, military call-ups, medical emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When results of a name check are available, the FBI provides them to USCIS as quickly as possible.

(21)    It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

7

PLAINTIFF'S NAME CHECK REQUEST.

(22)   The name check request for plaintiff Mohammad Abusadeh was received by the FBI from USCIS on or about April 28, 2004, and has not been completed.  The FBI is performing its check in response to USCIS's request in accordance with the procedures outlined above.  The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(23)   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _15_ day of February 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

8

Home  Contact Us  Site Map  FAQ

Search

Advanced Search

| Services & Benefits | Immigration Forms | Laws & Regulations | About USCIS | Education & Resources | Press Room |

U.S. Citizenship and Immigration Services

| Print This Page | Back |

## U.S. Citizenship and Immigration Services
## Houston TX Processing Dates
### Posted March 15, 2007

**Notice:** U.S. Citizenship and Immigration Services (USCIS) has improved the reporting procedure for processing times of immigration benefit applications. In the past, USCIS benefit processing reports indicated the specific type of applications or petitions that were being processed and the date the cases were received. However, the date the case was received did not provide a clear indication of when USCIS expected to complete the case, nor did it provide a clear indication of USCIS' commitment to process cases within a certain cycle time. It also did not align with the processing times and cycle times the agency reports in other contexts.

This improved reporting procedure is an effort to give our customers more accurate information that better reflects current processing time and USCIS service level commitments. Effective immediately, when we are completing applications and petitions within our service level goals we will report that as the processing time. For example, when our service level goal is to process a particular kind of case within six months, and if our processing time is six months or less, we will show a date consistent with our service level goal because that reflects our commitment.

When we are not meeting our service level goal, the date posted will reflect the filing date of cases that are being completed. It should be noted that while in some instances reported processing dates may appear to have regressed due to this change, they do not reflect a lengthening of USCIS processing times, but simply the change in reporting. Our goal is to provide accurate projections and thus give customers clear expectations as to what they can expect as a processing time.

**There are several important exceptions to the processing times shown below:**

- Case processing will be delayed if we must ask you for more evidence or information. If we ask for missing required initial evidence, count the processing time from when we receive that missing evidence.
- The case processing timeframe will start over if a customer doesn't appear for an interview or asks that it be rescheduled.

**What if I have a problem or have questions about a case?**





We offer a variety of services after you file. For example, for most kinds of cases you can check the status of your case online.

For more information about when and how to contact us, whether your case is outside our processing time or if there are other issues, please see our fact sheet –

Case Services - How do I... know what kind of services are available to me after I file my application or petition?

One additional point about these projections. They are the time to complete processing and mail the actual notice and/or document. If you check case status online and see that your case has been approved, and you haven't yet received your approval notice or document in the mail, we ask that you wait thirty days from the approval date before contacting us. That is because it may take that long before it is returned to us as undeliverable. You can also print the case status online answer for your records.

District Office Processing Dates for **Houston TX** Posted March 15, 2007

| Form | Form Name | Now Processing Cases with Receipt Notice Date of: |
|------|-----------|---------------------------------------------------|
| I-131 | Application for Travel Documents | December 13, 2006 |
| I-485 | Application to Register Permanent Residence or Adjust Status | September 13, 2006 |
| I-600 | Petition to Classify Orphan as an Immediate Relative | September 15, 2006 |
| I-600A | Application for Advance Processing of Orphan Petition | September 15, 2006 |
| I-765 | Application for Employment Authorization | December 27, 2006 |
| N-400 | Application for Naturalization | August 12, 2006 |
| N-600 | Application for Certification of Citizenship | July 22, 2006 |

Print This Page    Back

**04-25-2007 05:48 PM EDT**

Home  Contact Us  Privacy Policy  Website Policies  NoFEAR  Freedom Of Information Act  FirstGov

U.S. Department of Homeland Security



*Embassy of the United States of America*

Hashemite Kingdom of Jordan  )

                             )

Governorate of Amman   )

                             )

Amman                 )    ss:

                             )

Embassy of the         )
United States of America )

The U.S. Embassy accepts no responsibility for the veracity of the assertions and information contained in this document.

I certify that the official named below, whose true signature and official seal are, respectively and affixed to the annexed document, was, on this day, empowered to act in the official capacity designated in the annexed document, to which faith and credit are due.

*Mr. Abdel Fattah Dabbas*
Name of official (Ministry of Foreign Affairs)



Rena Bitter
Consul of the United
States of America

‒ 6 MAR 2007
Date

(Seal)

EXHIBIT

H

جبل الحسين – مجمع سكينة التجاري
المدخل الشرقي – الطابق الاول
مكتب رقم ١٠

دار الترجمة

**TRANSLATION HOUSE**

DAR UTTARJAMA

تلفاكس ٥٦٨٩٤٥٩ (٦-٩٦٢+)
تلفـون ٥٦٥٨٦٠٤ (٦-٩٦٢+)
(للمراسلات فقط ص.ب ٣٤٣ الزرقاء ١٣١١٠ الاردن)

translationh@nets.com.jo :البريد الالكتروني

THE HASHEMITE KINGDOM OF JORDAN
MINISTRY OF INTERIOR
CIVIL STATUS & PASSPORTS DEPARTMENT
CAPITAL'S GOVERNORATE
MARKA OFFICE

### DEATH CERTIFICATE

NO. OF CERTIFICATE : 11006/003
NATIONAL NO. : D-9362005946
NAME IN FULL : MAHDIEH
SEX : FEMALE
NATIONALITY : JORDANIAN
RELIGION : MUSLIM
PLACE OF BIRTH : ILLAR/ TULKARM
DATE OF BIRTH : 25/5/1936
PLACE OF DEATH : AMMAN/CAPITAL
TIME OF DEATH : FOUR O'CLOCK
DATE OF DEATH : 7/1/2005 (SEVENTH JANUARY TWO THOUSAND
AND FIVE AD.)

**PARTICULARS OF PARENTS:**

FATHER'S NAME : AZZAM
GRANDFATHER'S NAME : FARES
FAMILY NAME : ABU SADA
MOTHER'S NAME : FATIMAH NIMR ABU SADA
OFFICE OF EVENT : MARKA
NO. OF EVENT : 11/347
CIVIL ENTRY : MARKA,
DATE : 10/1/2005
NAME AND SIGNATURE
OF EMPLOYEE : MARIAM AL-KHATIB (SIGNED)
NAME OF REGISTRAR : SALMAN AL-QDAH (SIGNED)

(OFFICIAL SEAL)

TRANSLATION HOUSE
(DAR UTTARJAMA)
O. T. MESLIH
5th MARCH 2007



*Embassy of the United States of America*

Hashemite Kingdom of Jordan  )

)

Governorate of Amman   )

)

Amman                          )    ss:

)

Embassy of the                 )
United States of America )


The U.S. Embassy accepts no responsibility for the veracity of the assertions and information contained in this document.

I certify that the official named below, whose true signature and official seal are, respectively and affixed to the annexed document, was, on this day, empowered to act in the official capacity designated in the annexed document, to which faith and credit are due.

Mr. Ahmad Izzmagnah
Name of official (Ministry of Foreign Affairs)

Rena Bitter
Consul of the United
States of America

– 6 MAR 2007
Date

(Seal)



EXHIBIT
I

المدخل الشرقي – الطابق الأول
مكتب رقم ١٠
تلفاكس ٥٦٨٩٤٥٩ (٩٦٢-٦+)
تلفــون ٥٦٥٨٦٠٤ (٩٦٢-٦+)
(للمراسلات فقط ص.ب ٣٤٣ الزرقاء ١٣١١٠ الاردن)
translationh@nets.com.jo البريد الإلكتروني

**TRANSLATION HOUSE**
DAR UTTARJAMA

دار الترجمة

...lex
...oor,
...9459
...5658604
...dence Only
...arka 13110 ,Jordan )
...slationh@nets.com.jo

<u>In The Name of Allah, The Merciful, The Compassionate</u>

# **MEDICAL REPORT**

Al-Husain Medical Center
Queen Rania Al-Abdullah Center / Patients Affairs

Name : **Hafeth Mohammad Faris**
No.    : 124141
Rank : Civil
Date  : 17/12/2006

The above mentioned is suffering from prostate hypertrophy and he is in need of follow up and treatment.

This report has been given upon his request.

| (Signed) | (Signed) | (Signed) |
|---|---|---|
| Civil Physician | Brigadier Physician | Brigadier Physician |
| Surgery Resident | Sr. Consultant/ Nephrology | Director of Queen Rania |
| of Urinary Tract | & Transplant of Organs Surgery | Al-Abdullah Center for |
| Mazen Karamah | Zahran Taleb Budair | Nephrology & Tranplant of |
| | | Organs Surgery |
| | | Khalaf Mansour Al-Jader |



<u>بسم الله الرحمن الرحيم</u>
*تقرير طبي*

مدينة الحسين الطبيـــــــــــــة
مركز الملكة رانيا العبدالله /شؤون المرضى
الاسم : حافظ محمد فارس
الرقم : ١٢٤١٤١
الرتبه: مدني
التاريخ : ٢٠٠٦/١٢/١٧

المذكور اعلاه يعاني من تضخم غدة البروستات وهو بحاجة للمتابعة والعلاج .

اعطي التقرير بناءاً على طلبه



عميد طبيب
مدير مركز الملكة رانيا العبدالله
لجراحه الكلى وزراعه الاعضاء
خلف منصور الجادر

عميد طبيب
مستشار/١ جراحه الكلى والمسالك
طالب بديـــر

طبيب مدني
مقيم جراحه المسالك
مازن كرامة

المملكة الاردنية الهاشمية
وزارة الصحة
مصدق
صورة طبق الاصل